**14-1141**

In the

# UNITED STATES COURT OF APPEALS

### for the Federal Circuit

• ━━━━━━━━━━━━━━━━━━━━━ •

BRISTOL-MYERS SQUIBB COMPANY AND BRISTOL-MYERS SQUIBB PHARMA CO.,

*Plaintiffs/Counterclaim Defendants-Appellees,*

MERCK & CO., INC. AND MERCK SHARP & DOHME CORP.,

*Counterclaim Defendants-Appellees*

— v. —

MYLAN PHARMACEUTICALS INC. AND MATRIX LABORATORIES LTD.,

*Defendants/Counterclaimants-Appellants*

————————

On Appeal from the United States District Court of Delaware
Case No. 09-cv-00651, Judge Leonard P. Stark

---

**Brief for Defendants/Counterclaimants-Appellants
Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd.
Nonconfidential**

---

David R. Marriott
David Greenwald
David J. Kappos
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
*Attorneys for Defendants/
   Counterclaimants-Appellants*

February 3, 2014

**Form 9**

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Bristol-Myers Squibb Company    v.    Mylan Pharmaceuticals Inc.

No. 14-1141

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd.    certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Mylan Pharmaceuticals Inc. and Mylan Laboratories Ltd. f/k/a Matrix Laboratories Ltd. are the real parties in interest.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The majority of the stock of Mylan Laboratories Ltd. f/k/a Matrix Laboratories Ltd. is owned by wholly-owned indirect subsidiaries of Mylan Inc. No other publicly held company owns 10 percent or more of the stock of Mylan Laboratories Ltd. Mylan Pharmaceuticals Inc. is a wholly-owned direct subsidiary of Mylan Inc. No parent corporation or publicly held company owns 10 percent or more of the stock of Mylan Inc.

4.    ☑    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Mary B. Matterer and Richard K. Herrmann of Morris James LLP and Timothy K. Kratz, Robert Florence, George J. Barry III, Karen L. Carroll, Micheal L. Binns, Anil H. Patel, and Marcus A. Barber of McGuire Woods LLP appeared on behalf of Mylan Pharmaceuticals Inc. and/or Matrix Laboratories Ltd. in the District of Delaware action. David R. Marriott, David Greenwald, and David J. Kappos of Cravath, Swaine & Moore LLP will appear on behalf of Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd. in this court.

February 3, 2014
_____
Date

/s/ David R. Marriott
_____
Signature of counsel

David R. Marriott
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

# Table of Contents

<u>Confidential Material Omitted</u>

The material omitted on page 60 describes x-ray powder diffraction characteristics of the efavirenz in Mylan's ANDA product.

Page

Table of Authorities ........................................................................ iv

Statement of Related Cases ............................................................. 1

Jurisdictional Statement ................................................................. 2

Statement of Issues ......................................................................... 3

Statement of the Case ..................................................................... 4

Statement of Facts .......................................................................... 7

    A.    Technical Background ................................................... 7

        1.    Polymorphism ................................................... 7

        2.    The Identification and Characterization of Polymorphs ..................................................... 9

        3.    The Preparation of Polymorphs ...................... 14

    B.    The Merck Prior Art Patent (the "'729 Patent") .......... 16

    C.    The First Efavirenz Form 5 Experiments ................... 19

        1.    The Appearance of Form 5 ............................... 19

        2.    The Inventor's Attempts to Reproduce the Synthesis of Form 5 ............................................. 20

    D.    The Patent-in-Suit (the "'372 Patent") ........................ 23

        1.    The Prosecution of the '372 Patent ................. 23

2. The Disclosure of the '372 Patent ......................................28

E. The Asserted Claim ..............................................................31

1. XRPD Peak Limitations ......................................................31

2. DSC Peak Limitation ..........................................................32

Summary of the Argument ..................................................................33

Argument..............................................................................................38

I. Claim 18 Is Invalid for Lack of Enablement. .........................38

A. Proceedings Below ..............................................................38

B. Legal Standard ....................................................................39

C. The '372 Patent Fails to Teach Any Method of Making
Form 5 That May Be Practiced by One Who Does Not
Already Possess Form 5. .....................................................40

1. The '372 Patent Does Not Disclose How To Obtain a
Necessary Starting Material — Form 5 Seeds — or
Conditions Under Which Form 5 Can Be Prepared
Without Seeds.......................................................................41

2. The Inventor's Experiments Attempting To
Reproduce Form 5 Support a Finding That Form 5
Cannot Be Made Reliably Without Seeding.....................43

3. Even Assuming the Patent-in-Suit Enables the
Preparation of Form 5, It Does Not Enable the Full
Scope of Claim 18, Which Encompasses Many Other
Polymorphs. ........................................................................47

II. Claim 18 Is Invalid Because the Invention Is Not Adequately
Described. .................................................................................51

A. Proceedings Below ..............................................................51

B.      Legal Standard .................................................................52

C.      The Patent-in-Suit Does Not Demonstrate the Inventor's
        Possession of Form 5 or the Full Scope of Claim 18. .................53

        1.      The Patent-in-Suit Does Not Clearly Disclose Form
                5...................................................................................53

        2.      The Incomplete Disclosure of Form 5 Creates the
                Potential for Improperly Sidestepping Prior Art and
                for Patent "Evergreening." ..................................................58

III.    Claim 18 Is Invalid Because It Is Indefinite. ..........................................61

A.      Proceedings Below .........................................................61

B.      Legal Standard ................................................................62

C.      Claim 18 Is Too Ambiguous To Permit a Person of
        Ordinary Skill To Determine Which Form or Forms of
        Efavirenz Are Within Its Scope. ...................................................63

        1.      As Drafted, Claim 18 Does Not Distinguish Form 5
                From Other Polymorphs. .....................................................63

        2.      The Practical Consequences of the Indefiniteness of
                Claim 18 Are Serious. ..........................................................69

IV.     Claim 18 Is Inherently Anticipated by Form III, a Crystal Form
        Invented and Patented by Merck. ..........................................................70

A.      Proceedings Below .........................................................70

B.      Legal Standard ................................................................71

C.      Form III of the Prior Art '729 Merck Patent Has the X-Ray
        Powder Diffraction and Differential Scanning
        Calorimetry Peaks Required by Claim 18. ...............................72

Conclusion ...................................................................................................79

iii

# Table of Authorities

**Page(s)**

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.,*
    725 F.3d 1315 (Fed. Cir. 2013) ....................................................................34

*AK Steel Corp. v. Sollac,*
    344 F.3d 1234 (Fed. Cir. 2007) ...................................................39, 43, 45, 47

*Amgen, Inc. v. Chugai Pharm. Co.,*
    927 F.2d 1200 (Fed. Cir. 1991) ..............................................................40, 70

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
    598 F.3d 1336 (Fed. Cir. 2010) (en banc)............................................ passim

*Ass'n for Molecular Pathology v. USPTO,*
    467 Fed. App'x 890 (Fed. Cir. 2012)............................................................62

*Atlas Powder Co. v. Ireco Inc.,*
    190 F.3d 1342 (Fed. Cir. 1999) ......................................................71, 72, 76

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.,*
    501 F.3d 1274 (Fed. Cir. 2007) ........................................................42, 43, 47

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
    715 F.3d 891 (Fed. Cir. 2013), *cert. granted,* 2014 WL 92363
    (U.S. Jan. 10, 2014)................................................................................35, 62

*Carnegie Mellon Univ. v. Hoffmann-LaRoche Inc.,*
    541 F.3d 1115 (Fed. Cir. 2008) ........................................................33, 53, 58

*In re Collier,*
    427 F.2d 831 (C.C.P.A. 1970) ......................................................................40

*In re Cruciferous Sprout Litig.,*
    301 F.3d 1343 (Fed. Cir. 2002) ....................................................................71

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005) ....................................................................33

*Enzo Biochem, Inc. v. Calgene, Inc.,*
188 F.3d 1362 (Fed. Cir. 1999) ........................................... passim

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
323 F.3d 956 (Fed. Cir. 2002) .....................................56, 57, 58

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
117 F. 3d 1385 (Fed. Cir. 1997)...........................................63

*Genentech, Inc. v. Novo Nordisk A/S,*
108 F.3d 1361 (Fed. Cir. 1997) .....................................39, 43

*Gillespie v. Dywidag Sys. Int'l, USA,*
501 F.3d 1285 (Fed. Cir. 2007) ........................................72

*Gillette Co. v. Energizer Holdings, Inc.,*
405 F.3d 1367 (Fed. Cir. 2005) ........................................26

*Halliburton Energy Servs. v. M-I LLC,*
514 F.3d 1244 (Fed. Cir. 2008) ........................................ passim

*In re Howarth,*
654 F.2d 103 (C.C.P.A. 1981) ..........................................40

*LizardTech, Inc. v. Earth Res. Mapping, Inc.,*
424 F.3d 1336 (Fed. Cir. 2005) .....................................33, 50

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.,*
687 F.3d 1377 (Fed. Cir. 2012) ........................................51

*Nat'l Recovery Techs. v. Magnetic Separation Sys.,*
166 F.3d 1190 (Fed. Cir. 1999) .....................................34, 39

*In re Nomiya,*
509 F.2d 566 (C.C.P.A. 1975) ..........................................78

*In re Omeprazole Patent Litig.,*
483 F.3d 1364 (Fed. Cir. 2007) ........................................76

*Permutit Co. v. Graver Corp.,*
284 U.S. 52 (1931)..........................................................69

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,*
    491 F.3d 1342 (Fed. Cir. 2007) .......................................................78

*Purdue Pharma L.P. v. Faulding Inc.,*
    230 F.3d 1320 (Fed. Cir. 2000) .......................................................59

*Regents of Univ. of Cal. v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997) ...........................................53, 56, 57

*Schering Corp. v. Geneva Pharms., Inc.,*
    339 F.3d 1373 (Fed. Cir. 2003) ...........................................72, 76, 77

*Sitrick v. Dreamworks, LLC,*
    516 F.3d 993 (Fed. Cir. 2008) .............................................40, 47, 51

*SmithKline Beecham Corp. v. Apotex Corp.,*
    403 F.3d 1331 (Fed. Cir. 2005) ...........................................71, 76, 77

*Springs Window Fashions L.P. v. Novo Indus., L.P.,*
    323 F.3d 989 (Fed. Cir. 2003) .........................................................78

*Standard Oil Co. v. Am. Cyanamid Co.,*
    774 F.2d 448 (Fed. Cir. 1985) .........................................................45

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
    537 F.3d 1357 (Fed. Cir. 2008) .......................................................64

*Tyler Refrigeration v. Kysor Indus. Corp.,*
    777 F.2d 687 (Fed. Cir. 1985) .........................................................73

*Union Pac. Res. Co. v. Chesapeake Energy Corp.,*
    236 F.3d 684 (Fed. Cir. 2001) .....................................................62, 63

*United Carbon Co. v. Binney & Smith Co.,*
    317 U.S. 228 (1942).........................................................................70

*In re Vaeck,*
    947 F.2d 488 (Fed. Cir. 1991) .....................................................40, 50

*Vas-Cath Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991) .....................................................52, 53, 63

*In re Wallach,*
    378 F.3d 1330 (Fed. Cir. 2004) ....................................................................56

**Statutes & Rules**

21 U.S.C. § 355 .................................................................................................4

28 U.S.C. § 1295 ...............................................................................................2

28 U.S.C. § 1331 ...............................................................................................2

28 U.S.C. § 1338 ...............................................................................................2

28 U.S.C. § 2201 ...............................................................................................2

28 U.S.C. § 2202 ...............................................................................................2

35 U.S.C. § 102 ...............................................................................................18

35 U.S.C. § 112 ....................................................................................... passim

35 U.S.C. § 132 ...............................................................................................25

**Statement of Related Cases**

No other appeal in or from the same action in the district court was previously before any appellate court.

No other case is pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## Jurisdictional Statement

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201-02.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a). This appeal is taken from the Final Judgment Order, entered November 5, 2013, disposing of all parties' claims. Defendants/ Counterclaimants-Appellants filed their Notice of Appeal on December 3, 2013.

## Statement of Issues

I.    *Enablement*:  Whether the district court erred in finding that the claimed crystal form is enabled by a specification that discloses methods of making that crystal that can be practiced only by persons who already possess that same crystal form.

II.    *Written Description*:  Whether the district court erred in finding that a specification that fails to describe features of the claimed crystal form required to characterize that form and to distinguish it from other forms demonstrates that the inventor possessed his invention at the time he sought to patent it.

III.    *Definiteness*:  Whether the district court erred in finding sufficiently definite a claim to a single crystal form whose language nonetheless encompasses many other crystal forms, including forms previously claimed in other patents, as well as forms not yet invented.

IV.    *Inherent Anticipation*:  Whether the district court erred in rejecting Mylan's showing that the asserted claim is inherently anticipated by Merck's prior art crystal form that is the same as a crystal form that meets all the limitations of the asserted claim.

## Statement of the Case

This suit arises from the filing of Abbreviated New Drug Application No. 91-471 ("ANDA") by Matrix Laboratories Ltd. (collectively with its U.S. sister company, Mylan Pharmaceuticals Inc. (A144-45), "Mylan") seeking approval to market a generic efavirenz tablet product in the United States.  (A146-47; A1321-22 ¶¶ 33-34.)  Bristol-Myers Squibb Co. (collectively with its subsidiary, Bristol-Myers Squibb Pharma Co., "BMS") holds New Drug Application No. 21-360, which relates to its "Sustiva" efavirenz tablets.  (A107 ¶ 2; A111 ¶ 18.)

In conjunction with filing its ANDA, Mylan filed a certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) ("Paragraph IV certification") that two patents listed in the Sustiva Orange Book entry (A1319 ¶¶ 13, 18) are invalid, unenforceable, and will not be infringed by Mylan's generic efavirenz product.  (A1322 ¶ 35.)  These two patents, United States Patent Nos. 6,639,071 (the "'071 patent") and 6,939,964 (the "'964 patent"), are assigned to Merck Sharp & Dohme Corp. (collectively with their previous assignee, Merck & Co., Inc., "Merck").   (A1319-20 ¶¶ 15, 20.)

On August 28, 2009, BMS sued Mylan alleging that, by filing its ANDA, Mylan infringed a third patent, United States Patent No. 6,673,372

4

(the "'372 patent," or the "patent-in-suit"), assigned to BMS.  (A107-14.)  In its Amended Answer to the Complaint, Mylan counterclaimed for a declaratory judgment of invalidity and non-infringement of the '372 patent.  (A160-62.)  At the same time, Mylan counterclaimed for a declaratory judgment of invalidity and non-infringement of the '071 and '964 patents, the subjects of its Paragraph IV certification, and named Merck as an additional counterclaim-defendant.  (A162-63.)

On May 16, 2012, the district court issued a Memorandum Opinion and Order regarding claim construction.  (A1211-29.)

On January 11, 2013, shortly before trial, the district court entered a declaratory judgment in favor of Mylan with respect to Merck's '071 and '964 patents, consistent with the parties' joint stipulation that Mylan's ANDA product would not infringe these two patents.  (A1781-83.)

Between January 22 and January 29, 2013, the district court held a five-day bench trial, in which BMS and Mylan litigated the infringement and validity of claim 18 of the '372 patent (the "asserted claim").  (*See* A74.)

On September 30, 2013, the district court ruled in favor of BMS.  (A3-39.)

5

On November 5, 2013, the district court entered final judgment ordering that the effective approval date of Mylan's ANDA shall be no earlier than the date of expiration of the patent-in-suit and permanently enjoining the manufacturing, using, offering to sell, or selling within the United States, or importing into the United States, of Mylan's generic efavirenz product during the term of the patent-in-suit.  (A1-2.)

**Statement of Facts**

At issue in this case is the validity of claim 18 of the '372 patent, which covers a crystal form of efavirenz known as "Form 5." (A103.)  As discussed below, "Form 5" is characterized, according to claim 18, by an x-ray powder diffraction ("XRPD") pattern with six or more of a group of eleven 2θ values (or "peaks") and a differential scanning calorimetry ("DSC") thermogram having a peak at about 108° to about 110° C.  (A103; A106.)

### A.   Technical Background

#### 1.   Polymorphism

When a compound (*e.g.*, efavirenz) exists as a solid, individual molecules of that solid compound can be arranged in various ways. (A1956-57 at 321:17-322:17; A9454.)  If the molecules are organized in an essentially uniform pattern, the material is "crystalline."  (*Id.*)  A crystalline compound can exist in multiple forms, just as a snowflake can exist in multiple shapes.  (A1910 at 141:2-13; A1957 at 322:13-17; A9377; A9454.) These different crystalline forms are known as "polymorphs."  (A1957 at 322:21-323:5; A9377; A9454.)  Each polymorph of a particular compound

features a different spatial arrangement of its molecules.  (A1910 at 141:2-13; A1957 at 322:21-323:5; A9377; A9454.)

The unique spatial arrangement that distinguishes one polymorph from another can also confer distinctive properties upon each.  (A1910-11 at 141:23-142:3; A1957 at 323:6-15; A9377; A9454.)  For example, although two polymorphs may be composed of the same molecules, they can have different melting points, stabilities, and/or water solubilities.  (A1911 at 142:7-144:10; A1957 at 323:6-15; A9377.)  But such properties, although a product of the polymorphic structure, do not always distinguish one polymorph from another because polymorphs can share the same, or very similar, properties.  (*See* A2039 at 509:4-511:8.)

Under a given set of conditions (pressure, temperature, etc.), there exists one polymorph that is the most thermodynamically stable, meaning it is the lowest-energy crystalline form.  (A1911 at 144:16-19; A2082 at 651:18-652:15.)  But less thermodynamically stable polymorphs may nevertheless be highly stable under the same conditions.  (A2072 at 609:4-611:5; A2082 at 650:6-651:17.)  These are known as "metastable" or "kinetically stable" polymorphs, and under some circumstances, they may be more likely to form than a more thermodynamically stable polymorph.

8

(A2072 at 609:4-611:5; A2118 at 796:4-17.)  When a reaction or preparation results in a metastable polymorph, this polymorph may convert, over time, to a more thermodynamically stable polymorph, the component molecules rearranging to a lower-energy state.  (A1911 at 144:11-23.)  But whether this conversion is observable will depend on the rate of conversion, which may be measured in minutes, days, years, or millennia.  (A2072 at 609:4-611:12.)  For example, graphite, a crystal form of carbon, is more thermodynamically stable than diamond, a distinct crystal form of carbon, but the spontaneous conversion of diamond to graphite is not observed.  (*Id.*)

> 2.    The Identification and Characterization of Polymorphs
>
> a.    X-Ray Powder Diffraction ("XRPD")

XRPD is a characterization tool that can detect, and whose measurements reflect, differences in the molecular arrangement of distinct polymorphs.  (A1912 at 147:11-17; A1957-58 at 325:10-327:19; A9377-78; A9456-57.)  XRPD detects and measures these differences by directing x-rays at a powder sample of the compound of interest, and detecting how the radiation reflects (or "diffracts") from the sample.  (A1912 at 146:11-147:3; A1957 at 324:24-325:2; A9377; A9456-57.)  An x-ray source in the

XRPD instrument (known as a "diffractometer") directs x-rays at the sample from a range of angles (known as θ or "theta" values), while at the same time a detector moves in tandem with the x-ray source, measuring the amount of radiation emerging from the sample at the same angle or θ value.  (A1912 at 146:11-147:3, 148:17-149:12; A1957 at 324:24-325:9; A9456.)  The resulting XRPD "diffractogram" displays the amount of radiation detected as a function of 2θ, the sum of the x-ray source angle and the detector angle.  (A1912-13 at 149:8-150:23; *see* Figure 1.)



**Figure 1.  XRPD Diffractometer (A10125).**

The reflected x-ray radiation produces a diffraction pattern that is particular to each sample.  (A1913-14 at 153:10-154:4; A1957-58 at 324:11-328:20; A9378.)  Differences in the amount of radiation detected at different

2θ angles results in an XRPD pattern displaying a number of "peaks" of varying intensity.   (A1913 at 150:2-23; A1957-58 at 324:11-328:20; A9378; *see* Figure 2.)  The intensity of these peaks is a function of the arrangement and composition of atoms within the polymorph's unit cell, whereas the 2θ angle at which each peak appears is a function of the size and shape of the polymorph's unit cell.  (A1958 at 326:12-327:19; A9457.)



**Figure 2.  Mock XRPD Pattern (A10126).**

Like a human fingerprint or like the "optical fingerprint" pattern obtained by refracting light through an individual cut diamond, an XRPD pattern can identify a polymorph because each distinct polymorph of a compound yields a unique XRPD pattern.  (A1913-14 at 153:10-154:4;

A1957-58 at 324:11-328:20; A1990 at 455:20-457:15; A2065-66 at 583:20-585:23; A2462; A9378; A9456.)  Different polymorphs do, however, commonly share one or more of the same peaks.  (A1913 at 153:18-24; A1958 at 328:3-20; A9378.)  For that reason, the identification of a small subset of peaks from a polymorph's full diffraction pattern may not uniquely identify a polymorph, particularly in the absence of reference to the peak's intensities.  (A1966 at 360:7-361:23.)  The standard method for identifying polymorphs is a full XRPD diffractogram, which is typically compared to or overlaid with a reference diffractogram.  (A1912 at 146:4-7; A1966-67 at 361:24-365:3; A2040 at 515:2-516:1; A2108 at 756:2-8.)

b.    Differential Scanning Calorimetry ("DSC")

DSC is another characterization technique based on the observation that differences in the molecular arrangement of distinct polymorphs can result in different thermal properties.  (A1914 at 154:5-156:8; A1958-59 at 328:21-330:18; A9458.) The DSC instrument (a "calorimeter") increases the temperature of a sample pan containing the test material and measures the amount of energy that the sample pan takes in or gives off as it is heated to the desired temperature.  (A1914 at 154:10-22; A1959 at 330:19-331:21; A9379; A9458.)  The energy that the sample pan

takes in/gives out is compared to that of a reference pan that is identical but empty.  (A1959 at 330:19-331:21; A9379; 9458; *see* Figure 3.)  The DSC thermogram then plots, as a function of temperature, the differences between the energy absorbed/emitted by the two pans.  (A1959 at 331:4-332:4; A9379; A9458.)



**Figure 3.  DSC Calorimeter (A9436).**

A DSC thermogram can provide important information about a compound.  If the thermogram displays an "endothermic" peak, indicating the intake of heat by the sample, this frequently indicates the melting of the sample, in which case the temperature at which this occurs is the melting point of that material.  (A1914 at 154:23-155:22; A1958-59 at 329:13-330:18;

A1959 at 332:5-333:13; A9458.) If the thermogram displays an "exothermic" peak, indicating the release of heat by the sample, this frequently indicates the crystallization of material that had melted during the course of the experiment. (*Id.*)

Although a DSC thermogram complements the XRPD "fingerprint," it is not a substitute for it. (*See* A1912 at 146:2-10; A9459.) DSC is useful in identifying and characterizing polymorphs, but two different polymorphs can produce the same DSC endotherms because they share the same melting point (A2039 at 509:5-511:8) or because they melt and recrystallize to the same form (A9379; A9459; *compare* A85, *with* A86-88. In contrast, no two polymorphs can have the same XRPD pattern. (A1957-58 at 324:11-328:20; A1990 at 455:20-457:15; A2462; A9378; A9456.)

### 3. The Preparation of Polymorphs

Crystals of a particular polymorph can be prepared by several methods, including by crystallization from a solution containing the dissolved compound (*see* A101-02; 2742-44) and by conversion from one solid polymorph form to another (*see* A101-02; A2744-45; A9379-80). The preparation of a polymorph by crystallization may or may not include a step known as "seeding," in which crystals of the desired polymorph are

added to the crystallization solution to precipitate the formation of additional crystals of that same form.  (A1935-36 at 237:17-238:12; A2035 at 493:8-494:1; A2743-44; A9454.)  Seeding can significantly affect the crystallization process, including by determining the particular polymorph that results and by changing the rate at which crystals form.  (A1915-16 at 161:19-162:3; A1935-36 at 237:17- 238:12; A2035 at 493:8-494:1; A2098 at 713:19-24; A2118-19 at 796:22-797:4; A2743-44; A9454.)  Specifically, if a particular set of conditions could generate crystals of several different polymorph forms (*e.g.*, both the most thermodynamically stable form and a metastable form), seeding with one form or the other can "encourage the crystallization in the [desired] form."  (A1935 at 237:17-23; *accord* A2035 at 493:17-19 ("By seeding with the [polymorph] that you want, most often you can induce the crystallization to go in the direction that you want.").)

Seeding a solution with crystals of a particular form is a common technique chemists intentionally use to control the crystallization of polymorphs.  (A2033 at 487:11-488:5)  Once seeds of a polymorph exist in a particular environment (*e.g.*, laboratory), it may become difficult to exclude them from a crystallization solution in the same environment, leading to a phenomenon whereby the formation of that polymorph is

15

"unintentionally" favored in that specific environment.  (*Id.*; A2035-36 at

494:8-500:2 ("[N]ow the world has changed.  That crystal form exists, and it

didn't exist before.  You can't go back and do an experiment to repeat what

happened when that formed de novo because it's already formed.");

A2665; A2744.)  The mere existence of a new polymorph frustrates efforts

to reproduce distinct crystal forms obtained before discovery of the new

polymorph.  (A2035-36 at 494:8-500:2; A2744 (noting that a paper's authors

"suggested that seeding was the best explanation for" the difficulties in

reproducing an earlier form).)  For this reason, polymorph formation is a

field in which serendipity plays a large role, and in which reproducibility,

particularly in the absence of seed crystals, can in some cases be difficult.

(*See* A1975 at 395:12-396:13; A2035-36 at 495:8-500:2.)

    **B.**    **The Merck Prior Art Patent (the "'729 Patent")**

       The chemical structure of efavirenz is**:**

(A89).  Efavirenz was first synthesized in the 1990s by scientists at Merck,

and it was later developed as part of a pharmaceutical joint venture

between Merck and a DuPont division (the predecessor-in-interest to BMS

(A1321 ¶ 28; A1881 at 22:4-25:16)).  (A1901 at 103:8-104:19; A1927-28 at

205:1-207:18.)   Between 1992-93 and 1998, scientists at Merck and at the

DuPont Merck joint venture prepared five polymorphs of efavirenz.

(A1881 at 23:15-20; A1901 at 103:8-104:19; A1930 at 215:11-14.)

Merck filed a series of related patent applications and obtained

patents covering the earliest crystalline polymorphs of efavirenz.  (*See*

A2757-70; A3646-57; A3937-49.)  Among these patents, and relevant here, is

U.S. Patent No. 5,965,729 (the "'729 patent").  (A2757-70.)  The '729 patent

claims priority to provisional applications filed in 1997 and to a non-

provisional application filed on January 20, 1998, and the '729 patent issued

on October 12, 1999.  (A2757; A1318 ¶ 12.)  As such, the '729 patent is prior

art to the patent-in-suit under 35 U.S.C. § 102.  (A12 ¶ 39.)

The '729 patent discloses three polymorphs of efavirenz:  "Form

I," "Form II," and "Form III."[1]  (A2766 at 5:5-39.)  The '729 patent provides

full XRPD patterns for all three forms (in Figures 3, 4, and 5, respectively

(*see* A2759-61)), as well as a definitive listing of "key" diffraction peaks—all

observed peaks above a threshold intensity level (A2766 at 5:17-39; *see*

Figure 4).  The crystals present in Sustiva, the product sold by BMS, are

Form I.  (A1318 ¶ 10.)

---

[1] The '729 patent uses Roman numerals to refer to the three efavirenz
forms it discloses.  (*E.g.*, A2766 at 5:5-17.)  In contrast, the patent-in-suit
uses Arabic numerals to identify each of the five forms to which it refers.
(*E.g.*, A89 at 1:7-13.)  Form 1 and Form I, and Form 3 and Form III are
identical, whereas the patent-in-suit identifies as Form 4 the polymorph
referred to as Form II in the '729 patent.  (*See* A3862.)  Form 2 is not
described in the '729 patent.

| Form I | Form II | Form III |
|---|---|---|
| 6.0800 | 3.6375 | 7.2150 |
| 6.3900 | 6.3325 | 10.9675 |
| 10.3950 | 11.0725 | 13.7275 |
| 10.9875 | 12.7750 | 14.5325 |
| 12.2850 | 13.3275 | 16.7275 |
| 13.1900 | 14.2925 | 19.0675 |
| 14.1700 | 16.1200 | 19.6550 |
| 15.1925 | 16.8975 | 20.8250 |
| 16.9000 | 18.5025 | 21.7450 |
| 18.4375 | 19.1975 | 22.2825 |
| 19.2275 | 19.6025 | 22.8475 |
| 20.0925 | 20.6650 | 23.1750 |
| 21.2100 | 21.3250 | 23.8850 |
| 22.3600 | 22.6150 | 24.4900 |
| 23.0725 | 23.1775 | 24.9075 |
| 24.8900 | 24.4075 | 25.8200 |
| 25.9500 | 24.9650 | 27.0325 |
| 26.3575 | 26.0100 | 27.6050 |
| 27.2550 | 26.8550 | 29.2975 |
| 28.1150 | 27.6400 | 30.2600 |
| 28.5850 | 28.3675 | 30.7300 |
| 29.1325 | 29.1725 | 31.3125 |
| 29.5625 | 29.6325 | 33.3975 |
| 30.6850 | 30.5650 | 38.4325 |
| 32.3725 | 31.8950 | 39.2100 |
| 38.3125 | 33.8225 | |

**Figure 4.  Key Diffraction Peaks of Forms I, II, and III (A2766).**

## C.    The First Efavirenz Form 5 Experiments

### 1.    The Appearance of Form 5

The polymorph known as Form 5, which BMS does not sell,

was discovered approximately five years after the discovery of efavirenz

Form I.  (A1901 at 103:8-11; A1903 at 110:6-21; A1930 at 215:11-14.)  By early

1997, Merck had filed two patent applications disclosing Forms I through III (A3646-57; A3937-49), whereas Form 5 was not identified until June 1998 (A1930 at 215:11-14; A3113-15; A3124).

James Moore, an employee of the DuPont Merck joint venture (A1927 at 205:1-12), first encountered Form 5 while synthesizing efavirenz, when he set aside for several weeks the solution (known as the "mother liquor") that remained after he had isolated efavirenz.  (A1930 at 216:17-217:18; A3113-15; A3124.)  When Moore returned to this undisturbed solution weeks later, he found that crystals had formed at the bottom of the glassware.  (A1930-31 at 217:19-218:6; A3124.)  Testing indicated that these crystals were "a previously undiscovered crystal form."[2]  (A1933-34 at 229:4-230:23; A3124; A3235-44.)

    2.    <u>The Inventor's Attempts to Reproduce the Synthesis of Form 5</u>

With the first Form 5 crystals in hand, Moore performed a number of experiments to determine whether he could generate additional Form 5 crystals.  (A1934 at 231:13-232:2; A1934-35 at 233:15-234:24; A3125.)

---

[2] Many of Moore's notebook entries and experimental records refer to Form 5 as "Form V."

Moore first tried to reproduce the formation of Form 5 without resort to seeding.  (A1935 at 235:5-237:12; A1944-46 at 273:2-279:22; A1976-77 at 401:4-405:19; A3125-26.)  After seven attempts, Moore was unable to reproduce Form 5 from scratch.  (*Id.*; *see* A10146; Table 1.)

Moore then turned to seeding experiments, using his original Form 5 crystals to "set[] a matrix that the crystallization from solution will match" to generate additional Form 5 material.  (A1935-36 at 237:13-238:12; A1946 at 279:23-280:3; A1977-78 at 405:20-406:16; A3126.)  Even with seeding, Moore had mixed results:  he sometimes produced Forms 2 or 3, and he sometimes produced Form 5.  (A1935-40 at 237:13-256:3; A1946-52 at 279:23-305:24; A1977-84 at 405:20-431:16; A3126-29; A3144-47; A3150; *see* A10146; Table 1.)

In his final seven crystallization experiments, he used seeding six times and produced Form 5, at most, six times (and in several experiments produced other forms before finally isolating Form 5).  (A1937-40 at 244:24-256:3; A1948-52 at 287:3-305:24; A1979-84 at 413:1-431:16; A3144-47.)  Of the twenty crystallization experiments following the initial appearance of Form 5, Moore recorded only one that generated Form 5 material but did not involve seeding.  (*See* A10146; Table 1.)

21

| Experiment Notebook Reference | Seed-ing? | Polymorph Form? | Citation (Experimental; Characterization) |
|---|---|---|---|
| **7051-142 (1)** | No | "appears to be" Form 2 | A3125 |
| **7051-142 (2)** | No | None/no precipitate | A3125 |
| **7051-142 (3)** | No | "appear[s] to be" Form 4 | A3125 |
| **7051-142 (4)** | No | Form 4 (wet cake ("142-1")) | A3125; A3247 |
| **7051-142 (5)** | No | None/no precipitate | A3125-26 |
| **7051-142 (6)** | No | None/no precipitate | A3125-26 |
| **7051-143 (1)** | No | Unknown/not tested (but did not appear to be Form 5) | A3126 |
| **7051-143 (2)** | Yes | Form 5 (sample without acetic acid ("142-3")) | A3126; A3253 |
| **7051-143 (3)** | Yes | Unknown/not tested (sample with acetic acid) | A3126[3] |
| **7051-146 (1)** | No | Form 2 (wet cake ("144-3")) | A3127-29; A3258 |
| **7051-146 (2)** | Yes | Form 3 ("144-8") | A3129; A3266 |
| **7051-146 (3)** | Yes | None/no precipitate ("No form [5] crystallized despite seeding & extreme patience.") | A3129[4] |

---

[3] In describing Moore's Form 5 crystallization experiments, the district court consolidated the numerous experiments appearing on Moore's notebook pages 7051-142 and 7051-143 (A3125-26). (*See* A16 ¶ 53 (referring to these as Moore's "first experiment").) Although these experiments are not denominated separately, they reflect distinct crystallization conditions and outcomes. (*See* A1976-78 at 401:18-406:16; A10146.)

[4] Similarly, the district court described as "Moore's second polymorphic experiment" (A16-17 ¶ 54) what were actually three separate experiments described on page 7051-146 (A3129).

| Experiment Notebook Reference | Seeding? | Polymorph Form? | Citation (Experimental; Characterization) |
|---|---|---|---|
| 7051-167 (1) | Yes | Reported Form 2 ("144-9") | A3150; No XRPD pattern[5] |
| 7051-161 ("#1") | Yes | Reported Form 5 ("161-1") | A3144; No XRPD pattern |
| 7051-161 ("#2") | Yes | Reported Form 5 ("161-2") | A3144; No XRPD pattern |
| 7051-161 ("#3") | Yes | Form 5 ("161-4") (separate steps resulted in mixture of Forms 2 and 5) | A3144-45; A3362 |
| 7051-162 ("#4") | Yes | Form 2 ("161-5") | A3145; A3363 |
| 7051-162 ("#5") | Yes | Form 5 ("161-9") (separate steps resulted in Form 1) | A3145-46; A3368 |
| 7051-163 ("#6") | No | Form 5 ("161-7A" / "161-7B") | A3146; A3365-66 |
| 7051-164 ("#7") | Yes | Reported Form 5 ("161-11") | A3147; No XRPD pattern |

**Table 1.  Moore Form 5 Crystallization Experiments.**

**D.    The Patent-in-Suit (the "'372 Patent")**

1.    The Prosecution of the '372 Patent

The '372 patent claims priority to a June 1998 provisional

application that did not disclose Form 5 (A80; A1320 ¶ 24; A1960 at 337:5-

19), which was first identified that same month (A1930 at 215:11-14).  The

---

[5] The district court did not address page 7051-167 (A3150), which describes the result of allowing the seeded solution from page 7051-146 (A3129) to sit for three months.

subsequent non-provisional application, filed on June 10, 1999 (A80; A1320

¶ 21) disclosed and sought to patent five efavirenz polymorphs, Forms 1

through 5 (A3746-56; A1321 ¶ 32; A1961 at 341:13-22), and purported to

provide full XRPD diffractograms (A3759-62; A3767) and DSC

thermograms (A3763-66; A3768; *see* A1962 at 342:17-343:5) for all five.

Following the allowance of certain claims, including the

predecessors to claims 16 and 18 of the patent-in-suit (A3829-33),

applicants filed an Information Disclosure Statement ("IDS") disclosing the

'729 patent, which had issued in 1999 but had not yet been considered.

(A3838.)  In March 2002, the examiner withdrew the allowance and rejected

all pending claims as anticipated by or obvious in light of the '729 patent.

(A3845-49.)

Following this rejection, applicants filed another IDS, informing

the examiner that a pending U.S. patent application,[6] owned by Merck,

"claim[ed] the same crystalline forms of efavirenz as are claimed in the

subject application.  More particularly, Form 1 of the subject application

corresponds to [Merck] Form I . . . , Form 3 corresponds to [Merck] Form

---

[6] This application issued as the '071 Patent (A3646-57) and derives from
the same application as the '729 Patent.  (*See* A1318 ¶ 12.)

III, and Form 4 corresponds to [Merck] Form II."  (A3862-63; A1962-63 at 345:2-348:3; A2109-10 at 760:9-762:4.)  The IDS further stated that BMS owned the subject application and had agreed with Merck to arbitrate which party had priority rights to the three efavirenz polymorphs (Form I/1, Form III/3, and Form II/4) at issue.  (A3862-63; A1962-63 at 345:2-348:3.)  As a result of the arbitration, Merck was awarded priority to all three forms.  (*Id.*)

        Simultaneously, BMS amended its application to delete polymorph claims to Forms 1, 3, and 4, explaining that they "correspond to" "the disclosed forms of the [Merck] '729 patent" and referencing the IDS submission.  (A3866-67; A1962-63 at 345:23-348:3.)  In addition, BMS amended the application's specification to delete the Form 5 XRPD diffractogram and DSC thermogram (Figures 9 and 10, respectively), because they "were submitted in error as they are not the correct spectra for Form 5."  (A3866-67; A1842 at 29:8-21; A1963 at 348:4-349:14.)  No substitute XRPD or DSC patterns were provided out of a stated concern that they would be considered impermissible "new matter" under 35 U.S.C. § 132.  (A1885 at 40:5-41:3; A2179 at 877:17-878:11.)

25

Shortly after these amendments, the examiner issued a notice of allowability as to the remaining claims (covering Forms 2 and 5).  (A3868.) As initially allowed, claim 86 (which would become claim 16) recited:

> Form 5 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 10.2±0.2, 11.4±0.2, 11.6±0.2, 12.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0 2.

(A3854.)  Claim 86 thus employed a Markush-type element[7] encompassing efavirenz polymorphs "characterized by" a multitude of alternative XRPD patterns (*i.e.*, any combination of four or more of twelve specified 2θ values).  (*Id.*)

Notably, in this form, claim 86 was expressly anticipated by all three polymorphs disclosed in the '729 patent:  according to the '729 patent specification, Form I has XRPD peaks at 2θ values of 10.4, 19.2, 21.2, 24.9, 27.3, and 28.1 (*i.e.*, six of the 2θ values listed in the Markush group); Form II has XRPD peaks at 2θ values of 19.2, 20.7, 21.3, 22.6, 25.0, and 28.4  (six of

---

[7] A Markush group specifies alternatives that will satisfy the claim element, typically beginning with the language "a member selected from the group consisting of" and concluding with a discrete list of alternatives. *E.g.*, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005).

the listed 2θ values); and Form III has XRPD peaks at 2θ values of 19.1, 20.8, 22.8, 24.9, and 27.6 (five of the claimed 2θ values).  (A2766; A2093 at 694:2-11; A2108-09 at 756:13-759:8.)  Despite the anticipation, the examiner allowed claim 86 in this form.

After receiving the notice of allowability, BMS—rather than pursue issuance of the claims as allowed—filed a request for continued examination and further amended the remaining claims.  (A3875-78; A1963-64 at 349:15-350:17.)  BMS amended claim 86 to require six, rather than four, or more of the specified 2θ values and to eliminate the 12.6±0.2 2θ value.  (*Id.*)  BMS also attempted to amend another claim (158) to claim Form 5 by a peak listing that was not drafted in a Markush-type format (*i.e.*, to require all of the eleven listed 2θ values).  (*Id.*)  Regarding these changes, BMS stated:  "Claims 86 and 158 have been amended to more clearly distinguish [F]orm 5 from other forms and to delete a typographical error which occurred in one of the peaks."  (A3878.)  The examiner allowed claim 86 (present claim 16) as amended, despite continued anticipation by Forms I and II (A2108-09 at 756:13-759:8), but did not allow claim 158 (A3885; A3896) because it had previously been canceled (A3898-99; A1964 at 350:18-23).

27

When the patent issued on January 6, 2004 (A80; A1320 ¶ 22), it did not reflect the amendments to claim 86 (now claim 16) made during the continued examination.  (A3687.)  Rather, claim 16 contained the earlier language requiring an XRPD diffractogram "comprising four or more 2θ values selected from the group consisting of" twelve listed peaks (including the disclaimed 12.6±0.2 value).  (A103; A3687; A2076 at 626:5-627:15.)  In April 2012, after BMS had sued Mylan for infringement (A107-14), the erroneous claim 16 language was corrected to require six or more of the eleven listed 2θ values.  (A106; A1320 ¶ 23; *see* A1960 at 334:16-335:4; A2076 at 626:5-627:15.)

2.    The Disclosure of the '372 Patent

a.    The Identification of Form 5

The specification of the '372 patent discloses five efavirenz polymorphs: Forms 1, 2, 3, 4, and 5.  (A80-106; A1321 ¶ 32; A1961 at 341:17-22.)  But it treats Form 5 differently than the other four, omitting information about that form that is provided for the others.  While the specification includes full XRPD diffractograms for Forms 1 through 4 (A81-84), it does not include a diffractogram for Form 5, providing only the partial, Markush-type listing of optional peaks found in claim 16.  (A92 at

28

8:44-61; A1965 at 354:13-357:18; A2070-71 at 604:6-606:23.)  Similarly, the

specification provides full DSC thermograms for Forms 1 through 4 (A85-

88), but discloses only a DSC "peak at about 108° C. to about 110° C.,"

corresponding to a melting point, for Form 5.  (A92 at 8:50-61; A95 at 13:23-

24; A1965 at 354:13-357:18; A2070-71 at 604:6-606:23.)  Notably, the '372

patent specification teaches that Form 3 and Form 5 share this same DSC

peak (although, again, the thermogram is not provided for Form 5).  (A87;

A91 at 6:41-48; A1972 at 382:1-14, 384:5-12; A2073 at 614:2-615:7.)

> b.    The Preparation of Form 5

As with the characterization information, the '372 patent

specification provides a less complete description of the methods of

preparing Form 5 than it provides for the other four polymorphs.  In

contrast to those four, whose preparations are each described in multiple

examples (*see* A101-02), only one example, Example 17, describes the

preparation of Form 5.  (A1973 at 386:6-11; A2098 at 714:14-17; A2116 at

785:20-23.)  Example 17 discloses three methods of preparing Form 5, each

of which includes a step of "seed[ing ]with Form 5."  (A102 at 27:64-28:22;

A1973 at 386:12-388:4; A2116 at 785:24-787:16.)  In the first two

preparations, the seeding immediately precedes the formation of Form 5

crystals.  (A102 at 27:66-28:12.)  In the third preparation, the solution is

repeatedly seeded with Form 5 until the seeds no longer dissolve and then

filtered to isolate Form 1, after which Form 5 crystals form.  (A102 at 28:13-

22.)  The specification does not indicate how large or small the Form 5

seeds are, what filter type or pore size is used, or whether the filtration step

removes any of the Form 5 seeds and, if so, how completely.  (*Id*.)  The

specification includes nothing that would suggest that the third

preparation excluded the Form 5 seeds added in earlier steps.  (*Id*.)

Of the five polymorphs disclosed in the '372 patent, Form 5 is

the only polymorph whose disclosed methods of preparation all require

prior possession of the desired polymorph.  (A101-02; *see* A2116 at 785:24-

787:16.)  Example 17 is derived from the crystallization experiments of

Moore (A1938 at 246:7-249:6; A1939 at 251:17-253:11), who succeeded only

once in re-creating Form 5 without intentional seeding (*see* A1951-52 at

300:24-304:23), and this sole "seedless" experiment is not described in

Example 17 or anywhere else in the '372 patent.  (A80-106; *see* A2102-03 at

732:12-733:3; A2116 at 787:17-23.)  Nor are the details of the experiment that

first led to the appearance of Form 5 described.  (A1944 at 271:7-272:4.)

Moreover, the '372 patent specification does not teach how to prepare Form

5 from any of the other disclosed polymorph forms, whereas it provides

detailed examples and an interconversion chart with respect to the other

four forms.  (A94-95; A101-02; A1973 at 386:21-387:24; A2074 at 618:21-

619:20.)

### E.    The Asserted Claim

BMS asserts against Mylan only claim 18 of the ʹ372 patent.

(A1801.)  Claim 18 depends from independent claim 16.  (A103.)  Claim 16

claims "Form 5 of crystalline Efavirenz" by an XRPD pattern comprising 2θ

values that "characterize[]" the form.  (A103; A106; A1960 at 334:12-335:4.)

Claim 18 claims "the compound of claim 16" further "characterized by" a

DSC peak at about 108° to about 110° C.  (A103; A1960 at 336:1-9.)

### 1.    XRPD Peak Limitations

In its present form, claim 16 requires an XRPD diffractogram

having six or more of eleven 2θ values, claiming:

> Form 5 of crystalline Efavirenz which is characterized by an x-
> ray powder diffraction pattern comprising six or more 2θ
> values selected from the group consisting of: 10.2±0.2, 11.4±0.2,
> 11.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2,
> 28.2±0.2, and 31.6±0.2.

(A103; A106; A1960 at 334:12-335:4.)  In construing claim 16, the district

court determined that "Form 5" means "a polymorphic crystal form of

31

[efavirenz] that can be distinguished from other forms" (A1222-24; A1227), and that "[c]haracterized by" means "having the physical characteristics recited in the subject claims, which may or may not distinguish it from other forms of efavirenz" (A1219; A1227).

### 2.    DSC Peak Limitation

Claim 18 imposes an additional DSC peak requirement, claiming:

> The compound of claim 16, which is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

(A103; A1960 at 336:1-9.)  As relevant here, the district court construed "[c]haracterized by a differential scanning calorimetry thermogram having a peak at about 108°C to about 110°C" to mean "having, but not limited to, a differential scanning calorimetry peak between about 108°C to about 110°C."  (A1221-22; A1227.)

## Summary of the Argument

This appeal raises fundamental questions about the patentee's end of the "bargain" that is struck every time a patent issues. This Court has long emphasized that in exchange for the 20-year grant of exclusive patent rights, the applicant must provide certain disclosures satisfying 35 U.S.C. § 112. *E.g.*, *Carnegie Mellon Univ. v. Hoffmann-LaRoche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008). These disclosures further patent law policies relevant to three distinct periods in the life of the patent. At the time of patenting, the requirement that a specification "describe" an invention adequately ensures the public that the inventor has actually invented something and possessed it. *E.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1345, 1352-52 (Fed. Cir. 2010) (en banc); *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). While the patent is in force, the requirement of "definiteness" ensures that members of the public will be able to know the boundary between patented subject matter and the public domain, so that they may be able to invent or "design around" the patent's boundaries, or seek licenses if they cannot. *E.g.*, *Halliburton Energy Servs. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed.

33

Cir. 2005); *see also 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1334-36 (Fed. Cir. 2013) (Plager, J., concurring) ("When a term is ambiguous, a crystal ball matter, the ambiguity should be construed against the draftsman[, o]r better yet, the claim should simply be invalidated as indefinite . . . ."). Finally, the requirement of enablement ensures the public that after the patent expires, ordinarily skilled artisans previously excluded from possession of the invention will be able to practice it themselves without the need for further teaching or "undue experimentation." *See, e.g.*, *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999).

This case presents a patent claim and specification that held up none of these parts of the patent bargain.

**Written Description:**   Though purporting to lay claim to a single crystal form of efavirenz, the asserted claim, claim 18 of the '372 patent, covers not a single form, but in fact a group of at least hundreds, probably thousands, of possible forms, including at least one prior art, previously patented form, referred to herein as Form III/3. Even as to the form the claim appears to have been intended to cover—"Form 5"—the patent is hopelessly, unnecessarily vague. Rather than supply the defining

34

identifier of a crystal form — a full x-ray diffraction pattern (as it did for the

other forms it claimed) — BMS, after originally supplying a defective

pattern, declined to substitute an accurate one.  As a result, the public will

be forever ignorant of the defining characteristics of the form the inventor

in fact possessed (assuming he in fact possessed it) when he applied to

patent that form.

    **Definiteness:**  The same uncertainty that confounds the effort

to determine what BMS in fact possessed when it applied for the patent-in-

suit, now plagues the efforts of other drug developers attempting to

ascertain whether forms they wish to develop infringe claim 18.  That is

because claim 18 is "insolubly ambiguous" under the current standard for

indefiniteness (which may undergo revision while this appeal is pending,

*see Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891 (Fed. Cir. 2013), *cert.*

*granted*, 2014 WL 92363 (U.S. Jan. 10, 2014) (No. 13-369)).  Rather than

identify the specific XRPD peaks the claimed form possesses, claim 18

refers to a form characterized by six of eleven optional peaks — a grab bag

approach met by at least four known, disclosed forms as well as

innumerable unknown potential forms.  Nor does the additional

identification of a DSC peak between 108° and 110° C clear up the

confusion.  At least one other known form of efavirenz, Form III/3
possesses that same peak (as well as the requisite number of XRPD pattern
peaks).

     **Enablement:**  Perhaps most striking, and hence discussed first
in this brief, is the failure of the inventor here to describe a means of
practicing the invention recited in claim 18—at least a means of practicing
the invention by one who had not practiced it before.  While the patent
describes in good detail three methods of making "Form 5," each of those
methods calls for the initial addition of a starter crystal.  The patent teaches
no method of making Form 5 that does not presuppose the prior
possession of that form.  For that reason, the public expectation that those
excluded from practicing the invention while the patent is in force will
nonetheless be able to practice it once the patent expires is frustrated.

     **Inherent Anticipation:**  But the patent-in-suit not only fails to
describe, definitely claim, or enable the invention recited in claim 18.
Claim 18 is in fact not novel at all.  Again, owing to BMS's decision to claim
Form 5 according to a set of optional peaks, the claim encompasses a form
invented and patented by Merck four years before the patent-in-suit.  As
such, the XRPD and DSC peaks associated with that form—Form III/3—

36

according to Merck's and BMS's own data, demonstrates that that prior art

form meets all the limitations of claim 18 and hence invalidates the claim.

## Argument

## I.    Claim 18 Is Invalid for Lack of Enablement.

### A.    Proceedings Below

At trial, Mylan contended that claim 18 was not enabled because the '372 patent does not teach how to make Form 5 from scratch, *i.e.*, without seeding a solution of efavirenz with pre-existing Form 5 crystals.  (A2326-28; A2445-48.)  Mylan also argued that, in addition to not enabling the Form 5 efavirenz Moore had purportedly discovered, the patent does not enable "thousands of" other potential forms within the scope of claim 18.  (A2329-30; A2193 at 936:11-18; A10366; A10368-69.) Accordingly, it would require undue experimentation to practice the invention.  (A2328-30; A2447-48.)

Both BMS and the district court acknowledged that the relevant question was whether Form 5 could be obtained in the *absence* of seeding without "undue experimentation."  (A33-37; A2177 at 870:6-19 (counsel for BMS agreeing that, to find enablement, "the creation of Form 5 without seeding [must be] enabled").)  The district court concluded that Form 5 was enabled under that condition only by adopting the view of BMS's expert, Dr. Atwood, that "[t]he purpose of using seeding in an experiment such as

38

this is to control the rate at which crystals grow," and of Moore that "[b]ecause the seed is either dissolved or filtered out, the crystallization step in [the third preparation of] Example 17 occurs without any seed present in the solution."  (A34-35.)  The district court also concluded that the experiments in the '372 patent *with* seeds provide suitable conditions for crystallization *without* seeds, because "one of ordinary skill in the art would not ignore the[se] conditions."  (A33-35.)  In support of these conclusions, the court cited Moore's other "successful[]" crystallization experiments (A35-36), none of which are disclosed in the '372 patent itself (*see* A1984 at 432:5-433:20; A10146)**.**

## B.    Legal Standard

To enable a claim, as required by 35 U.S.C. § 112, the specification "must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).  To "ensure[] that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims," "[t]he scope of the claims must be less than or equal to the scope of the enablement." *Nat'l Recovery Techs*., 166 F.3d at 1195-96; *accord AK Steel Corp.*

39

*v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) (referring to this as the "*quid pro quo* of the patent bargain"). Accordingly, where the invention encompasses numerous embodiments that are beyond the level of ordinary skill, it is insufficient to enable only one or a few. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1377 (Fed. Cir. 1999); *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1212-14 (Fed. Cir. 1991); *In re Vaeck*, 947 F.2d 488, 495-96 (Fed. Cir. 1991).

Enablement is a question of law, subject to *de novo* review, based on underlying factual findings, which are subject to review for clear error. *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).

### C. The '372 Patent Fails to Teach Any Method of Making Form 5 That May Be Practiced by One Who Does Not Already Possess Form 5.

Because the '372 patent does not even attempt to teach how to prepare Form 5 without pre-existing seeds of that same crystal form, it does not enable a claim to that form. *See In re Collier*, 427 F.2d 831, 832-33 (C.C.P.A. 1970); *accord In re Howarth*, 654 F.2d 103, 104-07 (C.C.P.A. 1981) (affirming rejection of all claims "for failure to disclose how to make or obtain the starting material requisite to the preparation of the claimed compounds"). (*See also* A2177 at 870:6-19 (counsel for BMS agreeing that,

40

to find enablement, "the creation of Form 5 without seeding [must be] enabled").) The three preparations described in Example 17—the only example in the '372 patent that addresses the preparation of Form 5 (A1973 at 386:6-20; A2116 at 785:20-23)—present a "catch-22": they teach a person of ordinary skill how to prepare Form 5 only if he already has Form 5. (A1973 at 386:3-389:9; A2074 617:8-18.)

> 1.    The '372 Patent Does Not Disclose How To Obtain a Necessary Starting Material—Form 5 Seeds—or Conditions Under Which Form 5 Can Be Prepared Without Seeds.

All three preparations in Example 17 employ a seeding step that presupposes prior possession of Form 5. (A1973 at 386:6-20; A2116 at 785:24-787:16.) In the third of these preparations, periodic seeding occurs "until the seeds no longer dissolve[]," followed by the formation and filtration of Form 1 solids from the solution. (A102 at 28:13-22; A2103-04 at 736:23-737:23.) Nothing suggests that the step of saturating the solution with Form 5 seed was arbitrary or inconsequential. To the contrary, by including a seeding step in all three preparations, the specification teaches that seeding, whether or not attempts are made to "filter out" the seeds later, is necessary. Moore's own experiments confirm that the patent's

implication in this regard was not accidental; he had to resort to seeding to ensure the reproducible production of Form 5.  (*See* Part I.C.2 below.) Moore's private experiments show that on the eight occasions that he attempted to synthesize Form 5 without first seeding with Form 5, he succeeded in preparing Form 5 only once.  (*See* Table 1; A10146; A1984 at 431:17-433:20.)

Beyond the Example 17 preparations, nothing else in the specification teaches how to prepare Form 5 by crystallization without seeds or conversion from another polymorph.  Other references to the crystallization of Form 5—to "recrystallization from a dilute solution of THF/heptanes" or "from solutions in which either Form 1 or Form 4 have already been isolated" (A95 at 13:28-32)—simply summarize the teachings of Example 17 (*see* A1973 at 387:8-24; A2103-04 at 734:6-737:23) and are otherwise too "vague" or "naïve" to generate Form 5 without undue experimentation (A1973-74 at 386:21-390:7; A2074 at 617:22-618:20).  These scant teachings "provide no more than a 'plan' or 'invitation' for those of skill in the art to experiment practicing" crystallization of Form 5 without seed, which is insufficient to enable Form 5.  *Enzo Biochem*, 188 F.3d at 1374; *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1284 (Fed. Cir.

2007).  Moreover, "[t]he inadequacy of the description of [Form 5] is highlighted by comparison with the extensive disclosure of how to make and use [Forms 1 through 4]."  *Auto. Techs.*, 501 F.3d at 1284.  The '372 patent offers at least one example teaching their respective preparations without seeding, whether by crystallization from solution, conversion from another form, or both.  (*See* A101-02.)

> ### 2.  The Inventor's Experiments Attempting To Reproduce Form 5 Support a Finding That Form 5 Cannot Be Made Reliably Without Seeding.

To argue that the '372 patent teaches the preparation of Form 5 from scratch, BMS pointed to several successful attempts by Moore to crystallize Form 5.  (A2240-42.)  But the only successful attempts actually described in the specification—the only teachings accessible to those of skill in the art—are the three disclosed in Example 17, all of which employ a seeding step.  (A1938 at 246:2-249:6; A1939 at 251:17-253:13; A1944 at 271:7-272:4; A2116 at 787:17-788:12.)  Moore's private, undisclosed experiments cannot substitute for disclosure of how to make, from scratch, the very thing claimed.  *Genentech*, 108 F.3d at 1366.  Such public disclosure of Moore's method of producing Form 5 *without* seeding is fundamental to the "patent bargain."  *AK Steel*, 344 F.3d at 1244.

But even considering the record of Moore's private, undisclosed attempts to produce Form 5, that record clearly rejected a view that Form 5 could be reliably produced seedlessly.  Moore conducted twenty Form 5 crystallization experiments, of which only eight were seedless.  (*See* Table 1.)  Of those eight, only one generated Form 5, rendering clearly erroneous BMS's notion that Moore achieved an "extraordinary batting average."  (A2241; *see* A35-36.)  It is only by considering the twelve additional seeded experiments that Moore's "average" increased to arguably[8] seven out of twenty.  (*See* Table 1; A10146; A1984 at 431:17-433:20.)   Moore's nearly uniform, numerous failures to produce Form 5 without seeding show that it would require undue experimentation for a person of ordinary skill to practice claim 18.  *See Enzo Biochem*, 188 F.3d at 1375 ("[Defendant] satisfied th[e] burden [of showing a lack of enablement] by presenting, *inter alia*, evidence of [the

---

[8] For several of the seeded experiments, the record contains no evidence to substantiate the identification of Form 5.  (*See* Table 1.)  In fact, the record contains no "Form 5" XRPD or notebook notation corresponding to the first two preparations in Example 17.  (*See* Table 1; A3144; 1948-49 at 287:3-293:20.)

inventor's] numerous failures in attempting to practice [the claimed invention]."); *AK Steel*, 344 F.3d at 1244-45.

Even focusing on the single successful seedless experiment, this success by the inventor would not support a view that seedless production of Form 5 does not require "undue experimentation" by a person of ordinary skill.  Apart from the advantage of Moore's expertise and experience, *cf. Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985), the mere presence of the more stable Form 5 (A95 at 13:24-26; A2098 at 716:22-24) within his laboratory could cause the crystallization of Form 5 through the "commonplace" effect of "unintentional" seeding, which BMS's expert acknowledged.  (A2033 at 487:11-488:5; A2035-36 at 496:2-499:22; A2744.)  Such a process, by definition, could not occur in a laboratory where Form 5 has never previously existed.

The district court's conclusion that the seedless production of Form 5 was enabled appears to have been premised on a misunderstanding of the trial evidence concerning the role seeding plays in the crystallization of polymorphs.  While seeding can, as the court observed, "control the rate at which the crystals grow" (A34), that is not its sole function.  Seeding is also critical to determining which of several possible polymorphs form

45

under given conditions.  (A1935-36 at 237:17-238:12; A1973 at 386:13-18; A2035 at 493:8-494:1; A2118-19 at 796:22-797:4; A2743-44.)  The district court clearly erred in ignoring this evidence.

Likewise, it is not possible to determine, as the district court did, that the crystallization in the third preparation of Example 17 occurred "without any seed present in the solution" merely because the solution was filtered with simple filter paper (A1948 at 288:13-21).  As discussed above, unintentional seeding is always a suspect when a crystal forms spontaneously within an environment where it previously existed.  In addition, small crystals, not visible to the naked eye, can pass through the filter and act as sites of nucleation.  (*See* A2743-44 ("[S]eeds can be as small as 10 Å [*i.e.*, ten ten-billionths of a meter] in diameter . . . ."); A1981 at 420:20-421:2 ("but those seeds are clearly still in the solution after he collects the final sample").)  The court clearly erred here too in ignoring this information.  And even if the filtering step completely removed all traces of Form 5 seeds, it remains the case that the patent does not disclose any method of making Form 5 that does not involve first having Form 5 on hand.

46

3.    Even Assuming the Patent-in-Suit Enables the Preparation of Form 5, It Does Not Enable the Full Scope of Claim 18, Which Encompasses Many Other Polymorphs.

Even if the patent had enabled the specific polymorph first identified by Moore, the '372 patent does not enable the full scope of claim 18 as the district court construed it. *See Sitrick*, 516 F.3d at 999-1000; *AK Steel*, 344 F.3d at 1244-45; *Auto. Techs.*, 501 F.3d at 1281-82. The district court's claim construction contemplates that the claimed combinations of XRPD 2θ values and DSC peak "may or may not" characterize multiple forms of crystalline efavirenz. (A1219; A1227.) Claim 18 accordingly covers any polymorph whose XRPD pattern has between six and eleven of the listed peaks and any number of additional unlisted peaks (A19-23)—without regard to peak intensities (A2124 at 820:14-18)—and whose DSC pattern has the specified peak—whether endo- or exothermic (A2116 at 785:10-14). Form 5's pattern has all eleven of the XRPD peaks (A2124 at 817:22-818:4), but the claim encompasses other, distinct forms having fewer than all eleven. As Dr. Atwood conceded, the claim's Markush language encompasses "a lot of different combinations" of 2θ values, each of which combination could correspond to a different polymorph within the scope

of claim 16.  (A2115-16 at 782:22-785:4; A2122-24 at 811:17-817:13; *see* Figure

5; Figure 6 (hypothetical efavirenz XRPD patterns within the scope of claim

16 but not corresponding to Moore's Form 5 XRPD (Figure 7)).)



**Figure 5.  Hypothetical XRPD Pattern Within the Scope of Claim 16 (A10225).**



**Figure 6.  Hypothetical XRPD Pattern Within the Scope of Claim 16 (A10231).**



**Figure 7.  XRPD Pattern of Form 5 (A2681).**

As Dr. Atwood admitted, the '372 patent does not enable the many other polymorphs potentially within the scope of claim 18.  *See LizardTech*, 424 F.3d at 1345-47; *Enzo Biochem*, 188 F.3d at 1377; *In re Vaeck*, 947 F.2d at 495-96.  (*See* A2124 at 817:14-21 ("I don't see an enablement to make whatever this [referring to the pattern appearing in Figure 6] hypothetically is.").)  Dr. Atwood's rejoinder that such forms are "hypothetical" or not already known (A2124 at 817:4-21) misses—or perhaps, underscores—the point.  Broadly claiming as-yet-unknown

species is one of the evils the enablement requirement (as well as the

related written description requirement) seeks to combat. *See, e.g.*, *MagSil*

*Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380-84 (Fed. Cir.

2012); *Sitrick*, 516 F.3d at 999; *Enzo Biochem*, 188 F.3d at 1372-75.

## II. Claim 18 Is Invalid Because the Invention Is Not Adequately Described.

### A. Proceedings Below

At trial, Mylan contended that the '372 patent does not

adequately describe the subject matter of claim 18, Form 5, because its

description renders the claim's coverage indistinguishable from other

crystal forms of efavirenz, such as, but not only, Form III/3.  (A2333-34;

A2451-52.)  Unlike Forms 1 through 4, which are described by a full XRPD

pattern and DSC thermogram, Form 5 is described only in terms of a set of

optional XRPD peak values and a DSC peak.  (*Id.*)  Form 5's full XRPD

pattern and thermogram are absent from the specification.  (*Id.*)  As a

result, the specification is ambiguous as to the crystal form the inventor

actually possessed.  (*Id.*)

The district court found that the written description

requirement was satisfied because "the subject matter of claim 18 appeared

in the original claims of the ['372 patent] application"; because "the relevant identifying characteristics of Form 5 are sufficient to distinguish Form 5 from the prior art" (the court apparently did not consider compounds not in the prior art); and because the omission of the correct XRPD and DSC patterns from the '372 patent did not persuade the court "that the inventors did not possess the claimed invention."  (A38-39.)

### B.    Legal Standard

Although the enablement and written description requirement have the same statutory basis, *see* 35 U.S.C. § 112, the written description requirement focuses on a different aspect of the specification's disclosure: "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad*, 598 F.3d at 1351.  The level of detail required to show possession "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology," making it a highly fact-specific inquiry.  *Ariad*, 598 F.3d at 1351; *accord Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991).

"[T]he hallmark of [the] written description [requirement] is disclosure."  *Ariad*, 598 F.3d at 1351.  This "serves a *quid pro quo* function in

which the public is given meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time." *Carnegie Mellon*, 541 F.3d at 1122 (quotation marks omitted). Such disclosure "guards against the inventor's overreaching" by memorializing what is encompassed within the inventor's "original creation." *Vas-Cath*, 935 F.2d at 1561.

On appeal from a bench trial, compliance with the written description requirement is reviewed for clear error. *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997).

## C. The Patent-in-Suit Does Not Demonstrate the Inventor's Possession of Form 5 or the Full Scope of Claim 18.

### 1. The Patent-in-Suit Does Not Clearly Disclose Form 5.

The '372 patent does not disclose Form 5 in a way that reasonably conveys what Moore possessed. *See Ariad*, 598 F.3d at 1351-52. It describes (and claims) Form 5 with reference to an array of optional XRPD peaks, a DSC peak, and exemplary crystallizations. But none is disclosed in a manner that shows that Moore possessed the invention he claimed.

Most notably, the specification does not contain a full XRPD "fingerprint," or even a complete listing of the XRPD peaks that define Form 5. (*See* A92 at 8:44-49, 8:62-67; A1965 at 354:13-357:18; A2070-71 at 604:6-606:23.) In fact, according to the '372 patent, not a single XRPD peak is essential to the Form 5 XRPD pattern. (A2115 at 783:6-784:8.) Instead, the specification discloses a partial list of peaks, of unspecified intensities, that may or may not characterize Form 5, making it unclear which of the peaks are actually present in the form Moore purportedly invented. Nor does the patent contain a DSC thermogram for Form 5, providing only a reference to a single melting point peak. (A92 at 8:50-53, 8:62-67; A95 at 13:23-24; A1965 at 354:13-357:18; A2070-71 at 604:6-606:23.)

A person of ordinary skill would have expected an inventor who actually possessed Form 5 to have been able to provide such information. (*See* A2071 at 605:17-607:19.) XRPD is a routine, conclusive, and "very powerful tool for characterization and analysis" that a person of ordinary skill can readily employ. (*See* A1907 at 128:9-18; A1908 at 133:10-20; A1911-12 at 145:23-146:7; A2071 at 608:3-14; A2462) DSC is also a common characterization technique. (*See* A1907 at 128:9-18; A1908 at 133:10-20; A1911-12 at 145:23-146:10.) The specification itself confirms this:

it provides full XRPD diffractograms and DSC thermograms, as well as comprehensive preparation information, for Forms 1 through 4. (A81-88; A94-95; A101-02; A1323-24 ¶ 45; A1965 at 354:13-355:13; A2070-71 at 604:6-605:16.)  And the prosecution history is telling.  The specification's figures originally included both an XRPD diffractogram and a DSC thermogram for Form 5.  (A3767-68; A1842 at 28:11-29:13; A1962 at 342:17-343:5.)  But these were later deleted because they were wrong—they did not correspond to the form Moore claimed to have invented—and they were never replaced with accurate figures.  (A3866-67; A1842 at 28:11-29:21; A1963 at 348:13-349:10.)  BMS has explained its failure to provide the Form 5 XRPD and DSC figures as a strategy to avoid an accusation of adding impermissible "new matter" to the specification.  (A1885 at 38:23-41:3; A2179 at 877:17-878:11.)  That is a not a legally satisfactory explanation:  "the prohibition on new matter does not negate the need to provide a written description of one's invention."  *Ariad*, 598 F.3d at 1348.

As matters now stand, the public will be forever ignorant of what the actual XRPD pattern and DSC thermogram for the polymorph Moore purports to have discovered looks like.  (*See* A2070-71 at 604:6-608:2.)  Because Moore did not provide this fundamental crystal-

identifying information, it is unclear from the patent precisely what Moore possessed, whether he in fact possessed it, and how it differed from other efavirenz polymorphs.  *See In re Wallach*, 378 F.3d 1330, 1334-35 (Fed. Cir. 2004); *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002); *Eli Lilly*, 119 F.3d at 1568 ("A written description of [a chemical] invention . . . requires a precise definition, such as by structure, formula, or chemical name, of the claimed subject matter sufficient to distinguish it from other materials." (alterations and quotation marks omitted)).

In contending that the specification's deficient disclosure meets the written description requirement, BMS has argued that claim 18 has adequate description because "literal support is present in the specification," *i.e.*, because the language of claim 18 appeared in the specification of the original application.  (A2245; *see also* A38-39.)  But "[t]he appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy th[e written description] requirement."  *Gen-Probe Inc.*, 323 F.3d at 968-69; *accord Ariad*, 598 F.3d at 1350.  Here, the relevant words are worse than "mere[ly] indistinct."  They are inherently ambiguous, as they describe Form 5 in terms of a set of optional peak values that could be possessed by any number of crystals,

and which are in fact possessed by the four other forms disclosed in the

patent-in-suit.  (*See* Table 2.)

| Claim 18 2θ Values | Form 1 (A3512) | Form 2 (A3513) | Form 3 (A3514;  A1134*) | | Form 4 (A3515) |
|---|---|---|---|---|---|
| 10.2±0.2 | 10.3 | | | | |
| 11.4±0.2 | | 11.4 | | | |
| 11.6±0.2 | | | 11.6 | 11.6 | 11.6 |
| 19.1±0.2 | 19.1 | | 19.2 | 19.1 | 19.2 |
| 20.6±0.2 | 20.5 | 20.6 | | 20.5 | 20.6 |
| 21.3±0.2 | 21.1 | 21.4 | | | 21.3 |
| 22.8±0.2 | | 22.7 | 22.6 | 22.6 | |
| 24.8±0.2 | 24.8 | 24.9 | 24.9 | 24.8 | 24.9 |
| 27.4±0.2 | 27.3 | | | 27.4 | 27.5 |
| 28.2±0.2 | 28.0 | 28.0 | | 28.0 | 28.3 |
| 31.6±0.2 | 31.8 | | | 31.7 | 31.8 |

*Form 3 peaks appearing in A1134 are identified in A10138.

**Table 2.  Form 1 through 4 XRPD Peaks Corresponding to Claim 18.**

Finally, even assuming the specification demonstrates

possession of the single polymorph known as Form 5, it does not show

possession of a "representative" number of the polymorphs within the

scope of claim 18.  *Gen-Probe Inc.*, 323 F.3d at 966-68 ("Nor did the

specification describe a sufficient number of species within the very broad

genus to indicate that the inventors had made a generic invention, *i.e.*, that

they had possession of the breadth of the genus, as opposed to merely one

or two such species." (discussing *Eli Lilly*, 119 F.3d at 1567-68).)  The

specification discloses only one species of "Form 5" as claimed, omitting any description of "a lot of" other polymorphs ("[a] combination of eleven things taking six at a time" (A2115 at 784:9-20)) that are encompassed by the claim.  (*See* A2123-24 at 815:9-817:21.)  Because of the inherent unpredictability of the discovery of polymorphs, a person of ordinary skill would not understand possession of a single polymorph to imply possession of the whole class of potential polymorphs within the scope of claim 18.  *See Carnegie Mellon*, 541 F.3d at 1124, 1126 ("[A] specification must describe the claimed invention in such a way that a person of skill in the art would understand that the genus that is being claimed has been invented, not just a species of the genus.").

2.    The Incomplete Disclosure of Form 5 Creates the Potential for Improperly Sidestepping Prior Art and for Patent "Evergreening."

The "patent bargain" contemplates a full and fair public disclosure of the patentee's invention in exchange for the right to exclude others.  *See Gen-Probe Inc.*, 323 F.3d at 969-70 ("[T]he written description requirement is satisfied by the patentee's disclosure of [descriptive means] that *fully set forth* the claimed invention." (emphasis added; quotation marks omitted)).  In this case, the "Form 5" that Moore found is not a

polymorph having variable intrinsic properties or a partial XRPD fingerprint; it is a polymorph having a fixed and knowable XRPD pattern. (A2123 at 815:9-12.)  As such, the specification must fully disclose that characterizing information, rather than providing ambiguous information that (a) does not clearly describe the form Moore found and (b) does not specify whether Moore has found one or many forms.  In exchange for enjoying a limited monopoly over Form 5, BMS was required to provide to the public a complete written description of Form 5.  BMS failed to do so.

The failure to provide this information invites "exactly the type of overreaching the written description requirement was designed to guard against."  *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1327 (Fed. Cir. 2000); *see Ariad*, 598 F.3d at 1353-54.  By providing a list of eleven optional 2θ values, the '372 patent discloses at best only a portion of the Form 5 XRPD "fingerprint."  Such partial disclosures allow a patent applicant to sidestep prior art that otherwise would not be distinguishable.  For example, an applicant could simply omit the peaks found in the prior art in favor of other "characteristic peaks," and the PTO examiner, not having the full XRPD pattern available as part of the applicant's disclosure, would have no way to reject the newly claimed peaks as part of the same patterns

Confidential Material Has Been Deleted From This Page

already patented.  In the present case, the specification omits Form 5 2θ

values of 19.8, 29.1, and 33.5 (A2681) that correspond to peaks in the Form

III XRPD pattern (A2766).

Another ready abuse stemming from a polymorph claim

reciting only a partial XRPD peak list is patent "evergreening," claiming a

separate fingerprint portion or sets of peaks in a later application and

effectively extending the patent monopoly years beyond what is otherwise

permitted for a single invention.  The patentee's sanctioned ability to omit

disclosure of the complete characterizing XRPD information would, during

a subsequent application prosecution, leave a PTO examiner without the

characterizing information that would otherwise result in a proper

rejection.  For example, because of the incompleteness of the disclosure in

the '372 patent, BMS could have obtained an additional patent to "Form [X]

of crystalline Efavirenz which is characterized by an x-ray powder

diffraction pattern comprising 2θ values of: [[███████████████████

█████████████████]]."  All six of these 2θ values are among the

[[█████████]] Form 5 peaks that BMS identified in its infringement

analysis (A10116 (citing A2681; A7901)), but were not disclosed in the '372

patent peak listing (A92 at 8:44-49).

III.    **Claim 18 Is Invalid Because It Is Indefinite.**

A.    **Proceedings Below**

At trial, Mylan also argued that claim 18 is indefinite because "Form 5" as claimed is indistinguishable from other polymorph forms, including prior art forms, having the claimed XRPD and DSC properties.[9] (A2321-25; A2442-45.)  Notably in this regard, Mylan observed that the XRPD patterns of other crystal forms of efavirenz patented by Merck possess the requisite six peaks.  (A2321-23; A2442-44.)  At least one other known form of efavirenz, Form 3, has the same DSC thermogram peak recited in claim 18 as well.  (A2323-24; A2444-45.)

The district court concluded that claim 18 was not indefinite because the XRPD 2θ values and DSC peak limitations of claim 18 "clearly differentiate Form 5 of crystalline efavirenz" from other forms of efavirenz, particularly Form III.  (A30-31.)  In doing so, the district court disregarded the evidence that Form 3 (which is the same as Form III) has a DSC peak falling within the claimed temperature range (*see* A91 at 6:41-44; A94 at

---

[9] The overlap between the properties recited in claim 18 and those possessed by the prior art would, if claim 18 is found sufficiently definite, invalidate claim 18 as anticipated.  (*See* Part IV.C below.)

12:46-48), as well as nine of the eleven claimed 2θ values (*see* A91 at 6:32-36;

A1134; A2766; A3514; A10138), all according to BMS's own data. (A30-31.)

## B.    Legal Standard

To be valid, a claim must "particularly point[] out and

distinctly claim[] the subject matter" that the inventor regards as his

invention. 35 U.S.C. § 112, ¶ 2. Although it is the claim itself that must be

definite, the "inquiry focuses on whether those skilled in the art would

understand the scope of the claim when the claim is read in light of the rest

of the specification." *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d

684, 692 (Fed. Cir. 2001). Under current law, if the claim is "not amenable

to construction" or is "insolubly ambiguous," it is indefinite. *Halliburton*,

514 F.3d at 1250. The Supreme Court has recently granted *certiorari* on a

case concerning the standard for "indefiniteness," *see Biosig Instruments,*

*Inc. v. Nautilus, Inc.*, 715 F.3d 891 (Fed. Cir. 2013), *cert. granted*, 2014 WL

92363 (U.S. Jan. 10, 2014) (No. 13-369), and it is anticipated that the case will

be decided this term.[10]

---

[10] Mylan requests the opportunity to submit supplemental briefing
discussing the impact of the Supreme Court's decision in *Biosig* after it
issues. *See, e.g.*, *Ass'n for Molecular Pathology v. USPTO*, 467 Fed. App'x 890

"The definiteness requirement shapes the future conduct of persons other than the inventor, by insisting that they receive notice of the scope of the patented device." *Vas-Cath*, 935 F.2d at 1561. For this reason, the definiteness requirement serves an important public notice function. *Halliburton*, 514 F.3d at 1249. Failure to police its satisfaction closely makes it harder for competitors who do not wish to infringe patents to adjust their behavior accordingly. *See id.*

Indefiniteness is a question of law subject to *de novo* review. *Union Pac.*, 236 F.3d at 692.

C.    **Claim 18 Is Too Ambiguous To Permit a Person of Ordinary Skill To Determine Which Form or Forms of Efavirenz Are Within Its Scope.**

1.    As Drafted, Claim 18 Does Not Distinguish Form 5 From Other Polymorphs.

Claim 18 is indefinite because it purports to claim a single polymorph of efavirenz, Form 5, by use of features that do not actually distinguish it from other polymorphs of efavirenz. *See Halliburton*, 514 F.3d at 1251-56. The district court construed "Form 5" to mean "a polymorphic

_____

(Fed. Cir. 2012) (non-precedential); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 117 F. 3d 1385 (Fed. Cir. 1997).

crystal form of [efavirenz] that can be distinguished from other forms" (A1222-24; A1227), referring to the *single* polymorph Moore discovered in 1998. But the court acknowledged through its construction of the claim term "characterized by" that the attributes identified in claim 18—2θ values and DSC peak—"may or may not distinguish [Form 5] from other forms." (A1219; A1227.) This acknowledgement effectively summarizes Mylan's indefiniteness position. For where "reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008).

Claim 18 exemplifies just such an "insolubly ambiguous claim." According to BMS, Form 5 and Form III/3—the form that Merck first discovered as Form III and that BMS later "rediscovered" as Form 3 (A3862-63)—are distinct polymorphs. (*See* A1993 at 467:19-24.) But Form III/3 falls within the scope of claim 16, from which claim 18 depends. (A1967-71 at 365:19-379:21.) Form III/3 has at least the requisite six XRPD peaks, because the '729 patent attributes five of the claimed 2θ values (19.1,

20.6, 22.8, 24.8, and 27.4) to Form III and the '372 patent and other BMS records attribute four more (11.4, 11.6, 28.2, and 31.6) to Form 3. (*See* A91 at 6:32-36; A1134; A2766; A3514; A10138.) The XRPD peak limitations also do not differentiate Form 5 from Forms I and II, which according to the '729 patent have at least six of the optional 2θ values recited in claim 16. (A2766; A2109 at 757:13-758:1.) These three known polymorphs are therefore indistinguishable from the invention of claim 16 as characterized by XRPD. (A1967-71 at 365:19-379:21; A2109 at 758:15-759:8 (agreeing that "claim 16 is indefinite to distinguish [Form 5 from] the prior art Forms 1 and 2 from the Merck patent").)

Nor does the additional recital of a DSC peak in claim 18 resolve the indefiniteness inherited from claim 16. The patent-in-suit states clearly that the DSC peak of Form 3 (which, again, BMS has conceded to be identical to Form III (A3862-63)) falls between 108° and 110° C, just like the DSC peak of Form 5. (A91 at 6:41-44; A1971-72 at 381:1-382:14; *see also* A2109 at 759:9-760:1 (agreeing that "if Form 2 had a DSC peak of about 108 to 110," "claim 18 would not distinguish Form 5 from Form 2 of the Merck patent").) Because neither the claimed XRPD nor DSC properties are sufficient to differentiate Form III/3 from "Form 5," claim 18 is indefinite.

65

*See Halliburton*, 514 F.3d at 1253 (finding patentee's "failure to distinguish the [characterizing property] of the invention from [that of] the close prior art . . . fatal.").

The district court held that claim 18 was not indefinite because the '729 patent states that Form III's DSC peak falls between 117° and 118° C, not between 108° and 110° C. (A30; *see also* A25-26.) Whatever the force of that observation in evaluating the court's anticipation analysis (which Mylan challenges below), it does not resolve the indefiniteness of claim 18. As a defense rooted in Section 112, a claim must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention" to avoid being invalid for indefiniteness. 35 U.S.C. § 112, ¶ 2. Here, the specification fails in that regard, identifying at least one unclaimed polymorph, Form 3, that has a DSC peak identical to Form 5's. (A91 at 6:41-44; A94 at 12:46-48.) Hence, a person having Form 3, which Moore disclaimed inventing, and knowing that it was the same as Merck Form III (as BMS informed the PTO) could conclude that claim 18 covered his form, even though the patent itself purports to lay claim only to "Form 5 of crystalline Efavirenz," the form discovered by Moore (*see* A1966 at 358:1-359:7; A2123 at 815:9-12).

66

The indefiniteness of claim 18 extends beyond confusion over whether it covers Form III/3. As this Court observed in *Halliburton Energy Services, Inc. v. M-I LLC*, "differentiation [from the prior art] is an important consideration in the definiteness inquiry," but such differentiation must also "place a[] limit on the scope of what was invented beyond the prior art." 514 F.3d at 1252-53. Because each combination of XRPD peaks within the scope of claim 18 reflects a unique polymorphic arrangement (A1913-14 at 153:10-154:4; A1990 at 455:20-457:15), the claim encompasses any number of as-yet-undiscovered efavirenz polymorph forms that are not Form 5. (A2122-24 at 811:17-817:13; *see* Figure 5; Figure 6.) This insoluble ambiguity could have been dispelled had BMS simply claimed Form 5's full diffractogram (as it did for Form 2 in claim 1 (A102) and as it had originally intended to do for Form 5 (A3755)). But because BMS did not, it impermissibly blurred the line between the "one substance" first identified by Moore (A2123 at 815:9-12) and "a lot of different combinations" corresponding to "many, many different [forms] of efavirenz" (A2115 at 784:4-20; A2124 at 817:4-13).

And, again, the additional DSC peak in claim 18, to which BMS now points as a remedy for its omission of a full diffractogram, does not

dispel the insoluble ambiguity about what it claimed. Many other efavirenz polymorphs meeting the Markush limitation of claim 18 could also have the recited DSC peak. (*See* A2039 at 509:4-511:8; A2118 at 794:13-21.) Unlike a full XRPD pattern or definitive peak listing, a single DSC peak (or even a melting point) is not a uniquely identifying characteristic.[11] Moreover, although Form 5 has a melting point between 108° and 110° C (A95 at 13:23-24), claim 18 requires only a DSC "peak" at that temperature range, and does not require that it correspond to a melting point, does not specify whether it is endothermic or exothermic (A2116 at 785:10-14), and according to the district court, does not foreclose the presence of other peaks in the same DSC trace (A1221-22; A1227). Accordingly, claim 18 does not distinguish Form 5 from other efavirenz polymorphs by XRPD and DSC characterization.

---

[11] For example, the DSC traces of efavirenz Forms 1 through 4 all show a DSC peak at approximately 137° C (A85-88), and different polymorphs of other compounds have shown very similar melting points (A9503). As with the Form 5 XRPD pattern, no complete DSC trace appears in the '372 patent to help resolve the uncertainty. (A2070-71 at 604:20-605:16.)

2.    The Practical Consequences of the Indefiniteness of Claim 18 Are Serious.

The practical consequences of the district court's indefiniteness analysis are striking.  If a competitor of BMS discovered a "Form 6" of efavirenz, and after fully characterizing Form 6 by XRPD and DSC, discovered that it had six of the claimed 2θ peaks and an exothermic peak (*i.e.*, not a melting point) between about 108° and 110° C, but was otherwise distinct from Form 5, the competitor would not be able to determine with any clarity whether Form 6 infringes claim 18.  The competitor would be faced with a choice between discontinuing activities with Form 6 (which may not be simple, if Form 6 is the most stable polymorph (A1911 at 144:19-23; A2072 at 610:7-11)) or facing years of potential litigation to determine whether claim 18 indeed encompasses Form 6.  *See Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931) (noting that a patentee is required "to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not").

Not only does the district court's analysis of claim 18 permit patentholders to lay claim to currently undiscovered, future crystal forms,

but it also would permit patentholders to reclaim polymorphs disclaimed during patent prosecution.  For example, if Mylan had instead elected to develop a generic product employing Form 3, the form BMS disclaimed during prosecution of the '729 patent, BMS might still be accusing Mylan of infringing claim 18.  This defeats the underlying purpose of the definiteness requirement.  *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) ("The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise."); *Amgen*, 927 F.2d at 1217-18.  The repercussions of such ambiguity should fall upon the drafter of such defective claims, not other industry participants.  *Halliburton*, 514 F.3d at 1255-56 ("We note that the patent drafter is in the best position to resolve the ambiguity in the patent claims . . . .").

## IV.    Claim 18 Is Inherently Anticipated by Form III, a Crystal Form Invented and Patented by Merck.

### A.    Proceedings Below

At trial, Mylan argued that claim 18 was inherently anticipated by the Form III efavirenz polymorph disclosed in the '729 patent, because

the '729 patent and BMS's own experimental data show that XRPD analysis of that form reveals six or more of the 2θ values found in claim 18 and because the '372 patent itself establishes that an admittedly identical crystal form has a DSC peak falling between 108° and 110° C.  (A2331-32; A2449-51.)

The district court held that Merck Form III did not inherently anticipate claim 18, because Mylan "may not pick and choose" from different samples to show anticipation (A28-29), and because the apparent differences among these samples disprove that Merck Form III inherently results in a crystal having the claimed XRPD and DSC characteristics (A24-A28).

## B.    Legal Standard

To anticipate a claim *expressly*, a *single* prior art reference must disclose every limitation of the claimed invention.  *E.g.*, *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999).  But "[i]t is well settled that a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it."  *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002).  To determine whether a claim limitation is inherent in a reference, the court may look to extrinsic

evidence, including both prior art references as well as information not in the prior art. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343-45 (Fed. Cir. 2005); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1378-80 (Fed. Cir. 2003). It is not necessary that a person of ordinary skill in the art would have recognized the inherent characteristic or been aware of the extrinsic evidence before the critical date. *Schering Corp.*, 339 F.3d at 1377-78.

Anticipation is a question of fact, reviewed for clear error. *Atlas Powder*, 190 F.3d at 1346.

### C.    Form III of the Prior Art '729 Merck Patent Has the X-Ray Powder Diffraction and Differential Scanning Calorimetry Peaks Required by Claim 18.

Form III, an efavirenz crystal form patented by Merck, inherently anticipates claim 18. It is undisputed that the '729 patent is prior art to the '372 patent. (*See* A3862-63; A1994 at 470:16-18; A2091 at 686:4-10; A2092 at 692:18-21.) BMS and Merck made this determination during the prosecution of the '372 patent and informed the PTO examiner of that fact. (A3862-63.) In the same communication, BMS also informed the examiner that Form 3 of the '372 patent is the "same crystalline form[]" as Form III. (*Id.*) Having made these representations to the PTO during the prosecution

72

of the patent-in-suit, BMS cannot now deny that Form III and Form 3 are the same polymorph. *See Gillespie v. Dywidag Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent."); *Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 690 (Fed. Cir. 1985).

Form III/3 inherently anticipates claim 18 because it is characterized by the claimed XRPD 2θ values and DSC peak. With respect to XRPD, the analysis of Form III/3 generates a pattern that has six or more of the claimed 2θ values, as evidenced by three full XRPD diffractograms of Form III/3 presented at trial: the '729 patent pattern (A2761 (peaks identified internally at A2766)), the Form 3 pattern appearing in the "BMS Encyclopedia of Solid State Forms" (A7706 (peaks identified at A3514 (*see* A2094-95 at 700:15-703:1))), and a pattern generated by Moore, comparing Form 3 to Form 5 (A1134 (peaks identified by Mylan's expert, Dr. Hollingsworth at A10138 (*see* A1969-71 at 371:22-379:21))). (*See* Figure 8; Table 3.) As is apparent from Figure 8, the overlay of peaks among these three patterns indicates that they represent the same form, Form III/3. They differ primarily with respect to the amount of "noise" present in the

diffractograms,[12] which affects the clarity with which peaks can be

discerned.



| ■ '729 Patent – Form III (A2761/A2766) | ■ BMS Encyc. – Form 3 (A7706/A3514) | ■ Moore Sample – Form 3 (A1134/A10138) |

**Figure 8. Overlay of Form III/3 XRPD Patterns (A2761/A2766; A7706/A3514; A1134/A10138).**

---

[12] According to Mylan's expert, Dr. Hollingsworth, the XRPD experimental conditions will affect how noisy a diffractogram is, and the amount of noise can in turn affect whether a particular peak is apparent in the diffractogram. (*See* A1990 at 456:6-458:21.)

| Claim 18 2θ Values | '729 Patent – Form III (A2766) | BMS Encyc. – Form 3 (A3514) | Moore Sample – Form 3 (A10138) |
|---|---|---|---|
| **10.2±0.2** | | | |
| **11.4±0.2** | | | |
| **11.6±0.2** | | 11.6 | 11.6 |
| **19.1±0.2** | 19.1 | 19.2 | 19.1 |
| **20.6±0.2** | 20.8 | | 20.5 |
| **21.3±0.2** | | | |
| **22.8±0.2** | 22.8 | 22.6 | 22.6 |
| **24.8±0.2** | 24.9 | 24.9 | 24.8 |
| **27.4±0.2** | 27.6 | | 27.4 |
| **28.2±0.2** | | | 28.0 |
| **31.6±0.2** | | | 31.7 |

**Table 3.  Expressly Identified XRPD Peaks for Form III/3 Patterns (A2761/A2766; A7706/A3514; A1134/A10138).**

As shown in Table 3, each of the requisite six 2θ values appears in two or more of these Form III/3 XRPD patterns.  Moreover, each was identified in Form III/3 patterns prior to the commencement of this litigation, five of them in the very '729 patent that originally disclosed Form III.  (A2766; A3514; A1906 at 123:21-124:5; A1968-69 at 368:20-371:21; A2111-12 at 768:8-771:7.)  Dr. Hollingsworth's analysis of a third sample merely confirms the presence of all six of these peaks.  (A10138; A1969-71 at 371:22-379:21.)  The reproducibility of these six peaks across these three Form III/3 patterns indicates that they are attributable to Form III/3 (and

its unique molecular packing), rather than to some unspecified impurity (*see* A2093 at 694:17-695:16), and thus are inherent to Form III/3. *See SmithKline Beecham*, 403 F.3d at 1343-45.

The district court criticized Mylan's reliance on several sources of information about Form III/3's peak patterns—all coming from either Merck or BMS—as reflecting an effort to "pick and choose 2θ values from different samples." (A28-29.) But this criticism was legally irrelevant, and mischaracterized Mylan's argument. It was legally irrelevant because while it is forbidden to "pick and choose" references when asserting an express anticipation defense, there is no legal bar against ascertaining the intrinsic properties of a prior art compound by considering a variety and pre- and post-patent sources of information. *E.g.*, *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1372-73 (Fed. Cir. 2007); *Schering Corp.*, 339 F.3d at 1378-79; *Atlas Powder*, 190 F.3d at 1347-48. The criticism was also misdirected, because by considering peak data from several patterns, BMS was not "picking" peaks supportive of its positions while selectively disregarding others, the advocative evil targeted by the "picking and choosing" jurisprudence in the express anticipation context. Here, Mylan relied upon all the peaks present in various diffractograms of Form III/3 to

76

support its defense, and reliance on various diffractograms is proper because instrument noise or sample preparation difference can lead to the obscuring/disappearance of peaks from patterns.  (*See* A1958 at 326:23-328:2; A1990 at 456:6-457:15.)

With respect to DSC, BMS's own '372 patent indicates that Form III/3 has the claimed DSC peak at about 108° to 110° C:  "Form 3 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C."  (A91 at 6:41-44.)  Elsewhere, the '372 patent indicates that this peak corresponds to the melting point of Form 3.  (A94 at 12:46-48.)  Because a melting point is an intrinsic property that results from the unique molecular arrangement of the Form III/3 polymorph, Form III/3 can have only one true melting point.  (*See* A1994 at 470:11-472:1; A2110-11 at 764:23-765:21.)  Accordingly, the DSC peak at about 108° to 110° C is inherent to Form III/3.  Because the XRPD and DSC features of claim 18 are the "natural result flowing from" the intrinsic properties of Form III, Form III inherently anticipates claim 18. *SmithKline Beecham*, 403 F.3d at 1343-44; *Schering Corp.*, 339 F.3d at 1378-79.

In rejecting Mylan's inherent anticipation defense, the district court appeared to accept BMS's attempt to distance itself from its own

77

statements (and data (*see* A3511)) in the '372 patent and during its prosecution. (*See* A2399-2401.) But BMS is estopped from contradicting the information it provided to the PTO and to the public in exchange for a patent to Form 5. *See Springs Window Fashions L.P. v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003); *In re Nomiya*, 509 F.2d 566, 570-71 (C.C.P.A. 1975); *see also PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007) (rejecting expert's testimony regarding the prior art that was not reconcilable with the inventor's statements in the specification). Mylan, a member of the public and a "reasonable competitor," is entitled to rely on such representations made by a patent applicant during prosecution. *See Springs Window*, 323 F.3d at 995 ("Were we to accept [the patentee's] position, we would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies." (alteration in original)). BMS is accordingly estopped from denying that for Form III/3, the one true melting point (and hence inevitable DSC peak) is the one it reported in the patent-in-suit.

## Conclusion

For the foregoing reasons, the order finding the '372 patent valid and infringed should be reversed and the injunction vacated.

February 3, 2014

Respectfully submitted,

By:   /s/ David R. Marriott

David R. Marriott
David Greenwald
David J. Kappos
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Attorneys for Defendants/
Counterclaimants-Appellants*

# Addendum

## Table of Contents

<u>Confidential Material Omitted</u>

The material omitted on A9 describes the polymorphic form of the efavirenz in Mylan's ANDA product; and the material omitted on A11-12 and A23 describes the x-ray powder diffraction characteristics of the efavirenz in Mylan's ANDA product.

Page

### APPEALED ORDERS AND OPINION

ECF No. 243, Final Judgment Order, *Bristol-Myers Squibb Co., et al. v. Mylan Pharmaceuticals Inc., et al.* (C.A. No. 09-CV-00651 (LPS)), dated November 5, 2013 ........................................ A1-A2

ECF No. 232, Memorandum Opinion, *Bristol-Myers Squibb Co., et al. v. Mylan Pharmaceuticals Inc., et al.* (C.A. No. 09-CV-00651 (LPS)), dated September 30, 2013..................................... A3-A41

ECF No. 233, Order, *Bristol-Myers Squibb Co., et al. v. Mylan Pharmaceuticals Inc., et al.* (C.A. No. 09-CV-00651 (LPS)), dated September 30, 2013............................................................ A42-A43

### PATENT-IN-SUIT

Joint Trial Exhibit 1, U.S. Patent 6,673,372, issued January 6, 2004 ......................................................................... A80-A106

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB CO., and<br>BRISTOL-MYERS SQUIBB PHARMA<br>CO., | : <br> : <br> : <br> : |
| Plaintiffs/Counterclaim-Defendants, | : <br> : |
| v. | : C.A. No. 09-651-LPS |
| MYLAN PHARMACEUTICALS INC.,<br>MATRIX LABORATORIES LTD., | : <br> : <br> : |
| Defendants/Counterclaim-Plaintiffs. | : <br> : |
| v. | : <br> : |
| MERCK & CO., INC. and MERCK<br>SHARP & DOHME CORP., | : <br> : <br> : |
| Counterclaim Defendants. | : |

### FINAL JUDGMENT ORDER

WHEREAS, the Court held a five-day bench trial in the above-captioned action in January of 2013; and

WHEREAS, the Court issued its Memorandum Opinion, setting forth its Findings of Fact and Conclusions of Law, on September 30, 2013;

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED **this 5th day of November, 2013**, that:

1. Judgment shall be and is hereby entered in favor of Plaintiffs Bristol-Myers Squibb Co. and Bristol-Myers Squibb Pharma Co. (collectively, "BMS") and against Defendants Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd. (collectively, "Mylan" or "Defendants") on BMS's counts in its Complaint (D.I. 1) and in its Amended and Supplemental

Complaint (D.I. 183), that by submitting Abbreviated New Drug Application ("ANDA") No.

91-471, Mylan has infringed, and that Defendants' ANDA product described by ANDA No.

91-471, if commercially manufactured, used, marketed, or sold or offered for sale within the

United States or imported herein, would infringe claim 18 of U.S. Patent No. 6,673,372 ("the

'372 patent").

      2.      Judgment shall be and is hereby entered in favor of BMS and against Mylan on

Mylan's counterclaims set forth in the Answer to BMS's Amended and Supplemental Complaint

(D.I. 184), alleging noninfringement and invalidity of claim 18 of the '372 patent.

      3.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any Food and

Drug Administration ("FDA") approval of Mylan's ANDA 91–471 shall be no earlier than the

date of expiration of the '372 patent, which is at present June 10, 2019.

      4.      Pursuant to 35 U.S.C. § 271(e)(4)(B), Defendants, their officers, agents,

servants, and employees, and those persons in active concert or participation with them who

receive actual notice of this Final Judgment Order by personal service or otherwise, are hereby

permanently enjoined from manufacturing, using, offering to sell, or selling within the United

States, or importing into the United States, Defendants' ANDA product described in ANDA No.

91-471 during the term of the '372 patent.

_____

UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB CO., and BRISTOL-MYERS SQUIBB PHARMA CO., | : |
| | : |
| Plaintiffs/Counterclaim-Defendants, | : |
| | : |
| v. | : C.A. No. 09-651-LPS |
| | : |
| MYLAN PHARMACEUTICALS INC., MATRIX LABORATORIES LTD., | : **[FILED UNDER SEAL]** |
| | : |
| Defendants/Counterclaim-Plaintiffs. | : |
| | : |
| v. | : |
| | : |
| MERCK & CO., INC. and MERCK SHARP & DOHME CORP., | : |
| | : |
| Counterclaim Defendants. | : |

---

Mary B. Graham, Esq., Stephen J. Kraftschik, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.
Paul H. Berghoff, Esq., James C. Gumina, Esq., Sean M. Sullivan, Esq., S. Richard Carden, Esq., Andrew W. Williams, Esq., Kurt W. Rohde, Esq., Sydney R. Kokjohn, Esq., McDONNELL BOEHNEN HULBERT & BERGHOFF LLP, Chicago, IL.

    Attorneys for Plaintiffs/Counterclaim-Defendants Bristol-Myers Squibb Co., Bristol-Myers Squibb Pharma Co., Merck & Co., Inc. and Merck Sharp & Dohme Corp.

Mary B. Matterer, Esq., Richard K. Herrmann, Esq., MORRIS JAMES LLP, Wilmington, DE.
Timothy K. Kratz, Esq., Robert Florence, Esq., George J. Barry III, Esq., Karen L. Carroll, Esq., Micheal L. Binns, Esq., Marcus A. Barber, Esq., MCGUIREWOODS LLP, Atlanta, GA.

    Attorneys for Defendants Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd.

---

## MEMORANDUM OPINION

September 30, 2013
Wilmington, Delaware

STARK, U.S. District Judge:

In this patent infringement action, Plaintiffs Bristol-Myers Squibb Co. and Bristol-Myers

Squibb Pharma Co. (collectively "BMS"), allege that Defendants Mylan Pharmaceuticals Inc.

and Matrix Laboratories Ltd.[1] (collectively, "Mylan") infringe U.S. Patent No. 6,673,372 (the

'372 patent").[2]  The '372 patent relates to particular forms of crystalline efavirenz and use of

those forms to treat human immunodeficiency virus (HIV) infection.  (D.I. 191 Ex. 1 (Statement

of Uncontested Facts ("SUF")) ¶¶ 8, 32)  The Court held a five-day bench trial in this matter in

January of 2013.  (D.I. 210-214) (hereinafter "Tr.")[3]  The parties completed post-trial briefing on

April 12, 2013.  (D.I. 218, 219, 220, 221, 227, 228)

Pursuant to Federal Rule of Civil Procedure 52(a), and after having considered the entire

record in this case and the applicable law, the Court concludes that: (1) BMS has demonstrated

by a preponderance of the evidence that Mylan infringes claim 18 of the '372 patent; and

(2) Mylan has not proven by clear and convincing evidence that claim 18 of the '372 patent is

anticipated or invalid for failing to satisfy the definiteness, enablement, and written description

requirements of 35 U.S.C. § 112.  The Court's findings of fact and conclusions of law are set

forth below.

## I.    FINDINGS OF FACT

This Section contains the Court's findings of fact on the issues raised by the parties

during trial.  However, to avoid duplication, certain additional findings of fact are provided only

---

[1] Matrix Laboratories was dismissed from the suit by a joint stipulation of the parties.  (D.I. 180)

[2] Mylan filed a counterclaim against BMS and Counterclaim-Defendants Merck & Co., Inc. and
Merck Sharp & Dohme Corp. (collectively "Merck") seeking, *inter alia*, a declaratory judgment
of non-infringement and invalidity with respect to the '372 patent.  (*See* D.I. 47)

[3] Certain portions of the trial testimony were sealed, and appear in a separate transcript.  (*See* D.I.
208) (hereinafter "Conf. Tr.")

in connection with the Court's conclusions of law.

### A.    The Parties

1.    Bristol-Myers Squibb Company is a corporation organized and existing under the laws of the State of Delaware, having a place of business at Route 206 and Province Line Road, Princeton, New Jersey 08540.  (SUF ¶ 1)

2.    Bristol-Myers Squibb Pharma Company, an indirect wholly-owned subsidiary of Bristol-Myers Squibb Co., is a general partnership organized and existing under the laws of the State of Delaware, having its principal place of business at Route 206 and Province Line Road, Princeton, New Jersey 08540.  (SUF ¶ 2)

3.    Mylan Pharmaceuticals Inc. is a corporation organized and existing under the laws of the State of West Virginia, with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  (SUF ¶ 3)

4.    Matrix Laboratories Ltd. is a wholly-owned indirect subsidiary of Mylan Inc., formally known as Mylan Laboratories, Inc., operating and existing under the laws of India, with its principal place of business at 1-1-151/1, 4th Floor, Sal Ram Towers, Alexander Road, Secunderabad – 500 003, Andhra, Pradesh, India.  (SUF ¶ 4)

5.    Merck & Co., Inc., is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse Station, New Jersey 08889.  (SUF ¶ 5)

6.    Merck Sharp & Dohme Corp. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse Station, New Jersey 08889.  (SUF ¶ 6)

2

**B.    U.S. Patent No. 6,673,372**

7.    The '372 patent issued from U.S. Patent Application No. 09/329,421 ("the '421 application"), which was filed on June 10, 1999. (SUF ¶ 21; JTX-001) The '372 patent, entitled "Crystalline Efavirenz," was issued by the USPTO on January 6, 2004 and expires on June 10, 2019. (SUF ¶¶ 22, 25) The USPTO issued two Certificates of Correction for the '372 patent, on July 13, 2004 and April 17, 2012. (SUF ¶ 23)

8.    The inventors of the '372 patent are Lilian A. Radesca, Michael B. Maurin, Shelley R. Rabel, and James R. Moore. (SUF ¶ 27) The '372 patent was assigned to Bristol-Myers Squibb Pharma Company on October 1, 2001. (SUF ¶ 28)

9.    The '372 patent is directed to various forms of crystalline efavirenz. (SUF ¶¶ 26, 32) Crystalline efavirenz exists in several polymorphic forms, which are designated Forms 1, 2, 3, 4, and 5. (SUF ¶ 32)

10.    A polymorph of a given compound is a distinct entity with its own structure and intrinsic properties. (Tr. at 142, 153-54, 323, 325-27) The structure and properties of crystalline forms can be characterized using a number of different techniques, including x-ray powder diffraction ("XRPD") and differential scanning calorimetry ("DSC"). (JTX-001 at col. 1, ll. 8-11; Tr. at 146-56, 324-33) Running the appropriate XRPD and DSC tests is within the skill of one of ordinary skill in the art. (Tr. at 707-08, 646-47, 726)

11.    An XRPD analysis is conducted using a diffractometer. (JTX-001 at col. 21, ll. 33-44; Tr. at 150) The results of an XRPD analysis are typically represented as a plot with diffraction angles (2θ values) and relative intensities. (Tr. at 149-50) The 2θ values represent intrinsic properties of a crystal, meaning that the 2θ values for a given polymorph are generally

3

different from the 2θ values for a different polymorph. (Tr. at 153, 325-26)

    12.    DSC is used to measure thermal properties of compounds. (Tr. at 330) The output of a DSC experiment is a thermogram, in which endothermic peaks point in one direction and exothermic peaks point in the other direction. (Tr. at 331-32) If two thermograms of a given compound have a peak in the same position, but one peak is exothermic and the other peak is endothermic, one of ordinary skill in the art would conclude that the thermograms are of two different polymorphs. (Tr. at 794)

    13.    Various factors, such as preparation of the sample, length of collection time, and the presence of impurities, may affect the accuracy of the XRPD or DSC measurement. (Tr. at 457-59, 695-96) For example, the presence of impurities in a sample can affect its powder x-ray pattern and generate peaks not associated with the particular polymorph of interest. (Tr. at 458-459, 695-96)

    14.    BMS contends that Mylan infringes claim 18 of the '372 Patent. (D.I. 200) Claim 18 of the '372 Patent depends from claim 16. (JTX-001) Claim 16, as corrected by the Certificate of Correction issued on April 17, 2012, reads:

> 16. Form 5 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising six or more 2θ values selected from the group consisting of 10.2±0.2, 11.4±0.2, 11.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2. (JTX-001)

    15.    Claim 18 reads:

> 18. The compound of claim 16, which is characterized by a differential scanning calorimetry thermogram having a peak at about 108 °C to about 110 °C. (JTX-001)

    16.    The specification of the '372 patent discloses all eleven 2θ values listed in claim

16 and states that in a "preferred embodiment, Form 5 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C to about 110° C." (JTX-001 at col. 8, ll. 50-53; SUF ¶ 46)

### C.    Efavirenz

17.    The chemical name for efavirenz is (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one. (SUF ¶ 29) Efavirenz is also known by the chemical name (-)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one. (SUF ¶ 29)

### D.    Sustiva®

18.    BMS is the holder of New Drug Application ("NDA") No. 21-360, which relates to tablets containing a 600 mg dose of efavirenz. (SUF ¶ 7)

19.    On February 1, 2002, the United States Food and Drug Administration ("FDA") approved the marketing of the tablets described in NDA No. 21-360 in combination with other antiretroviral agents for the treatment of human immunodeficiency virus type 1 (HIV-1) infection. (SUF ¶ 8)

20.    The tablets described in NDA No. 21-360 are sold in the United States by BMS using the trademark Sustiva®. (SUF ¶ 9) Sustiva® contains the polymorphic form of crystalline efavirenz known as Form 1. (SUF ¶ 10)

21.    The FDA's entry for Sustiva® in the "Approved Drug Products with Therapeutic Equivalence Evaluations" ("Orange Book") lists U.S. Patents Nos. 6,639,071 ("the '071 patent") and 6,939,964 ("the '964 patent"). (SUF ¶¶ 13, 18)

22.    The '071 patent expires on February 14, 2018. (SUF ¶ 13) The '964 patent

5

Confidential Material Has Been Deleted From This Page

expires on January 20, 2018.  (SUF ¶ 18)

### E.    Mylan's ANDA No. 91-471 and ANDA Product

23.    On April 9, 2009, Mylan submitted Abbreviated New Drug Application

("ANDA") No. 91-471 to the U.S. Food and Drug Administration ("FDA"), seeking approval to

engage in the commercial manufacture, use, or sale of tablets containing 600 mg of efavirenz

("Mylan's ANDA product").  (SUF ¶ 33)  ANDA No. 91-471 also seeks approval to market

Mylan's ANDA product in combination with other antiretroviral agents for the treatment of

human immunodeficiency virus type 1 (HIV-1) infection.  (SUF ¶ 34)  Mylan refers to the form

of efavirenz in its ANDA product as ▮▮▮▮  (SUF ¶ 33)  On March 28, 2011, Mylan received

tentative approval from the FDA to market its ANDA product.  (SUF ¶ 41)

24.    In conjunction with its ANDA filing, Mylan submitted a certification pursuant to

21 U.S.C. § 355(b)(2)(A)(iv) ("Paragraph IV certification") that the '071 and '964 patents are

invalid, unenforceable, and will not be infringed by the manufacture, use, sale, offer for sale, or

importation of its ANDA Product.  (SUF ¶ 35; JTX-067)

25.    By letter dated July 16, 2009 (the "Notice Letter"), Mylan notified BMS and

Merck of its Paragraph IV certification, as required by 21 U.S.C. § 505(j)(2)(B)(ii).  (SUF ¶ 36;

JTX-067)  In the Notice Letter, Mylan notified BMS and Merck that it is seeking FDA approval

to engage in the commercial manufacture, use, and/or sale of Mylan's ANDA product prior to the

expiration of the '071 and '964 patents.  (SUF ¶ 37; JTX-067 at p. 04)  Within 45 days of

receiving Mylan's Notice Letter, BMS brought suit against Mylan alleging infringement of the

'372 Patent.  (D.I. 1; SUF ¶ 40)

26.    On May 26, 2010, BMS and Merck executed a covenant not to sue Mylan for

infringement of the '071 and '964 patents with respect to the filing of ANDA No. 91-471 and the

manufacture, use, distribution, sale, offer for sale, or importation by, for, or to Mylan of the

products described in, and the subject of, ANDA No. 91-471.  (SUF ¶ 38)

    **F.**    **Facts Relating to Infringement and Validity of the '372 Patent**

          **1.**    **Expert witnesses**

27.    Dr. Jerry Atwood testified as an expert in "polymorphs, including how to make

polymorphs and how to characterize polymorphs," on behalf of BMS.  (Tr. at 139)

28.    Dr. Harold Kessler testified as a "medical expert in the treatment of HIV and

AIDS and the history and treatment of HIV and AIDS," on behalf of BMS.  (Tr. at 532)

29.    Dr. Mark David Hollingsworth testified as an expert in "organic chemistry and the

study of crystal forms, including crystal engineering, crystallography, the identification,

characterization, and isolation of crystal forms, organic chemical synthesis, organic solids, and

polymorphs," on behalf of Mylan.  (Tr. at 320-21)

30.    Dr. Craig Eckhardt testified as an expert in "the growth and manipulation of

crystalline organic compounds and characterizing and analyzing solid materials, including

crystalline materials using laboratory techniques, including differential scanning calorimetry, x-

ray diffraction, and powder x-ray diffraction," on behalf of Mylan.  (Tr. at 593-94)

          **2.**    **Person having ordinary skill in the art**

31.    Dr. Atwood defined a person of ordinary skill in the art as someone with a Ph.D.

"in fields relevant to small molecule drug development, such as biochemistry, medicinal

chemistry, organic chemistry, or the equivalent, or a bachelor's degree in the same field(s) with

four to six years of practical experience."  (Tr. at 678)

7

Confidential Material Has Been Deleted From This Page

32.    Dr. Hollingsworth defined a person of ordinary skill in the art as one likely to have experience and/or an advanced degree (*i.e.*, a Ph.D. degree) "in fields relevant to small molecular drug development, such as biochemistry, medicinal chemistry, organic chemistry, or the equivalent, and at least one to two years of practical experience in the development and/or characterization of small molecules." According to Dr. Hollingsworth, a person of skill in the art might have a lesser degree (such as a B.S. or B.A. degree in the same fields) with increased time (2-3 years) of practical experience in the research and development and/or characterization of small molecules. (Tr. at 338-39)

33.    Both Dr. Atwood and Dr. Hollingsworth agreed that their opinions as to the validity of the patent would remain the same regardless of which definition of the person of ordinary skill in the art the Court ultimately adopts. (Tr. at 340, 678-79)

34.    The Court adopts BMS's proposed definition for one of ordinary skill in the art. The Court agrees with Dr. Atwood that the multi-year study and training program associated with an advanced degree, such as a Ph.D., cannot be replaced by a single additional year of work experience. (Tr. at 678) This level of skill is lower than, but consistent with, the skill level of Mr. Moore, an inventor on the '372 patent, who holds a bachelor's degree and worked with pharmaceuticals for over 10 years before discovering Form 5 of crystal efavirenz. (Tr. at 200-11, 228)

### 3.    Mylan's ANDA product

35.    Mylan's ANDA product is crystalline efavirenz. (JTX-067 at p. 4)

36.    The active pharmaceutical ingredient and Mylan's ANDA product have peaks at the following $2\theta$ values, within the ranges identified: ███████████████████

8

███████████████████████████████████████████ ] (SUF ¶ 43) X-ray

powder diffraction testing further indicated that Mylan's active pharmaceutical ingredient and

ANDA product have additional peaks at the following 2θ values ███████████████████

███████████████████████████████████████████ ]

(*Id.*)

37.    Mylan's ANDA product has a DSC thermogram with a peak at about 108° C to

about 110° C. (JTX-037 at pp. 06-08; JTX-113 at p. 32)

### 4.    Facts Relating to Anticipation and Indefiniteness

38.    United States Patent No. 5,965,729 issued on October 12, 1999 from patent

application No. 09/008,824, which was filed January 20, 1998, and is entitled "Process for the

Crystallization of a Reverse Transcriptase Inhibitor Using an Anti-Solvent." (JTX-107)

39.    The '729 patent is prior art to the '372 patent. (SUF ¶ 12; Tr. at 686)

40.    The '729 patent covers certain crystalline forms of efavirenz. (*See* JTX-107)

These are Form I, II, and III, which correspond to Forms 1, 4, and 3 of the '372 patent. (Tr. at

367; JTX-004 at p. 205)  In particular, BMS has agreed that "Form 3 [of the '372 patent]

corresponds to Form III [of the '729 patent]." (JTX-004 at p. 205)

41.    The '729 patent shows the full XRPD patterns for Forms I, II, and III in Figures 3,

4, and 5, respectively, as well as a list of 2θ values for each of these forms. (JTX-107 at p. 3-5,

col. 5, ll. 15-40)  That listing of 2θ values is reproduced below:

9

| Form I | Form II | Form III |
|--------|---------|----------|
| 6.0800 | 3.6375 | 7.2150 |
| 6.3900 | 6.3325 | 10.9675 |
| 10.3950 | 11.0725 | 13.7275 |
| 10.9875 | 12.7750 | 14.5325 |
| 12.2850 | 13.3275 | 16.7275 |
| 13.1900 | 14.2925 | 19.0675 |
| 14.1700 | 16.1200 | 19.6550 |
| 15.1925 | 16.8975 | 20.8250 |
| 16.9000 | 18.5025 | 21.7450 |
| 18.4375 | 19.1975 | 22.2825 |
| 19.2275 | 19.6025 | 22.8475 |
| 20.0925 | 20.6650 | 23.1750 |
| 21.2100 | 21.3250 | 23.8850 |
| 22.3600 | 22.6150 | 24.4900 |
| 23.0725 | 23.1775 | 24.9075 |
| 24.8900 | 24.4075 | 25.8200 |
| 25.9500 | 24.9650 | 27.0325 |
| 26.3575 | 26.0100 | 27.6050 |
| 27.2550 | 26.8550 | 29.2975 |
| 28.1150 | 27.6400 | 30.2600 |
| 28.5850 | 28.3675 | 30.7300 |
| 29.1325 | 29.1725 | 31.3125 |
| 29.5625 | 29.6325 | 33.3975 |
| 30.6850 | 30.5650 | 38.4325 |
| 32.3725 | 31.8950 | 39.2100 |
| 38.3125 | 33.8225 | |

42.     As illustrated above, the listing of 2θ values for Form III in the '729 patent

includes: 19.1, 20.8, 22.8, 24.9, and 27.6. (JTX-107 at col. 5, ll. 15-50) These five 2θ values

match five of the recited 2θ values of Claim 16 of the '372 patent. (Tr. at 371)

43.     The '729 patent also provides the DSC of Form III in Figure 6. (JTX-107 at p. 6;

Tr. at 367-68) According to the '729 patent, DSC results show a peak at 118° C. (JTX-107 at

col. 5, ll. 55-59) The '372 patent, on the other hand, states that Form 3 has a DSC peak at about

108° C to about 110° C. (JTX-001 at col. 6, ll. 49-61)

44.     BMS publishes an "Encyclopedia of Solid State Forms" (JTX-019), which

contains an x-ray powder diffraction pattern for "pure" Form III, and serves as a BMS reference

standard for Form III. (Tr. at 700) JTX-117 is a computer analysis of the x-ray powder

diffraction pattern for Form III in the BMS Encyclopedia. Dr. Atwood testified that Dr.

10

Radesca's XRPD pattern for Form III, identified as Sample No. 7858-40E, is the same form

contained in the BMS Encyclopedia. (Tr. at 700-01; 768-69; JTX-117 at p. 6; JTX-019 at p. 15)

45.    The Form III XRPD pattern from page 6 of JTX-117 is reproduced below:



46.    Mylan's experts did not conduct any independent tests in connection with this

litigation. (Tr. at 472-73)

### 5.    Facts Relating to Enablement and Written Description

47.    The '372 patent teaches that the appropriate solvent system for crystallizing Form

5 efavirenz is THF/heptane. (Tr. at 715; JTX-001 at col. 13, ll. 28-30, col. 27, l. 67 to col. 28, l.

22)  Specifically, Example 17 teaches that Form 5 can be crystallized from a slurry of "1% v/v

11

A14

THF/heptane" (i.e., 1% THF, 99% heptane). (Tr. at 711-12, 723-24; JTX-001 at col. 27, l. 67 to

col. 28, l. 22) A slurry is prepared by adding efavirenz to the solvent until no more efavirenz

dissolves. (Tr. at 723) Example 17 uses approximately 70 grams of efavirenz in either one liter

or 1.5 liters of 1% v/v THF/heptane. (JTX-001 at col. 27, l. 67 to col. 28, l. 22)

48.    The '372 Patent states that "Form 5 is the most thermodynamically stable form

below 40° C." (JTX-001 at col. 13, ll. 24-26) Example 17 illustrates three experiments in which

Form 5 is crystallized at room temperature, which is below 40° C. (Tr. at 718; JTX-001 at col.

27, l. 67 to col. 28, l. 22)

49.    Scheme 4 of the '372 Patent teaches that Form 5 can be obtained using slow

crystallization from a dilute solution. (Tr. at 720; JTX-001 at col. 13, ll. 28-60) The third

paragraph of Example 17 describes an experiment in which the dilute solution was "allowed to

cool to room temperature overnight and Form 5 crystals were then collected by filtration." (JTX-

001 at col. 28, ll. 19-22)

50.    The specification of the '372 patent states that "[Form 5] crystals may be obtained

by recrystallization from a dilute solution of THF/heptane. The crystals may be obtained from

solutions in which either Form 1 or Form 4 have already been isolated." (JTX-001 at col. 13,

lines 28-32; SUF ¶ 48) Scheme 5 then directs one skilled in the art to apply the teachings of

Example 17 to this dilute solution, as illustrated below. (Tr. at 736; JTX-001 at col. 26, ll. 1-25)



(JTX-001 at col. 26, Scheme 5; *see also* JTX-001 at col. 28, ll. 19-22)

51.    Example 17 of the '372 patent discloses that the slurry was seeded "periodically

12

with Form 5 until the seeds no longer dissolved (63° C), then allowed to cool to 45° C and filtered." (JTX-001 at col. 28, ll. 17-19) Mr. Moore testified that if efavirenz is dissolved in solution, the "crystal form is gone." (Tr. at 234) The filtering step of Example 17 removes whatever seeds have not dissolved into the slurry. (Tr. at 252-53, 736-38)

52.     After his discovery of Form 5, Mr. Moore investigated how to reproduce it. (Tr. at 234) Mr. Moore ran ten experiments in order to determine how to make Form 5. (*See* Tr. at 235-57) Mr. Moore described these experiments on pages 142-64 of his laboratory notebook, Notebook No. DMP 7051. (JTX-056 at pp. 149-71)

53.     In his first experiment, Mr. Moore took isolated efavirenz and dissolved it in a mixture of about 20% v/v THF/heptane. (Tr. at 235; JTX-056 at p. 149) He then concentrated it to a paste at less than 40° C, in order to remove the solvent and encourage crystallization. (*Id.*) The resulting polymorph was Form 2. (Tr. at 236; JTX-056 at p. 149) Next, he reconstituted the paste with additional THF and heptane and warmed the mixture up to 70° C. (*Id.*) He cooled it slowly to 40° C and nothing crystallized, so he concentrated it to a paste once again. (*Id.*) The resulting polymorph this time was Form 4; so Mr. Moore reslurried again, splitting the sample into two and adding acetic acid to one of the samples. (*Id.*) No crystals formed in either sample, so he opened the flasks and allowed the solvent to evaporate. (Tr. at 237; JTX-056 at p. 150) Small rings formed at the solvent lines for each sample, but no crystals. (Tr. at 237) He then seeded both samples with his originally discovered Form 5 crystals and a few days later both samples had crystals in them – and the crystals in the sample without acetic acid were Form 5. (Tr. at 237; JTX-056 at p. 150)

54.     Mr. Moore's second polymorphic experiment is described on page 146 of his

13

laboratory notebook (JTX-056 at p 153)  In this experiment, he took the mother liquor from a previous synthesis reaction and seeded it with his originally isolated Form 5 crystals several times; he did not obtain Form 5 crystals. (Tr. at 242-43; JTX-056 at p. 153)

55.     Mr. Moore proceeded to do seven more experiments, described at pages 161-64 of his laboratory notebook (Experiments #1-7 below). (JTX-056 at p. 168-71)  In these experiments, he was studying crystallization in 1% v/v THF/heptane. (Tr. at 245-46)

56.     In Experiment #1, Mr. Moore took a sample of efavirenz and slurried it in one liter of 1% v/v THF/heptane, filtered out the residual solids, and seeded it. (Tr. at 246; JTX-056 at p. 168)  The experiment resulted in the formation of Form 5 crystals. (*Id.*)

57.     In Experiment #2, Mr. Moore added the solids that had been filtered out of Experiment #1 to 1.5 liters of 1% v/v THF/heptane and warmed it to 40° C. (Tr. at 248; JTX-056 at p. 168)  He then filtered out residual solids while the mixture was still warm and seeded with Form 5 crystals. (*Id.*)  The resulting Form 5 crystals formed quickly, yielding about ten times more material than had been obtained in Experiment #1. (*Id.*)

58.     In Experiment #3, Mr. Moore reslurried the solids that had been filtered out of Experiment #2 and warmed the mixture to 79° C. (Tr. at 249; JTX-056 at p. 168)  He then filtered out the residual solids, seeded with Form 5, and let the mixture cool. (*Id.*)  The result was a mixture of Forms 2 and 5. (*Id.*)  Mr. Moore testified that he believes he got the mixture because the temperature was too high. (Tr. at 250)  The next day, the mother liquor from the sample had formed "crystals in long needles." (JTX-056 at p. 169)  An XRPD analysis found that these crystals were Form 5. (JTX-056 at p. 169; JTX-055 at p. 187)

59.     In Experiment #4, Mr. Moore concentrated the leftover materials from the

14

previous experiments into a paste, reslurried the paste in the solvent mixture, and warmed it to 80° C. (Tr. at 250; JTX-056 at p. 169) He then cooled it slowly, seeding periodically until the seeds no longer dissolved. (*Id.*) He continued cooling and solids precipitated – they were Form 2, not Form 5. (Tr. at 250-51; JTX-056 at p. 169)

60.    In Experiment #5, Mr. Moore reconcentrated everything from Experiment #4 into a paste, dissolved it into heptane, and added THF to make a 1% v/v THF/heptane solution. (Tr. at 251-52; JTX-056 at p. 169) He warmed the mixture to about 80° C and, at about 85° C, everything was dissolved. (Tr. at 252; JTX-056 at p. 169) He then cooled the mixture slowly to 63° C and seeded. (*Id.*) The resulting samples were Form 1, so Mr. Moore reheated it to dissolution and cooled it very slowly, seeding until the solids precipitated out at 50° C. (Tr. at 252; JTX-056 at p. 170) He filtered out the seeds and solids at 45° C, resulting in a clear mother liquor with no solids or seeds in it. (*Id.*) He then let the mother liquor sit overnight without seeding and found that the resulting solids were Form 5. (Tr. at 252-53; JTX-056 at p. 170)

61.    In Experiment #6, Mr. Moore warmed a sample of efavirenz in a 1% v/v THF/heptane solution to 40° C. (Tr. at 253-54; JTX-056 at p. 170) He filtered out the residual solids and separated the resulting mother liquor into two flasks. (Tr. at 254; JTX-056 at p. 170) On the next day, there were Form 5 crystals in both flasks. (*Id.*)

62.    In Experiment #7, Mr. Moore combined the remaining mother liquors and non-Form 5 solids from the previous experiments, concentrated those into a paste, and chased it with heptane to remove any residual THF. (Tr. at 255; JTX-056 at p. 171) He then reconstituted it in one liter of 1% v/v THF/heptane and warmed it to 85° C. (*Id.*) After cooling it to 50° C, he filtered out the precipitate that had formed, and then seeded the solution with Form 5. (Tr. at

15

255-56) He held it at room temperature overnight and Form 5 resulted. (Tr. at 256; JTX-056 at p. 171) Given the results of his experiments, Mr. Moore concluded, "Excellent. Produced Form V Repeatedly." (Tr. at 256-57; JTX-056 at p. 171)

## II.    INFRINGEMENT

BMS contends that Mylan's planned commercial manufacture, use, sale, or offer for sale in the United States and importation into the United States of Mylan's ANDA product will infringe claim 18 of the '372 patent. The Court agrees with BMS.

### A.    Legal Standards

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A two-step analysis is required before making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, a court must construe the asserted claims. *See id.* Next, the trier of fact must compare the properly construed claims with the accused infringing product. *See id.*

Literal infringement is present only when each and every element set forth in the patent claims is found in the accused product. *See Southwall Techs., Inc. v. CardinaliG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). The patent owner has the burden of proving infringement by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

### B.    Discussion

There are no factual disputes with respect to infringement. Mylan's non-infringement argument concerns only the appropriate application of the Court's construction of the Markush

16

group language in claim 18 to the undisputed facts. (*See* Tr. at 838, 885-86)

Claim 18 depends from claim 16, which requires:

> 16. Form 5 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising six or more 2θ values selected from the group consisting of: 10.2±0.2, 11.4±0.2, 11.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2.

(JTX-001) The Court has construed the Markush group language "selected from the group consisting of" to mean that "the x-ray powder diffraction pattern must include at least [6] of the 2θ values selected from 10.2±0.2, 11.4±0.2, 11.6±0.2, [] 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2."[4]  (D.I. 179 at ¶ 9)

Mylan contends that the phrase "selected from the group consisting of" limits the x-ray powder diffraction pattern to the eleven 2θ values specifically recited in the claim, and nothing more. (D.I. 220 at 2-8)  According to Mylan, if a crystal sample has an x-ray powder diffraction pattern with more than the eleven claimed 2θ values, that sample is outside the scope of claim 16. (D.I. 220 at 3)  BMS, on the other hand, contends that the word "comprising" in claim 16 renders the claim open-ended and that the transitional phrase "consisting of," used in the Markush group, closes only the group of alternative 2θ values, not the entire claim. (*See* D.I. 218 at 6) (citing *Maxma v. ConocoPhillips Inc.*, 2005 WL 1690611, at *5 (E.D. Tex. July 19, 2005)) The Court agrees with BMS.[5]

---

[4] Claim 16 was amended by a Certificate of Correction to delete "12.6±0.2" from the list of possible 2θ values. (*See* JTX-001) Hence, the Court's construction should also not include this 2θ value and is hereby modified to eliminate the 12.6 value.

[5] To the extent the Court's holding involves a clarification of its prior claim construction, such clarification is permissible. *See Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) ("District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.").

17

Claim 16 is directed to Form 5 of crystalline efavirenz. The Court has construed the term "Form 5" as: "A polymorphic crystal form of [efavirenz] that can be distinguished from other forms." (D.I. 179 ¶ 4) According to the claim, Form 5 is distinguished from other crystal forms by certain 2θ values in an x-ray powder diffraction pattern. The "consists of" language defines a group of possible 2θ values in an x-ray powder diffraction pattern that can be used to characterize the crystal form. As explained in the Court's Markman Opinion (D.I. 178 at 9), the Markush group is closed with respect to the 2θ values that can be used to characterize Form 5. Read in context, however, neither the claim itself nor the Court's construction of the claim precludes an x-ray powder diffraction pattern having additional 2θ values. Because the claim also includes the transitional phrase "comprising," additional 2θ values are permissible, but those 2θ values cannot be used to characterize the crystal form.

The Court's conclusion is consistent with the Federal Circuit's reasoning in *In re Crish*, 393 F.3d 1253, 1257 (Fed. Cir. 2004). There, the claim at issue included both "comprising" and "consisting of" as transitional phrases, requiring: "A purified oligonucleotide *comprising at least a portion* of the nucleotide sequence of SEQ ID NO: 1, wherein *said portion consists of* the nucleotide sequence from 521 to 2473 of SEQ ID NO: 1." *Id*. at 1254-55 (emphasis added). The Federal Circuit concluded that the transitional phrase "consists of" modifies the "said portion" language of the claim, while the word "'comprising' means that the claim can include that portion plus other nucleotides." *Id*. at 1257. As in *In re Crish*, the phrase "consists of" restricts only the 2θ values that may be used to characterize Form 5, while the term "comprising" allows for the possibility of additional 2θ values in an XRPD pattern, although those additional values may not be used to characterize Form 5.

18

The Court is also guided by the claim construction principles set forth in *Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (internal quotation marks omitted):

> Ultimately, the interpretation to be given a term can only be
> determined and confirmed with a full understanding of what the
> inventors actually invented and intended to envelop with the claim.
> The construction that stays true to the claim language and most
> naturally aligns with the patent's description of the invention will
> be, in the end, the correct construction.

The '372 patent discloses different polymorphic forms of crystal efavirenz, which are

characterized by certain $2\theta$ values on an x-ray powder diffraction pattern. (JTX-001 at col. 1, ll.

7-11) As Dr. Hollingsworth explained, the $2\theta$ values on an XRPD pattern represent intrinsic

properties of a crystal structure. (Tr. at 325-26) As a result, different polymorphs of the same

compound will have different XRPD patterns. (Tr. at 153) However, "the number of peaks that

one gets [on an XRPD pattern] depends in large measure on how much time one spends carrying

out the experiment, taking the pattern itself;" depending on how long one runs the experiment,

there could be as many as "2,100 possible peaks on an XRPD pattern." (*See* Conf. Tr. at 49-50)

In other words, a crystalline form of a compound will always have the same XRPD pattern, but

running the experiment for a longer period of time will result in additional peaks appearing in the

pattern.[6] In this context, adopting Mylan's proposed construction would mean that running the

diffractometer for a short amount of time could result in a finding of infringement, but running

the same experiment for a different (longer) amount of time could result in pattern that does not

infringe. Such a result would not be sensible, nor would it "align[] with the patent's description

---

[6]Mylan's expert, Dr. Eckhardt, acknowledged that he is not aware of any polymorphic form of
crystal efavirenz with fewer than 11 total peaks in its XRPD pattern. (Tr. at 641)

Confidential Material Has Been Deleted From This Page

of the invention."[7] *Phillips*, 415 F.3d at 1316.

Having resolved the claim construction dispute in favor of BMS, the Court concludes that BMS has proven that Mylan infringes claim 18 of the '372 patent by a preponderance of the evidence. Mylan's ANDA product is crystalline efavirenz. (JTX-067 at p. 4) █████████ ██████████████████████████████████████ ████ █ █████████████████████████████ ████████████████████ ] Mylan's ANDA product has a DSC peak between 108° and 110° C. (JTX-037 at pp. 06-08; JTX-113 at p. 32) In sum, BMS has proven that all of the limitations of claim 18 are present in Mylan's ANDA product, so BMS has proven that Mylan's ANDA product infringes that claim.

## III.    VALIDITY

Mylan has raised four separate invalidity challenges to claim 18 of the '372 patent: (1) anticipation; (2) indefiniteness; (3) enablement; and (4) written description. The Court will address these in order.

### A.    Anticipation

Mylan asserts that claim 18 of the '372 patent is invalid as being anticipated by a different prior art crystal form of efavirenz, Form III. (D.I. 220 at 14, 26-27) In view of the evidence presented at trial and for the reasons that follow, the Court concludes that Mylan has not proven

---

[7]The Court disagrees with Mylan's contention that adopting BMS's proposed construction would result in the "recapture" of subject matter recited in claim 158, which was canceled during prosecution. (*See* D.I. 228 at 4) At the time claim 158 was canceled, the claim included the same Markush group language as remains in present claim 18. (JTX-004 at pp. 169, 196) The amendment proposed by applicants was never entered, since the claim had previously been canceled.

anticipation by clear and convincing evidence.

### 1.     Legal Standards

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Inherent anticipation, which is the theory Mylan asserts here, requires that every element of the claim must "necessarily and inevitably" be present in the anticipating reference, even though those elements are not expressly disclosed. *See id.* at 1378. "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011).

An issued patent is presumed valid. *See* 35 U.S.C. § 282. Whether a prior art reference anticipates a patent claim is a question of fact, and proving anticipation requires clear and convincing evidence. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010). Clear and convincing evidence is evidence that "proves in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable." *Intel Corp. v. ITC*, 946 F.2d 821, 830 (Fed. Cir. 1991) (internal quotation marks omitted).

### 2.     Discussion

Mylan contends that the inherent physical characteristics of Form III crystalline efavirenz disclosed in the '729 patent (JTX-107) satisfy each limitation of claim 18 of the '372 patent.[8] BMS responds that Mylan has failed to prove by clear and convincing evidence that Form III:

---

[8]The '729 patent was considered by the Patent Examiner during prosecution of the '372 patent. (JTX-004 at p. 189)

21

(1) necessarily has a DSC peak between 108° and 110° C; and (2) inherently includes at least six of the 2θ values required by claim 18. (D.I. 218 at 11-12) The Court agrees with BMS.

At trial, the parties agreed that a polymorph of a given compound is a distinct entity with its own structure and intrinsic properties. (Tr. at 142, 153-54, 323, 325-27) The parties also agreed that the structure and properties of those crystalline forms can be evaluated using x-ray powder diffraction and differential scanning calorimetry. (Tr. at 145-47, 154-55, 324) The parties further agreed that various factors, such as preparation of the sample, length of collection time, or the presence of impurities could affect the accuracy of the XRPD or DSC measurement. (Tr. at 457-59, 695-96)

Claim 18 of the '372 patent requires a DSC peak between 108° and 110° C. There is no dispute that the '729 patent describes Form III as having a DSC peak at 118° C (JTX-107 at col. 5, ll. 55-61), which the experts agree is clearly different from the claimed range. (*See* Tr. at 469-70, 686-87) The '372 patent, however, describes Form 3 as having a DSC peak at about 108° C to about 110° C. (JTX-001 at col. 6, ll. 49-61) Mylan contends that the DSC peak for Form 3 in the '372 patent should also be attributed to Form III of the '729 patent, because BMS has previously agreed that "Form 3 [of the '372 patent] corresponds to Form III [of the '729 patent]."[9] (D.I. 220; JTX-004 at 205)

Mylan's expert, Dr. Hollingsworth, testified that there is a "conflict" as to which of the DSC patterns – the one in the '729 patent, showing a peak at 118° C, or the one in the '372 patent, showing a peak at about 108° to 110° C – is correct. (Tr. at 470) Dr. Hollingsworth

---

[9]This statement was made in the context of a dispute between BMS and Merck as to the ownership of Form 3.

opined that because the '372 patent was filed after the '729 patent, one of ordinary skill in the art would expect the '372 patent to be correct.[10]  (Tr. at 471-72)  This is not persuasive.

The record includes documents created by BMS prior to this litigation describing Form III as having a DSC peak at 117° C.  For example, BMS's Encyclopedia of Solid State Forms ("BMS Encyclopedia") describes Form III as having a DSC peak at 117° C.  (JTX-019 at p. 23)  This is consistent with the disclosure of Merck's independently developed '729 patent.  Taken together, this evidence supports a finding that Form III has a DSC peak at about 117° C.

Mylan could have attempted to rebut this evidence, but – despite having the burden of proof – it did not.  For example, Dr. Hollingsworth testified that he "could make Form 3," and had the equipment necessary to conduct a DSC test, but he did not do so.  (Tr. at 472-73)  Given the state of the record – which by even Dr. Hollingsworth's estimation shows only a "conflict" – the Court concludes that Mylan has failed to establish by clear and convincing evidence that Form III in the '729 patent has a DSC peak between 108° and 110° C, as required by claim 18 of the '372 patent.

The asserted patent claim further requires "an x-ray powder diffraction pattern compris[ing] six or more 2θ values selected from the group consisting of 10.2±0.2, 11.4±0.2, 11.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2." (JTX-001)  Mylan concedes that the '729 patent includes only five – not six or more – of the 2θ values required by claim 18.  (JTX-107 at col. 5, ll. 16-39; Tr. at 371, 694)  According to Mylan, however, the inherent physical characteristics of Form III result in additional 2θ values that

_____

[10]Dr. Hollingsworth also testified that the DSC peak of between 108° and 110° C "could be a mistake in the '372 patent."  (Tr. at 471)

23

correspond to the 2θ values of claim 18. To establish the "inherent" characteristics of Form III,

Mylan relies on an x-ray powder diffraction pattern from an internal BMS file labeled as Form III

(JTX-075), the BMS Encyclopedia (JTX-019), and a computer analysis of Form III disclosed in

the BMS Encyclopedia (JTX-117). (D.I. 220 at 16-18)

Dr. Hollingsworth testified that the x-ray powder diffraction pattern for Form III in the

internal BMS file (Exhibit JTX-075) disclosed eight peaks[11] that match the 2θ values required by

claim 18. (Tr. at 377) According to Dr. Hollingsworth, JTX-075 discloses the same five peaks

as the '729 patent, as well as three additional peaks at 11.6, 28.0, and 31.7. (Tr. at 373-77; JTX-

075 at p. 10) BMS's expert, Dr. Atwood, disagrees with Dr. Hollingsworth's analysis for two

reasons. First, according to Dr. Atwood, at least four of the peaks identified by Dr.

Hollingsworth do not have sufficient intensity to qualify as a peak. Second, the peaks identified

by Dr. Hollingsworth could have been caused by the presence of impurities in the sample tested

in JTX-075. (Tr. at 695-98) Because there is no purity information for the sample in JTX-075,

Dr. Atwood contends that the peaks shown in JTX-075 do not necessarily represent any inherent

characteristic of Form III. (*Id.*)

At trial, neither party presented evidence of the purity of the Form III sample tested in

JTX-075. (Tr. at 462-63) However, both sides' experts agreed that the presence of impurities in

a sample can lead to the presence false peaks in an x-ray powder diffraction pattern. (Tr. at 459,

696-97) For instance, Dr. Hollingsworth agreed that "if we look at a . . . x-ray powder diffraction

pattern for a given sample and it's not pure, we may see peaks that aren't due to the polymorph

of interest to us." (Tr. at 459) Dr. Hollingsworth also agreed that "noise" present in the x-ray

---

[11]For purposes of this discussion, the term "peaks" is interchangeable with the term "2θ values."

24

powder diffraction patterns can make it difficult to distinguish smaller peaks from the noise itself. (Tr. at 457-58) While it is possible that the eight peaks identified by Mylan in the XRPD of Form III contained in JTX-075 represent inherent physical characteristics of Form III, it is likewise possible that one or more of those peaks may be attributed to noise, or to the presence of impurities in the JTX-075 sample.[12] Mylan, as the party with the burden of proof, simply has not presented sufficient evidence to eliminate, or even discount, these latter possibilities. Accordingly, the Court cannot agree that Form III in JTX-075 "necessarily and inevitably" includes at least six 2θ values required by claim 18 of the '372 patent. *See Bettcher*, 661 F.3d at 639 (explaining that inherency "may not be established by probabilities or possibilities").

Mylan also relies on the BMS Encyclopedia of Solid State Forms (JTX-019), which contains an x-ray powder diffraction pattern for "pure" Form III, and serves as a BMS reference standard for that form. (Tr. at 700) JTX-117 is a computer analysis of the x-ray powder diffraction pattern for Form III in the BMS Encyclopedia. Only four 2θ values in the diffractometer in JTX-117 match the 2θ values recited in claim 18. One of those values (11.6) is not disclosed in the listing of 2θ values disclosed in the '729 patent. (Compare JTX-117 and JTX-107) Mylan contends that it is appropriate to combine the 2θ values from the Form III sample in JTX-117 with the 2θ values for Form III in the '729 patent because those 2θ values purportedly represent intrinsic physical characteristics of Form III. (D.I. 220 at 17-18)

In the Court's view, however, Mylan may not pick and choose 2θ values from different

---

[12]Mylan contends that the purity of the Form III sample is "irrelevant" because claim 18 "does not include a purity limitation." (D.I. 228 at 11) The Court does not agree. Mylan's argument is inherent anticipation. If the Form III sample contains some impurities, then the 2θ values in an XRPD pattern for that sample do not necessarily and inevitably represent any inherent property of Form III.

25

samples in order to arrive at a conclusion of anticipation. Because x-ray powder diffraction patterns of different samples of Form III have appeared to result in different 2θ values – perhaps due to the presence of impurities or noise – the Court cannot conclude that any single 2θ value necessarily represents an inherent physical characteristic of the crystal structure itself. Instead, it is possible that one or more of the 2θ values in the '729 patent may be the result of the presence of impurities or noise. Mylan has not offered any single x-ray powder diffraction pattern that, on its own, contains at least six of the 2θ values recited in claim 18. Even the "pure" reference standard sample of Form III in BMS's Encyclopedia contains only four matching 2θ values. (JTX-117 at p. 6)

Thus, the Court finds that Mylan has failed to prove by clear and convincing evidence that Form III in the '729 patent "necessarily and inevitably" has six or more of the 2θ values required by claim 18 of the '372 patent. Accordingly, for this reason as well (in addition to the DSC finding described earlier), the Court concludes that claim 18 of the '372 patent is not anticipated by Form III as disclosed in the '729 patent.

### B.    Indefiniteness

Mylan contends that claim 18 of the '372 patent is indefinite and, therefore, invalid. (D.I. 220 at 14-21) For the reasons below, the Court disagrees.

#### 1.    Legal Standards

The definiteness requirement is set forth in 35 U.S.C. § 112, ¶ 2, which states that a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The Federal Circuit has explained that:

26

> Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims.

*Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  Again, because the claims of a patent are presumed to be valid, "the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence."  *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007).

## 2.    Discussion

Claim 18 of the '372 patent is directed to Form 5 of crystalline efavirenz.  (JTX-001) The Court has construed the term "Form 5" to mean "[a] polymorphic crystal form of [efavirenz] that can be distinguished from other forms."  (D.I. 179 at ¶ 4)  Mylan contends that claim 18 is indefinite because one of ordinary skill in the art could not "clearly differentiate" Form 5 from prior art forms of crystalline efavirenz described in the '729 patent, specifically Form III and/or a combination of several forms (*e.g.*, Form I and Form III).  (D.I. 228 at 9)  According to Mylan, "'[s]uch differentiation is an important consideration in the definiteness inquiry because in attempting to define a claim term, a person of ordinary skill in the art is likely to conclude that the definition does not encompass that which is expressly distinguished as prior art.'"  (*Id.*) (quoting *Halliburton*, 514 F.3d at 1252)  However, as explained in connection with Mylan's anticipation argument above, claim 18 of the '372 patent does clearly differentiate Form 5 of crystalline efavirenz from Form III alone and from a combination of Form I and Form III, at least because claim 18 requires "a differential scanning calorimetry thermogram having a peak at about 108° C to about 110° C."  (JTX-001)

Moreover, Mylan's contention that if a claim cannot be distinguished from the prior art, that claim is indefinite (Tr. at 908-10) is incorrect. This is evident from *Halliburton*, a case relied on by Mylan, which states:

> Of course, that is not to suggest that a claim can never be definite and yet read on the prior art. For example, a claim that recites a specific numeric range for a physical property may be definite even though prior art products fell within that range. In such a case, a person of ordinary skill in the art would know the boundaries of the claim, and the focus would properly be on other validity challenges (e.g., anticipation).

514 F.3d at 1252. Here, as in *Haliburton*, claim 18 of the '372 patent contains specific numeric requirements that define the physical characteristics of Form 5: an x-ray powder diffraction pattern with six or more of the specified eleven 2θ values and DSC peak at about 108° C to about 110° C. (JTX-001) These limitations are sufficiently clear to "inform the public of the bounds of the protected invention." *Halliburton*, 514 F.3d at 1249. For this reason, claim 18 is not indefinite, regardless of the prior art.

Mylan also contends that claim 18 is indefinite because it does not specify whether the DSC peak is endothermic or exothermic and, thus, could conceivably cover more than one compound. (D.I. 220 at 20-21) Mylan has not offered evidence of any other compound that satisfies the other requirements of claim 18 (e.g., 2θ values) and would render the endothermic/exothermic distinction pertinent. Mylan's hypothetical speculation does not constitute clear and convincing evidence of indefiniteness.

## C.    Enablement

Mylan contends that claim 18 of the '372 patent is invalid under 35 U.S.C. §112, ¶ 1 for failing to satisfy the enablement requirement. The Court disagrees.

28

## 1.  Legal Standards

A patent specification must set forth "the manner and process of making and using [the invention] . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112. To satisfy the enablement requirement of § 112, the disclosure in a patent application must enable a person skilled in the art to make and use the claimed invention without "undue experimentation" as of the filing date of the application. *See In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988); *see also Genetech, Inc. v. Novo Nordisk AIS*, 108 F.3d at 1361, 1365 (Fed. Cir. 1997). Enablement is "not precluded where a 'reasonable' amount of routine experimentation is required to practice the claimed invention." *ALZA Corp. v. Andrx Pharms., L.L.C.*, 603 F.3d 935, 940 (Fed. Cir. 2010). While the knowledge generally available in the art can supplement an application's specification, "[i]t is the specification, not the knowledge of one skilled in the art that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genetech, Inc.*, 108 F.3d at 1366.

In determining whether "undue" experimentation is required to make and use a claimed invention, courts may, but are not required to, consider such factors as: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims. *See In re Wands*, 858 F.2d at 737. Not all of the factors need to be reviewed when determining whether a disclosure is enabling. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991) (stating that *Wands* factors "are illustrative, not

29

mandatory. What is relevant depends on the facts"). Mylan has the burden of proving lack of enablement by clear and convincing evidence. *See Morton Int'l v. Cardinal Chem. Co.*, 5 F.3d 1464, 1469 (Fed. Cir. 1993).

### 2.    Discussion

Mylan contends that claim 18 fails the enablement requirement because: (1) the '372 patent specification does not teach one of ordinary skill in the art how to make Form 5 without seeding; and (2) the '372 patent specification does not teach one of ordinary skill in the art how to make Form 5 with an exothermic peak at about 108° C to about 110° C. (D.I. 220 at 21) The Court will address these two arguments in order.

Mylan first contends that the '372 patent does not provide any independent means of making Form 5. According to Mylan, every example of making Form 5 disclosed in the '372 patent requires a step of seeding the solution with Form 5, meaning that "you can only make Form 5 if you already have Form 5 on hand." (D.I. 220 at 22) In Mylan's view, there is no example that discloses making Form 5 from scratch. (*Id.*) It follows, according to Mylan, that to make Form 5 without seeding would require undue experimentation by one of ordinary skill in the art. The Court does not agree.

The '372 patent explains that Form 5 "crystals may be obtained by recrystallization from a dilute solution of THF/heptane. The crystals may be obtained from solutions in which either Form 1 or Form 4 have already been isolated." (JTX-001 at col. 13, ll. 28-32) Mylan's expert, Dr. Hollingsworth, testified that this guidance is too "vague" because it does not provide the necessary conditions such as: (1) the make-up of the solvent system; (2) the temperature of crystallization; (3) the time frame for formation of the crystal form; (4) the amount of material to

30

use; and (5) the methods for characterizing the resulting form. (Tr. at 388-90) While acknowledging that Example 17 of the '372 patent discloses many of these conditions, Dr. Hollingsworth believes that one of ordinary skill in the art would likely ignore this example because it requires a step of seeding with Form 5. (Tr. at 395-96) The Court does not find this reasoning persuasive.

Instead, the Court finds that Plaintiff's expert, Dr. Atwood, testified credibly that, "The purpose of using seeding in an experiment such as this is to control the rate at which the crystals grow. If one seeds the solution, the crystals would grow rather quickly. If one does not, they'll grow more slowly." (Tr. at 713) The Court agrees that one of ordinary skill in the art would not ignore the crystallization conditions described in Example 17 simply because the example includes a seeding step. *See generally* Manual of Patent Examining Procedure § 2164.01 ("Any part of the specification can support an enabling disclosure, even a background section that discusses, or even disparages, the subject matter disclosed therein.") (citing *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361 (Fed. Cir. 2005)).

Moreover, credible testimony from Dr. Atwood and Mr. Moore established that Example 17 does not require one of ordinary skill in the art to seed with Form 5 (or seed at all) to make Form 5. Mr. Moore testified that the form of the seed in the slurry does not matter, because "when it goes into the solution, the crystal form is gone." (Tr. at 234) Also according to Mr. Moore, the filtering step removes whatever seeds are not dissolved. (*See* Tr. at 254) Dr. Atwood agreed. (Tr. at 725, 729) This is consistent with the explanation in the '372 patent, that the slurry "was seeded periodically with Form 5 *until the seeds no longer dissolved* (63° C.), then allowed to cool to 45° C. and *filtered*." (JTX-001 at col. 28, ll. 17-19) (emphasis added)

31

Because the seed is either dissolved or filtered out, the crystallization step in Example 17 occurs without any seed present in the solution. (JTX-001 at col. 28, ll. 17-19; Tr. at 737-38) Additionally, the '372 patent explicitly discloses a method of making Form 5 by recrystallization of a dilute solution, which is defined as a "solution[] in which either Form 1 or Form 4 have already been isolated." (JTX-001 at col. 13, ll. 28-32)

When considered as a whole, the '372 patent provides one of ordinary skill in the art with information about the solvent system ("1% v/v THF/heptane"); the temperature ("room temperature"); the time ("overnight"); and the amount of material ("approximately 70g" of efavirenz) to make a slurry. The '372 patent also provides a method of characterizing the form – using x-ray powder diffraction and differential scanning calorimetry.[13] (JTX-001 at col. 1, ll. 8-11) Given these teachings, and in view of the high level of ordinary skill in the art, any additional experimentation required to make Form 5 would be "routine" and, therefore, not undue.[14] *See ALZA Corp.,* 603 F.3d at 940.

The Court's conclusion that the '372 patent enables one of ordinary skill in the art to make Form 5 crystal efavirenz without seeding is further supported by the nearly

---

[13]For the reasons provided above in connection with Mylan's indefiniteness argument, the Court does not agree that claim 18 of the '372 patent is too broad to differentiate Form 5 from other prior art forms of crystalline efavirenz. The Court also does not agree that there are "thousands of distinct characterizations of material that would be considered Form 5." (D.I. 220 at 24 n.9) At trial the evidence established that only one existing form of material satisfies the requirements of claim 18: Form 5 of crystalline efavirenz. Accordingly, the "breadth of the claims" factor supports the Court's conclusion. *See In re Wands,* 858 F.2d at 737

[14]While other factors, such as "solution concentration, degree of supersaturation, system volume, temperature, solvent, presence or absence of impurities, and/or the time the system is allowed to stand unperturbed" may play a role in crystal formation (Tr. at 488-92), the record does not support a conclusion that these factors would require one of ordinary skill in the art to undergo undue experimentation to make Form 5.

32

contemporaneous experiments carried out by Mr. Moore. (*See* JTX-056 at pp. 148-71)  For

example, in experiment number 5, which used largely the same method (i.e., solvent system,

temperature, time, and amount of material) as described in Example 17 of the '372 patent, but

*without* seeding, Mr. Moore was able to make Form 5 successfully.  (Tr. at 252-53; JTX-056 at

pp. 169-70)  Indeed, after running ten different experiments, Mr. Moore concluded that the

results were "Excellent" and that he "Produced Form V repeatedly." (JTX-056 at p. 171)  Mr.

Moore confirmed this fact at trial:

> **Q.** So based on your experimental work, was it your belief that
> you could make Form 5 crystals at will, as you said, with or
> without seeding?
>
> **Mr. Moore.** Yes.

(Tr. at 257)  The Court finds Mr. Moore's testimony credible.  By contrast, Mylan's expert, Dr.

Hollingsworth, did not attempt to make Form 5 using the guidance of the '372 patent. (*See* Tr. at

472-73)[15]

Mylan also contends that the '372 patent specification does not teach one of ordinary skill

in the art how to make Form 5 with an exothermic peak at about 108° C to about 110° C.  By

following the steps for making Form 5 outlined in the '372 patent, one of ordinary skill in the art

will obtain a crystal form with a DSC peak at about 108° C to about 110° C.  That peak will be

endothermic, which is consistent with the disclosure of the specification that describes Form 5 as

having a "melting point" at about 108° C to about 110° C. (JTX-001 at col. 13, ll. 23-24; D.I.

---

[15]In its Responsive Brief, Mylan also contends that claim 18 is not enabled because "Mr. Moore
admitted at trial [that] Form 5 crumbles and reverts to Form I at room temperature." (D.I. 228 at
15)  According to Mylan, this purported fact renders Form 5 "useless" and, therefore, not
enabled.  (*Id.*)  This argument is not persuasive.  Mr. Moore stated only that "he believes" Form 5
will revert to Form I after some time – "a lot longer" than three days. (Tr. at 300)  This limited
evidence is not clear and convincing evidence that claim 18 is not enabled.

33

220 at 25) Both sides agree that a single polymorph cannot have both an endothermic and an exothermic peak at the same location. (D.I. 220 at 25; Tr. at 794) There is no evidence in the record that a crystal form of efavirenz exists which satisfies the requirements of claim 18, but has an *exothermic* peak at about 108° C to about 110° C. Mylan cites no authority for the suggestion that a patent may be found invalid for lack of enablement based on the patent's failure to enable one of skill in the art to make a compound that does not exist.[16]

In sum, the Court rejects Mylan's enablement argument, and concludes that claim 18 is enabled.

### D.    Written Description

Mylan also contends that claim 18 of the '372 patent is invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112. For the reasons below, the Court disagrees.

#### 1.    Legal Standards

To comply with the written description requirement of 35 U.S.C. § 112, the patent disclosure must convey with reasonable clarity to a person of ordinary skill in the art that the inventor was in possession of the claimed invention at the time of the application. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). "[T]he purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification. It is part of the *quid pro quo* of the patent grant and ensures that the public receives a meaningful disclosure in exchange for being excluded from

---

[16]Neither party requested for the Court to determine whether the claims are limited to an endothermic peak.

practicing an invention for a period of time." *Id*. at 1353-54 (internal citations and quotation marks omitted).

Whether the written description requirement is met is a question of fact. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1369 (Fed. Cir. 2009). Mylan must demonstrate by clear and convincing evidence that claim 18 of the '372 patent is invalid for lack of written description. *See ICU Med., Inc. v. Alaris Med. Sys.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009).

**2. Discussion**

Mylan contends that claim 18 of the '372 patent fails to satisfy the written description requirement because: (1) it fails to distinguish Form 5 from other crystal forms; (2) the specification fails to teach one of ordinary skill in the art how to make Form 5; and (3) the specification contains numerous scientific errors and inconsistencies, which would cause one of ordinary skill in the art to doubt the information contained therein. (D.I. 220 at 27-29) None of these arguments is persuasive.

The specification of the '372 patent discloses all eleven 2θ values listed in claim 16 and states that in a "preferred embodiment, Form 5 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C to about 110° C." (JTX-001 at col. 8, ll. 50-61; SUF ¶ 46) For chemical compounds, the written description requirement is satisfied when the application discloses "relevant identifying characteristics" such that the compound can be distinguished from other compounds. *See In re Wallach,* 378 F.3d 1330, 1335 (Fed. Cir. 2004). Moreover, the subject matter of claim 18 appeared in the original claims of the '421 application, which issued as the '372 patent. (JTX-004 at p. 98) (claims 92

35

and 93) Those "original claims constitute their own description." *In re Koller*, 613 F.2d 819, 823 (CCPA 1980) Hence, the Court concludes that the '372 patent specification provides literal support for claim 18.

Additionally, the Court has already found that the relevant identifying characteristics of Form 5 are sufficient to distinguish Form 5 from the prior art. The Court has also concluded that the disclosure of the '372 patent specification enables one of ordinary skill in the art to make Form 5 without undue experimentation. Finally, the Court is not persuaded that any purported "errors and inconsistencies" in the '372 patent, such as filing the original patent application with incorrect XPRD and DSC patterns for Form 5 (D.I. 220 at 29), lead to the conclusion that the inventors did not possess the claimed invention. Mylan's professed suspicions would not lead one of ordinary skill in the art to ignore the explicit disclosure of the '372 patent specification.

For these reasons, the Court concludes that Mylan has not proven by clear and convincing evidence that claim 18 is invalid for failing to satisfy the written description requirement.

## IV.    CONCLUSION

BMS has proved by a preponderance of the evidence that Mylan's ANDA product infringes asserted claim 18 of the '372 patent. Mylan has failed to prove by clear and convincing evidence that claim 18 of the '372 patent is invalid. By separate order, the parties will be directed to submit an appropriate form of judgment consistent with this opinion.[17]

---

[17]Both parties moved for judgment as a matter of law during trial, pursuant to Federal Rule of Civil Procedure 52(c). (Tr. at 559-66, 667-71; *see also* D.I. 204) The Court deferred ruling on these motions until after trial. (Tr. at 574-75, 676-77) Having now made findings of fact and reached conclusions of law on a full post-trial record, the Court will deny all motions for judgment as a matter of law.

36

## Hall, Taccie A

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Monday, September 30, 2013 9:05 AM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:09-cv-00651-LPS Bristol-Myers Squibb Co. et al v. Mylan Pharmaceuticals Inc. et al Memorandum Opinion |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

### U.S. District Court

### District of Delaware

### Notice of Electronic Filing

The following transaction was entered on 9/30/2013 at 9:05 AM EDT and filed on 9/30/2013
**Case Name:**         Bristol-Myers Squibb Co. et al v. Mylan Pharmaceuticals Inc. et al
**Case Number:**      1:09-cv-00651-LPS
**Filer:**
**Document Number:** 232

**Docket Text:**
**[SEALED] MEMORANDUM OPINION re bench trial. Signed by Judge Leonard P. Stark on 9/30/13. (ntl)**


**1:09-cv-00651-LPS Notice has been electronically mailed to:**

Mary Matterer mmatterer@morrisjames.com, Andrea.Tiglio@mylan.com, ippara@morrisjames.com, jaime.lebo@mylan.com, jill.ondos@mylan.com, joseph.divinagracia@mylan.com, mini.bhatt@mylan.com

Mary B. Graham mbgefiling@mnat.com, dmyers@mnat.com

Derek James Fahnestock dfahnestock@mnat.com

Timothy H. Kratz tkratz@mcguirewoods.com, cregan@mcguirewoods.com

Robert L. Florence rflorence@mcguirewoods.com, cregan@mcguirewoods.com

Sean M. Sullivan sullivan@mbhb.com

George J. Barry gbarry@mcguirewoods.com, jhalvorson@mcguirewoods.com

Sydney R. Kokjohn kokjohn@mbhb.com

Kurt W. Rohde rohde@mbhb.com

Andrew W. Williams williams@mbhb.com

James C. Gumina gumina@mbhb.com

S. Richard Carden carden@mbhb.com

Paul H. Berghoff berghoff@mbhb.com

**1:09-cv-00651-LPS Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=9/30/2013] [FileNumber=1980340-0
] [d7951f943dbba47c3e386c45744a818e377300c31cdce8cc558c5c5a9a6e2e0dff3
16bab4063232b0eb87ca328c5e1fda1cdd6d575586ebdaac30e056c920c4d]]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB CO., and BRISTOL-MYERS SQUIBB PHARMA CO., | : <br> : <br> : <br> : |
| Plaintiffs/Counterclaim-Defendants, | : <br> : |
| v. | : C.A. No. 09-651-LPS <br> : |
| MYLAN PHARMACEUTICALS INC., MATRIX LABORATORIES LTD., | : <br> : <br> : |
| Defendants/Counterclaim-Plaintiffs. | : <br> : |
| v. | : <br> : |
| MERCK & CO., INC. and MERCK SHARP & DOHME CORP., | : <br> : <br> : |
| Counterclaim Defendants. | : |

### O R D E R

At Wilmington this 30th day of September, 2013:

For the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY

ORDERED that:

1.      The parties shall meet and confer and submit, no later than **October 10, 2013**, a

proposed form of order consistent with the Memorandum Opinion, to enter final judgment for

Plaintiffs and against Defendants, including any appropriate remedy.

2.      Defendants' motion for judgment of non-infringement as a matter of law (D.I.

203) is DENIED.

3.      Motions for judgment as a matter of law made during trial (*see* Trial Transcript at

559-66, 667-71) are DENIED.

4.    The parties shall submit a proposed redacted version of the Memorandum Opinion no later than **October 7, 2013.**

_____

UNITED STATES DISTRICT JUDGE



US006673372B1

(12) **United States Patent**
Radesca et al.

(10) **Patent No.:**    **US 6,673,372 B1**
(45) **Date of Patent:**    **Jan. 6, 2004**

(54) **CRYSTALLINE EFAVIRENZ**

(75) Inventors: **Lilian A. Radesca**, Newark, DE (US); **Michael B. Maurin**, Wilmington, DE (US); **Shelley R. Rabel**, Landenberg, PA (US); **James R. Moore**, Newark, DE (US)

(73) Assignee: **Bristol-Myers Squibb Pharma Company**, Princeton, NJ (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/329,421**

(22) Filed:    **Jun. 10, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/088,981, filed on Jun. 11, 1998.

(51) **Int. Cl.**[7] ............................. **A61K 9/14**; A61K 9/20
(52) **U.S. Cl.** ....................................... **424/489**; 424/464
(58) **Field of Search** ................................ 424/464, 451, 424/455, 489

(56)    **References Cited**

U.S. PATENT DOCUMENTS

5,519,021 A  *  5/1996  Young et al. ............. 514/230.5

5,965,729 A    10/1999  Clarke et al.
6,124,319 A  *  9/2000  MacCoss et al. ........... 514/318

FOREIGN PATENT DOCUMENTS

| EP | 0582455 | 2/1994 |
|---|---|---|
| WO | 9520389 | 8/1995 |
| WO | 9637457 | 11/1996 |
| WO | 9804535 | 2/1998 |
| WO | 9814436 | 4/1998 |
| WO | WO 98/27073 | 6/1998 |
| WO | WO 98/45278 | 10/1998 |

OTHER PUBLICATIONS

PGPUB US 20020115664 A1, App. No. 10/000,537, filed Oct. 19, 2001.

* cited by examiner

*Primary Examiner*—James M. Spear
(74) *Attorney, Agent, or Firm*—Mary K. Van Atten

(57)    **ABSTRACT**

The potent reverse transcriptase inhibitor Efavirenz is produced in crystalline form. Crystalline Efavirenz exists in several physical forms which are-designated Forms 1, 2, 3 and 4, and are characterized by x-ray powder diffraction and differential scanning calorimetry. Pharmaceutical compositions and methods are useful for the treatment of the human immunodeficiency virus (HIV).

**45 Claims, 8 Drawing Sheets**



$2\theta$ (degrees)

U.S. Patent

Jan. 6, 2004     Sheet 1 of 8     US 6,673,372 B1



2θ (degrees)

FIG. 1

U.S. Patent

Jan. 6, 2004

Sheet 2 of 8

US 6,673,372 B1



$2\theta$ (degrees)

FIG. 2

U.S. Patent

Jan. 6, 2004

Sheet 3 of 8

US 6,673,372 B1



$2\theta$ (degrees)

FIG. 3

U.S. Patent    Jan. 6, 2004    Sheet 4 of 8    US 6,673,372 B1



2θ (degrees)

FIG. 4

JTX001.0005
A84



FIG. 5

U.S. Patent

Jan. 6, 2004

Sheet 5 of 8

US 6,673,372 B1

JTX001.0006
A85



U.S. Patent

Jan. 6, 2004

Sheet 6 of 8

US 6,673,372 B1

FIG. 6

JTX001.0007
A86

U.S. Patent

Jan. 6, 2004

Sheet 7 of 8

US 6,673,372 B1



FIG. 7



FIG. 8

U.S. Patent          Jan. 6, 2004          Sheet 8 of 8          US 6,673,372 B1

US 6,673,372 B1

**1**

# CRYSTALLINE EFAVIRENZ

This application claims the benefit of U.S. Provisional Application No. 60/088,981, filed Jun. 11, 1998.

## FIELD OF THE INVENTION

The potent reverse transcriptase inhibitor Efavirenz is produced in crystalline form. Crystalline Efavirenz exists in several physical forms which are designated Forms 1, 2, 3, 4, and 5 and are characterized by x-ray powder diffraction and differential scanning calorimetry. Pharmaceutical compositions and methods are useful for the treatment of the human immunodeficiency virus (HIV).

## BACKGROUND OF THE INVENTION

Reverse transcription is a common feature of retrovirus replication. Viral replication requires a virally encoded reverse transcriptase to generate DNA copies of viral sequences by reverse transcription of the viral RNA genome. Reverse transcriptase, therefore, is a clinically relevant target for the chemotherapy of retroviral infections because the inhibition of virally encoded reverse transcriptase would interrupt viral replication.

Efavirenz is a compound which is effective in the treatment of the human immunodeficiency virus (HIV) which is the retrovirus that causes progressive destruction of the human immune system with the resultant onset of AIDS. Effective treatment through inhibition of HIV reverse transcriptase has been shown for both nucleoside based inhibitors, such as azidothymidine, and non-nucleoside based inhibitors. Benzoxazinones such as Efavirenz have been found to be useful non-nucleoside based inhibitors of HIV reverse transcriptase. Efavirenz is known by its chemical name, (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one represented in formula (I):

(I)

Efavirenz is not only a highly potent reverse transcriptase inhibitor, but is also efficacious against HIV reverse transcriptase resistance. Due to the importance of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one as a reverse transcriptase inhibitor, crystalline forms which exhibit chemical and physical advantages for manufacture, purification and formulation are necessary.

Treatment or prevention of the foregoing disorders is accomplished by administering a therapeutically effective amount of Efavirenz to a human or animal subject in need of such treatment or prevention. The treatment with Efavirenz may be accomplished by its use as a single compound, as a pharmaceutical composition ingredient, or in combination with other antivirals, immunomodulators, antibiotics and vaccines. The compound may be administered enterally or parenterally in solid or liquid dosage forms.

**2**

Efavirenz has not been known previously to exist in stable crystalline polymorphic forms. Accordingly, a need exists for stable crystalline forms of the drug and reliable and reproducible procedures for their manufacture.

## SUMMARY OF THE INVENTION

In one aspect, the present invention is directed to crystalline Efavirenz. A related aspect resides in novel crystalline forms of Efavirenz, designated as Form 1, Form 2, Form 3, Form 4, and Form 5. These forms have been characterized and distinguished from one another by differential scanning calorimetry (DSC) and x-ray powder diffraction analysis.

Further aspects of the invention involve pharmaceutical compositions of crystalline Efavirenz and its five forms. The crystalline products of this invention may be formulated into conventional solid pharmaceutical dosage forms or used for the preparation of liquid dosage forms by combining a therapeutically effective amount of the crystalline drug with a pharmaceutically acceptable carrier. The crystalline products may be administered in pharmaceutical compositions which may combine other antivirals, immunomodulators, antibiotics or vaccines.

In another aspect, the present invention involves a method for inhibiting reverse transcriptase which comprises administering an amount of crystalline Efavirenz sufficient to result in reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In particular aspects, the invention involves methods for treating retroviral infections such as human immunodeficiency virus and disorders involving viral replication, which comprise administering a therapeutically effective amount of a pharmaceutical composition comprising the novel crystalline forms of Efavirenz of this invention.

It is another object of the present invention to provide a novel method for treating HIV infection which comprises administering to a host in need thereof a therapeutically effective combination of Form 1, 2, 3, 4, or 5 Efavirenz with and one or more compounds selected form the group consisting of HIV reverse transcriptase inhibitors and HIV protease inhibitors.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention is illustrated by reference to the accompanying drawings described below.

FIG. 1 shows a powder x-ray diffractogram of the Form 1 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. 2 shows a powder x-ray diffractogram of the Form 2 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. 3 shows a powder x-ray diffractogram of the Form 3 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. 4 shows a powder x-ray diffractogram of the Form 4 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. 5 shows a differential calorimetry thermogram of the Form 1 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. 6 shows a differential calorimetry thermogram of the Form 2 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

US 6,673,372 B1

3

FIG. **7** shows a differential calorimetry thermogram of the Form 3 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

FIG. **8** shows a differential calorimetry thermogram of the Form 4 crystalline form of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

## DETAILED DESCRIPTION OF THE INVENTION

In a first embodiment, the present invention provides Form 1 of crystalline Efavirenz.

In a preferred embodiment, Form 1 crystalline Efavirenz is in substantially pure form.

In another preferred embodiment, the Form 1 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more $2\theta$ values selected from the group consisting of $6.0\pm0.2$, $6.3\pm0.2$, $10.3\pm0.2$, $10.8\pm0.2$, $14.1\pm0.2$, $16.8\pm0.2$, $20.0\pm0.2$, $20.5\pm0.2$, $21.1\pm0.2$, and $24.8\pm0.2$.

In another preferred embodiment, the Form 1 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. **1**.

In another preferred embodiment, the Form 1 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 138° C. to about 140° C.

In another preferred embodiment, the Form 1 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. **5**.

In a more preferred embodiment, the Form 1 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more $2\theta$ values selected from the group consisting of: $6.0\pm0.2$, $6.3\pm0.2$, $10.3\pm0.2$, $10.8\pm0.2$, $14.1\pm0.2$, $16.8\pm0.2$, $20.0\pm0.2$, $20.5\pm0.2$, $21.1\pm0.2$, and $24.8\pm0.2$, and further characterized by a differential scanning calorimetry thermogram having a peak at about 138° C. to about 140° C.

In another more preferred embodiment, the Form 1 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. **1**, and is further characterized by a differential scanning calorimetry thermogram having a peak at about 138° C. to about 140° C.

In a second embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of the Form 1 crystalline Efavirenz and a pharmaceutically acceptable carrier.

In a preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage form, wherein the therapeutically effective amount is about 1 mg to about 1000 mg of Form 1 crystalline Efavirenz.

In a more preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage form, wherein the therapeutically effective amount is about 50 mg to about 200 mg of Form 1 crystalline Efavirenz.

In another more preferred embodiment, the pharmaceutical composition contained in a capsule or compressed tablet contains greater than about 10% by weight of a disintegrant relative to the total dry weight of the dosage form.

4

In another preferred embodiment, the pharmaceutical composition is in liquid form.

In a more preferred embodiment, the liquid form comprises about 0.1 percent to about 15 percent by weight of Form 1 crystalline Efavirenz and a liquid vehicle comprising about 50 percent to about 99 percent by weight of polyolesters of medium chain fatty acids.

In an even more preferred embodiment, the composition is contained in a soft gelatin capsule, wherein the polyol esters of medium chain fatty acids consist essentially of $C_8$ to $C_{10}$ fatty acid triglycerides.

In another more preferred embodiment, the liquid form comprising about 0.1 percent to about 15 percent by weight of Form 1 crystalline Efavirenz and a liquid vehicle comprising about 50 percent to about 99 percent by weight of polyolesters of medium chain fatty acids contains a sweetening agent in a range of about 0.1 percent to about 50 percent by weight.

In another more preferred embodiment, the pharmaceutical composition which is in liquid form comprises about 0.1 percent to about 10 percent by weight of Form 1 crystalline Efavirenz and a liquid vehicle about 50 percent to about 99 percent by weight of vegetable oil.

In an even more preferred embodiment, the pharmaceutical composition is contained in a soft gelatin capsule, wherein the vegetable oil is soybean oil or peanut oil.

In another more preferred embodiment, the pharmaceutical composition which is in liquid form comprising about 0.1 percent to about 10 percent by weight of Form 1 crystalline Efavirenz and a liquid vehicle about 50 percent to about 99 percent by weight of vegetable oil, contains a sweetening agent in a range of about 1.0 percent to about 50 percent by weight.

In a third embodiment, a capsule or compressed tablet pharmaceutical dosage form comprises:

(a) a therapeutically effective amount of Form 1 crystalline Efavirenz;

(b) a surfactant;

(c) a disintegrant;

(d) a binder; and

(e) a lubricant.

In a preferred embodiment, the therapeutically effective amount is about 50 mg to about 200 mg of Form 1 crystalline Efavirenz, the surfactant is sodium lauryl sulfate, the disintegrant is sodium starch glycolate, the binder is lactose and the lubricant is magnesium stearate.

In a fourth embodiment, the present invention describes a method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing Form 1 crystalline Efavirenz, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In a preferred embodiment, the compound is provided to a human or animal subject to inhibit HIV reverse transcriptase in vivo.

In a fifth embodiment, the present invention describes a method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment a therapeutically effective amount of Form 1 crystalline Efavirenz.

In a preferred embodiment, the Form 1 crystalline Efavirenz is administered at a dosage from about 1 to about 1000 mg per dose.

In a more preferred embodiment, the Form 1 crystalline Efavirenz is administered at a dosage from about 50 mg to about 200 mg per dose.

US 6,673,372 B1

5

In a sixth embodiment, Form 1 crystalline Efavirenz is prepared by recrystallization of Efavirenz from a hydrocarbon solvent.

In a seventh embodiment, Form 1 crystalline Efavirenz is prepared by the process comprising:

1) recrystallizing Efavirenz from a suitable solvent;
2) isolating the crystals; and
3) drying the crystals to an appropriate temperature to afford Form 1 crystalline Efavirenz in substantially pure form.

In a more preferred embodiment, the suitable solvent is heptane or a mixture of tetrahydrofuran and heptane, the crystals are isolated by filtration, the appropriate temperature is about 70° C. to about 95° C., and substantially pure is greater than 90 percent pure.

In an eighth embodiment, Form 1 crystalline Efavirenz is prepared by heating Form 2, Form 3, Form 4, or Form 5 Efavirenz or mixtures thereof.

In a ninth embodiment, Form 1 crystalline Efavirenz is prepared by stirring a slurry of Form 2 Efavirenz, Form 3 Efavirenz, or mixtures thereof in a hydrocarbon solvent.

In a tenth embodiment, the present invention describes Form 2 of crystalline Efavirenz.

In a preferred embodiment, Form 2 crystalline Efavirenz is in substantially pure form.

In another preferred embodiment, Form 2 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 6.8±0.2, 9.2±0.2, 12.3±0.2, 16.2±0.2, 21.4±0.2, 22.7±0.2, 24.1±0.2, and 28.0±0.2.

In another preferred embodiment, Form 2 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 2.

In another preferred embodiment, Form 2 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119 ° C.

In another preferred embodiment, Form 2 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. 6.

In a more preferred embodiment, Form 2 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 6.8±0.2, 9.2±0.2, 12.3±0.2, 16.2±0.2, 21.4±0.2, 22.7±0.2, 24.1±0.2, and 28.0±0.2, and further characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119° C.

In another more preferred embodiment, Form 2 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 2, and further characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119° C.

In an eleventh embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of Form 2 crystalline Efavirenz and a pharmaceutically acceptable carrier.

In a preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage form, wherein the therapeutically effective amount is about 1 mg to about 1000 mg of Form 2 crystalline Efavirenz.

In another preferred embodiment, the pharmaceutical composition is in liquid form, wherein the therapeutically effective amount is about 0.1 percent to about 15 percent Form 2 crystalline Efavirenz.

6

In a twelfth embodiment, the present invention describes a method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing Form 2 crystalline Efavirenz, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In a thirteenth embodiment, the present invention describes a method for the treatment of viral disorders, such as human immunodeficiency virus and other indications which comprises administering to a host in need of such treatment or prevention a therapeutically effective amount of Form 2 crystalline Efavirenz.

In a preferred embodiment, the Form 2 crystalline Efavirenz is administered at a dosage from about 1 to about 1000 mg per dose.

In a fourteenth embodiment, Form 2 crystalline Efavirenz is prepared by the process of rapid crystallization from a saturated alkane solution of Efavirenz.

In a preferred embodiment, rapid crystallization comprises:

1) dissolving Efavirenz in a suitable solvent at a suitable temperature to give a saturated solution;
2) filtering the saturated solution; and
3) cooling the saturated solution rapidly to produce Form 2 crystalline Efavirenz.

In a more preferred embodiment, the suitable solvent is heptane, the suitable temperature is about 70° C. to 80° C., and cooling the saturated solution rapidly comprises contacting the saturated solution with a cold surface.

In a fifteenth embodiment, the present invention describes Form 3 of crystalline Efavirenz in substantially pure form.

In another preferred embodiment, Form 3 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 7.1±0.2, 7.3±0.2, 11.0±0.2, 13.8±0.2, 20.9±0.2, 23.3±0.2, 27.9±0.2, and 33.5±0.2.

In another preferred embodiment, Form 3 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 3.

In another preferred embodiment, Form 3 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

In another preferred embodiment, Form 3 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. 7.

In a more preferred embodiment, Form 3 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 7.1±0.2, 7.3±0.2, 11.0±0.2, 13.8±0.2, 20.9±0.2, 23.3±0.2, 27.9±0.2, and 33.5±0.2, and further characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

In another more preferred embodiment, Form 3 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 3, and further characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

In a sixteenth embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of Form 3 crystalline Efavirenz and a pharmaceutically acceptable carrier.

In a preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage

US 6,673,372 B1

7

form, wherein the therapeutically effective amount is about 1 mg to about 1000 mg of Form 3 crystalline Efavirenz.

In another preferred embodiment, the pharmaceutical composition is in liquid form, wherein the therapeutically effective amount is about 0.1 percent to about 15 percent Form 3 crystalline Efavirenz.

In a seventeenth embodiment, the present invention describes a method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing Form 3 crystalline Efavirenz, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In an eighteenth embodiment, the present invention describes a method for the treatment of human immunodeficiency virus infection comprises administering to a host in need of such treatment or prevention a therapeutically effective amount of Form 3 crystalline Efavirenz.

In a preferred embodiment, the Form 3 crystalline Efavirenz is administered at a dosage from about 1 to about 1000 mg per dose.

In a nineteenth embodiment, Form 3 crystalline Efavirenz is prepared by the process of stirring a slurry of Form 1 Efavirenz, Form 2 Efavirenz or a mixture thereof, in a hydrocarbon solvent and isolating the crystals.

In a preferred embodiment, the hydrocarbon is heptane and the crystals are isolated by filtration.

In a twentieth embodiment, the present invention describes Form 4 of crystalline Efavirenz.

In a preferred embodiment, Form 4 of crystalline Efavirenz is in substantially pure form.

In another preferred embodiment, Form 4 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 3.6±0.2, 6.3±0.2, 9.7±0.2, 11.0±0.2, 12.7±0.2, 13.2±0.2, 16.1±0.2, 19.2±0.2, 19.5±0.2, 20.6±0.2, and 24.3±0.2.

In another preferred embodiment, Form 4 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 4.

In another preferred embodiment, Form 4 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 95° C. to about 100° C.

In another preferred embodiment, Form 4 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. 8.

In a more preferred embodiment, Form 4 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 3.6±0.2, 6.3±0.2, 9.7±0.2, 11.0±0.2, 12.7±0.2, 13.2±0.2, 16.1±0.2, 19.2±0.2, 19.5±0.2, 20.6±0.2, and 24.3±0.2, and further characterized by a differential scanning calorimetry thermogram having a peak at about 95° C. to about 100° C.

In another more preferred embodiment, Form 4 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 4, and is further characterized by a differential scanning calorimetry thermogram having a peak at about 95° C. to about 100° C.

In a twenty-first embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of Form 4 crystalline Efavirenz and a pharmaceutically acceptable carrier.

8

In a preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage form, wherein the therapeutically effective amount is about 1 mg to about 1000 mg of Form 4 crystalline Efavirenz.

In another preferred embodiment, the pharmaceutical composition is in liquid form, wherein the therapeutically effective amount is about 0.1 percent to about 15 percent Form 4 crystalline Efavirenz.

In a twenty-second embodiment, the present invention describes a method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing Form 4 crystalline Efavirenz, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In a twenty-third embodiment, the present invention describes a method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment or prevention a therapeutically effective amount of Form 4 crystalline Efavirenz.

In a preferred embodiment, the Form 4 crystalline Efavirenz is administered at a dosage from about 1 to about 1000 mg per dose.

In a twenty-fourth embodiment, Form 4 crystalline Efavirenz is prepared by recrystallization from a mixed solvent system.

In a twentyfifth embodiment, Form 4 crystalline Efavirenz is prepared by the process comprising:

1) adding a suitable solvent to a solution of Efavirenz to produce a final solution;

2) distilling the final solution to a solvent composition from which Efavirenz crystallizes as Form 4 crystals; and

3) isolating the crystals.

In a preferred embodiment, the suitable solvent is heptane, the solution comprises of tetrahydrofuran and Efavirenz, the solvent composition is about 1 to about 10 percent tetrahydrofuran in heptane, and isolating comprises of filtering.

In a twentysixth embodiment, the present invention describes Form 5 of crystalline Efavirenz.

In a preferred embodiment, Form 5 of crystalline Efavirenz is in substantially pure form.

In another preferred embodiment, Form 5 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 10.2±0.2, 11.4±0.2, 11.6±0.2, 12.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2.

In another preferred embodiment, Form 5 crystalline Efavirenz is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

In a more preferred embodiment, Form 5 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 10.2±0.2, 11.4±0.2, 11.6±0.2, 12.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2, and further characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

In another more preferred embodiment, Form 5 crystalline Efavirenz is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. 9, and is further characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

9

In a twenty-seventh embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of Form 5 crystalline Efavirenz and a pharmaceutically acceptable carrier.

In a preferred embodiment, the pharmaceutical composition is contained in a capsule or compressed tablet dosage form, wherein the therapeutically effective amount is about 1 mg to about 1000 mg of Form 5 crystalline Efavirenz.

In another preferred embodiment, the pharmaceutical composition is in liquid form, wherein the therapeutically effective amount is about 0.1 percent to about 15 percent Form 5 crystalline Efavirenz.

In a twenty-eighth embodiment, the present invention describes a method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing Form 5 crystalline Efavirenz, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

In a twenty-nineth embodiment, the present invention describes a method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment or prevention a therapeutically effective amount of Form 5 crystalline Efavirenz.

In a twenty-fifth embodiment, the Form 5 crystalline Efavirenz is administered at a dosage from about 1 to about 1000 mg per dose.

In a thirtieth embodiment, Form 5 crystalline Efavirenz is prepared by recrystallization from a mixed solvent system.

In a thirty-first embodiment, the present invention describes a method of treating HIV infection which comprises administering, in combination, to a host in need thereof a therapeutically effective amount of:

(a) Form 1, 2, 3, 4 or 5 of crystalline Efavirenz; and

(b) at least one compound selected from the group consisting of HIV reverse transcriptase inhibitors and HIV protease inhibitors.

In a thirty-second embodiment, the present invention describes a pharmaceutical composition comprising a therapeutically effective amount of Form 1, Form 2, Form 3, Form 4, Form 5 or mixtures thereof and a pharmaceutically acceptable carrier.

Efavirenz is known by its chemical name, (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3, 1-benzoxazin-2-one represented by formula (I):

(I)



Synthesis of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one can be accomplished through the use of commercially available 4-chloroaniline. After reaction with pivaloyl chloride in the presence of hydroxide to afford the corresponding amide, treatment with an alkyl lithium and ethyl trifluoroacetate is followed by acidification with a mineral acid to provide the salt of the triflouroketone (Scheme 1).

10



Scheme 1

The free base is subsequently reacted with a benzylic alcohol in the presence of acid to afford the benzylamine, which is alkylated in the presence of a chiral inducing agent with cyclopropylethynyl lithium to give the chiral alcohol (Scheme 2).



Scheme 2

The carbinol is oxidized to the benzylic imine, which undergoes an intramolecular cyclization. The benzyl group is removed, and the free amine cyclized to give the active drug substance represented by formula (I) (Scheme 3).

**11**

Scheme 3



(I)

Methods for the synthetic preparation of Efavirenz are further disclosed in commonly assigned U.S. patent application Ser. No. 60/032,980, now U.S. Pat. No. 5,932,726, which is hereby incorporated by reference.

Five Forms designated as Form 1, Form 2, Form 3, form 4, Form 5 have been identified. Each Form is distinguishable from the other forms by x-ray powder diffraction (XRD) and differential scanning calorimetry (DSC). Each form can be isolated in substantially pure form under the conditions described. Further, the forms may be interconverted by procedures taught herein.

Form 1 is the most thermodynamically stable form. It has a melting point of about 138° C. to about 140° C., which is the highest of the four forms. Due to its increased stability, it is commonly used for drug formulation. All other forms may be converted into Form 1 during drying at about 60° C. to about 110° C. Conversion and drying is preferably done in a dryer oven at about 70° C. to about 110° C. under

**12**

reduced pressure. More preferred is about 75° C. to about 85° C. Form 5 is converted to Form 1 by heating to 95° C under reduced pressure. Forms 2 and 3 may also be converted into Form 1 using a hydrocarbon slurry at about 65° C. to about 75° C. Heptane is the most preferred hydrocarbon for this conversion. Form 4, however, may not convert to Form 1 under these conditions because it is soluble at about 70° C. Form 1 may be directly crystallized from heptane when the saturated solution is seeded at about 60° C. to about 75° C. and held at about this temperature until Form 1 starts crystallizing.

Form 2 may be obtained by rapid crystallization. Rapid crystallization may be accomplished by the filtration of a saturated heptane solution of Efavirenz at about 70° C. to about 80° C., and crystallization preferably occurs when the solution is contacted with a cooler surface. Form 2 has a melting point of about 116° C. to about 119° C., observed by differential scanning calorimetry, and as such has exceptional stability. The needles are generally larger than the other forms. Form 2 rejects a variety of impurities common to the process which produces Efavirenz. Form 2 is therefore an important tool for commercial manufacture of Efavirenz concerning purification of second crops, and the recovery of batches which fail drug specifications. Further, the larger crystal size imparts numerous process advantages such as shortening filtration and drying time, and improving the flowability of slurry solutions. Form 2 may be converted into Form 1 by heating in a drier to about 95° C. to about 100° C. for about 15 hours. Alternatively, Form 1 may be prepared from Form 2 by slurrying Form 2 in heptane heated to about 70° C. and holding for about 2 hours. The preferred concentration of this slurry is about 12 mL of solvent per gram of Form 2 Efavirenz.

Form 2 may also be converted into Form 3 by slurrying in heptane at room temperature for about 8 to about 24 hours. Form 2 may be converted into Form 4 by slurrying Form 2 into heptane to achieve a concentration of about 10 mL solvent per gram of Efavirenz and adding THF to reach a concentration of about 4 to about 6 mL THF in about 100 mL of heptane/THF solution.

Form 3 may be obtained by stirring a hydrocarbon slurry of Form 1 or Form 2 at about 25° C. Heptane is the most preferred hydrocarbon. In general, Form 2 converts faster to Form 3 than Form 1. This conversion takes about 8 hours to about 24 hours. The conversion of Form 1 to Form 3 takes about a minimum of about 48 hours. Form 3 has a melting point of about 108° C. to about 110° C., observed by differential scanning calorimetry, and is the most stable form in solution slurries of Efavirenz at room temperature. Form 3 may be converted into Form 1 by drying at about 85° C. to about 90° C. for about 12 to about 24 hours. The conversion of Form 3 to Form 1 may also be accomplished by heating a heptane slurry having a concentration of about 10 mL to about 14 mL of solvent per gram of Form 3 Efavirenz to about 65° C. to about 75° C., and holding the slurry at this temperature for about 2 hours.

Form 4 has a melting point of about 95° C. to about 100° C., observed by differential scanning calorimetry. Form 4 has the most suitable morphology following drying which leads to process advantages related to the handling of the crystalline material. Further, Form 4 possesses a preferred crystal shape, and may therefore be particularly well suited for formulation. The crystals may be obtained from a hydrocarbon slurry of Form 1 or Form 2 when a cyclic ether such as tetrahydrofuran (THF) is added to result in about a 4 to about 6 percent THF to hydrocarbon (v/v) solvent composition. Heptane is the most preferred hydrocarbon. It

US 6,673,372 B1

**13**

can be directly crystallized from about a 5% THF in heptane solution. The solubility of Efavirenz in THF/heptane mixtures is generally high, so in order to maximize yield, certain process protocol is preferably followed. Once Form 4 has crystallized, the THF concentration is preferably reduced to about less than 1%, which is accomplished by solvent exchange with heptane. Form 4 has also been obtained by crystallization from a saturated solution in methylcyclohexane. Recrystallization from straight heptane generally results in the formation of Forms 4, 1, 2 or mixtures thereof. Because Form 4 is the form which most commonly results when Efavirenz is crystallized from hydrocarbon/THF mixtures, it is the form which is isolated as a wet cake in the commercial drug manufacture. Form 4 may be converted to Form 1 by drying the crystals at about 80° C. to about 100° C. for about 12 to about 24 hours, preferably in a vacuum dryer.

For large scale preparations of Form 1 from Form 4, it is preferable for processing concerns to heat the wet cake of Form 4 to about 30 to about 50 to expel the majority of the solvent, after which the temperature may be elevated to about 80° C. to about 100° C. to complete the conversion.

Form 5 has a melting point of about 108° C. to about 110° C., observed by differential scanning calorimetry. Form 5 has been determined to be the most thermodynamically stable crystalline form below 40° C. Form 5 is highly crystalline and had the additional property of preferentially excluding impurities which leads to process advantages. The crystals may be obtained by recrystallization from a dilute solution of THF/heptane. The crystals may be obtained from solutions in which either Form 1 or Form 4 have already been isolated.

The possible interconversions of the forms of the present invention may be further understood by reference to Scheme 4.



Scheme 4

Definitions

The following abbreviations are used herein: "THF" is intended to mean tetrahydrofuran, "GC" as used herein is intended to mean gas chromatography, "DMSO" is intended to mean dimethylsulfoxide, "TMEDA" is intended to mean N,N,N'N'-tetramethylethylenediamine.

**14**

The term "hydrocarbon" as used herein, refers to alkane solvents. Examples include but are not limited to solvents such as pentane, hexane, heptane, octane, nonane, decane and the like. Preferred mixed solvent systems in the present invention are mixed solvent systems comprising of tetrahydrofuran and hydrocarbons.

The term "slurry" as used herein is intended to mean a saturated solution of Efavirenz and an additional amount of Efavirenz to give a heterogeneous solution of Efavirenz and a solvent.

The present invention describes Form 1 Efavirenz, Form 2 Efavirenz, Form 3 Efavirenz, Form 4 Efavirenz, and Form 5 Efavirenz in substantially pure form. As used herein, "substantially pure" means a compound having a purity greater than 90 percent, including 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, and 100 percent.

When dissolved, Efavirenz loses its crystalline structure, and is therefore referred to as a solution of Efavirenz. All forms of the present invention, however, may be used for the preparation of liquid formulations in which the drug is dissolved or suspended. In addition, the crystalline Efavirenz may be incorporated into solid formulations.

A therapeutically effective amount of the crystalline Efavirenz is combined with a pharmaceutically acceptable carrier to produce the pharmaceutical compositions of this invention. By "therapeutically effective amount" it is meant an amount that, when administered alone or with an additional therapeutic agent, is effective to prevent, suppress or ameliorate the disease or condition or the progression of the disease or condition. The combination of compounds described herein is preferably a synergistic combination. Synergy, as described for example by Chou and Talalay, Adv. Enzyme Regul. 22:27–55 (1984), occurs when the effect (in this case, inhibition of HIV replication) of the compounds when administered in combination is greater than the additive effect of the compounds when administered alone as a single agent. In general, a synergistic effect is most clearly demonstrated at suboptimal concentrations of the compounds. Synergy can be in terms of lower cytotoxicity, increased antiviral effect, or some other beneficial effect of the combination compared with the individual components.

The compounds of the present invention are useful in the inhibition of HIV reverse transcriptase, treatment of infection by human immunodeficiency virus (HIV) and the treatment of consequent pathological conditions such as acquired immunodeficiency syndrome (AIDS). Treating AIDS, or treating infection by HIV is defined as including, but not limited to, treatment and prevention of a wide range of states of HIV infection: AIDS, ARC (AIDS related complex), both symptomatic and a symptomatic, and actual or potential exposure to HIV by blood transfusion, exchange of bodily fluids, bites, accidental needle stick, or exposure to blood during surgery.

For these purposes, the compounds of the present invention may be administered orally, parenterally (including subcutaneous injections, intravenous, intramuscular, intrasternal injection or infusion techniques), by inhalation spray, rectally, in dosage unit formulations containing conventional non-toxic pharmaceutically acceptable adjuvants and vehicles, all using dosage forms well known to those of ordinary skill in the pharmaceutical arts.

The crystalline forms of Efavirenz described herein may be formulated into pharmaceutical compositions and employed in therapeutic and prophylactic methods as described in U.S. Pat. No. 5,519,021, which is hereby

US 6,673,372 B1

15

incorporated by reference. These methods include the direction of the forms of the present invention to combinations with one or more agents useful in the treatment of AIDS such as other HIV reverse transcriptase inhibitors, HIV protease inhibitors, antivirals, immunomodulators, antibiotics antiinfectives, or vaccines.

As used herein, "HIV reverse transcriptase inhibitor" is intended to refer to both nucleoside and non-nucleoside inhibitors of HIV reverse transcriptase (RT). Examples of nucleoside RT inhibitors include, but are not limited to, AZT, ddC, ddI, d4T, and 3TC. Examples of non-nucleoside RT inhibitors include, but are no limited to, delavirdine (Pharmacia and Upjohn U90152S), nevirapine (Boehringer Ingelheim), Ro 18,893 (Roche), trovirdine (Lilly), MKC-442 (Triangle), HBY 097 (Hoechst), ACT (Korean Research Institute), UC-781 (Rega Institute), UC-782 (Rega Institute), RD4-2025 (Tosoh Co. Ltd.), and MEN 10979 (Menarini Farmaceutici).

As used herein, "HIV protease inhibitor" is intended to refer to compounds which inhibit HIV protease. Examples include, but are not limited, saquinavir (Roche, Ro3-8959), ritonavir (Abbott, ABT-538), indinavir (Merck, MK-639), amprenavir (Vertex/Glaxo Wellcome), nelfinavir (Agouron, AG-1343), palinavir (Boehringer Ingelheim), BMS-232623 (Bristol-Myers Squibb), GS3333 (Gilead Sciences), KNI-413 (Japan Energy), KNI-272 (Japan Energy), LG-71350 (LG Chemical), CGP-61755 (Ciba-Geigy), PD 173606 (Parke Davis), PD 177298 (Parke Davis), PD 178390 (Parke Davis), PD 178392 (Parke Davis), U-140690 (Pharmacia and Upjohn), and ABT-378. Additional examples include the cyclic protease inhibitors disclosed in WO 93/07128, WO 94/19329, WO 94/22840, and PCT Application Number US 96/03426.

The crystalline forms of Efavirenz of this invention may be administered in oral dosage forms such as tablets, capsules (each of which includes sustained release or timed release formulations), pills, powders, granules, elixirs, tinctures, suspensions, syrups, and emulsions.

Solid dosage forms (pharmaceutical compositions) suitable for administration may generally contain from about 1 mg to about 1000 mg of crystalline Efavirenz per dosage unit.

For oral administration in solid form such as a tablet or capsule, the crystalline Efavirenz can be combined with a non-toxic, pharmaceutically acceptable inert carrier, such as lactose, starch, sucrose, glucose, methylcellulose, magnesium stearate, dicalcium phosphate, calcium sulfate, mannitol, sorbitol and the like.

Preferably, in addition to the active ingredient, solid dosage forms contain a number of additional ingredients referred to herein as "excipients". These excipients include among others diluents, binders, lubricants, glidants and disintegrants. Coloring agents may also be incorporated. "Diluents" as used herein, are agents which impart bulk to the formulation to make a tablet a practical size for compression. Examples of diluents are lactose and cellulose. "Binders" as used herein, are agents used to impart cohesive qualities to the powered material ensuring the tablet will remain intact after compression, as well as improving the free-flowing qualities of the powder. Examples of typical binders are lactose, starch and various sugars. "Lubricants" as used herein have several functions including preventing the adhesion of the tablets to the compression equipment and improving the flow of the granulation prior to compression or encapsulation. Lubricants are in most cases hydrophobic materials. Excessive use of lubricants can result in a formu-

16

lation with reduced disintegration and/or delayed dissolution of the drug substance. "Glidants" as used herein are substances which improve the flow characteristics of the granulation material. Examples of glidants include talc and colloidal silicon dioxide. "Disintegrants" as used herein are substances or a mixture of substances added to a formulation to facilitate the breakup or disintegration of the solid dosage form after administration. Materials that serve as disintegrants include starches, clays, celluloses, algins, gums and cross-linked polymers. A group of disintegrants referred to as "super-disintegrants" generally are used at a low level in the solid dosage form, typically 1% to 10% by weight relative to the total weight of the dosage unit. Croscarmellose, crospovidone and sodium starch glycolate represent examples of a cross-linked cellulose, a cross-linked polymer and a cross-linked starch, respectively. Sodium starch glycolate swells seven- to twelve-fold in less than 30 seconds effectively disintegrating the granulations that contain it.

The disintegrant preferably used in the present invention is selected from the group comprising modified starches, croscarmallose sodium, carboxymethylcellulose calcium and crospovidone. A more preferred disintegrant in the present invention is a modified starch such as sodium starch glycolate.

Preferred carriers include capsules or compressed tablets which contain the solid pharmaceutical dosage forms described herein. Preferred capsule or compressed tablet forms generally comprise a therapeutically effective amount of Efavirenz and one or more disintegrants in an amount greater than about 10% by weight relative to the total weight of the contents of the capsule or the total weight of the tablet.

Preferred capsule formulations may contain Efavirenz present in an amount from about 5 to about 1000 mg per capsule. Preferred compressed tablet formulations contain Efavirenz in an amount from about 5 mg to about 800 mg per tablet. More preferred formulations contain about 50 to about 200 mg per capsule or compressed tablet. Preferably, the capsule or compressed tablet pharmaceutical dosage form comprises a therapeutically effective amount of Form 1, 2, 3, or 4 Efavirenz; a surfactant; a disintegrant; a binder; a lubricant; and optionally additional pharmaceutically acceptable excipients such as diluents, glidants and the like; wherein the disintegrant is selected from modified starches; croscarmallose sodium, carboxymethylcellulose calcium and crospovidone.

In general, liquid pharmaceutical compositions for oral administration have ranges of the HIV reverse transcriptase inhibitor agents which can vary from about 0.1 to about 15% by weight (wgt). More preferably, the drug substance component will range from about 1 to about 10% by weight in the composition.

For oral administration in liquid form, the crystalline Efavirenz can be combined with any oral, non-toxic pharmaceutically acceptable inert carrier such as ethanol, glycerol, water and the like. In a preferred liquid composition, the liquid vehicle consists of essentially polyol esters of medium chain fatty acids. This term polyol esters of medium chain fatty acids is intended to include esters and mixed esters of glycerol, propylene glycol or other open chain polyols such as polyethylene glycol, reacted with medium chain fatty acids, wherein said acid has a chain length between 6 and 12 carbon atoms. Particularly preferred for compositions are triglycerides or diglycerides of the $C_8$-$C_{10}$ fatty acids commercially available from the fractionation of coconut oil. Commercially available prod-

US 6,673,372 B1

17

ucts of this description are sold under the trade names "Miglyol" and "Captex 300" which are described as having a typical composition of about 68% $C_8$ fatty acid (caprylic) triglyceride and about 28% $C_{10}$ fatty acid (capric) triglyceride with minor levels of $C_6$ and $C_{14}$ fatty acid triglycerides.

The medium chain fatty acid ester component, when present serves as the solvent vehicle for the active agent in formulating the compositions of the invention and is present in the composition in the range from about 50% to about 99%, by weight, but more preferably from 70% to 99% by weight.

Preferably, the liquid composition containing polyol esters will contain a sweetening agent which is useful in reducing the oily taste of the medium chain fatty acid ester and thus contributes in a significant way in making the compositions more palatable.

The sweetening agent can be selected from a sugar such as sucrose, mannitol, sorbitol, xylitol, lactose, etc. or a sugar substitute such as cyclamate, saccharin, aspartame, etc. If sugar substitutes are selected as the sweetening agent the amount employed in the compositions of the invention will be substantially less than if sugars are employed. Taking this into account, the sweetening agent can be used in the composition in the range of from 0.1 to 50% by weight and more preferably in the range of 0.5 to 30% by weight.

The more preferred sweetening agents are the sugars and particularly sucrose. The particle size of the powdered sucrose used has been found to have a significant influence in the physical appearance of the finished composition and its ultimate acceptance for taste. The preferred particle size of the sucrose component when used is in the range of from 200 to less than 325 mesh US Standard Screen.

In another preferable liquid pharmaceutical composition, Efavirenz is combined with a liquid vehicle which is a vegetable oil selected from the class consisting of olive oil, peanut oil, soybean oil, corn oil, safflower oil, sunflower oil, canola oil, or walnut oil. These vegetable oils are commercially available from a number of sources well recognized by those skilled in the art.

The vegetable oil component serves as the solvent vehicle for the active agent in formulating the compositions of the invention and is present in the composition in the range from 50 to 99%, by weight more preferably from 70% to 99% by weight.

Preferably, the pharmaceutical compositions containing vegetable oil will also contain a sweetening agent which is useful in reducing the oily taste of the vegetable oil and thus contributes in a significant way in making the compositions more palatable.

The liquid compositions may also contain other components routinely utilized in formulating pharmaceutical compositions. One example of such components is lecithin. Its use in compositions of the invention as an emulsifying agent in the range of from 0.05 to 1% by weight, more preferably from 0.1 to 0.5% by weight may possibly serve to improve absorption of the active drug agent. Other examples of components that may be used are antimicrobial preservatives, such as benzoic acid or parabens; suspending agents, such as colloidal silicon dioxide; antioxidants; topical oral anesthetics; flavoring agents; and colorants.

The selection of such optional components and their level of use in the compositions of the invention is within the level of skill in the art and will be even better appreciated from the working examples provided hereinafter.

Crystalline Efavirenz may also be coupled with soluble polymers as targetable drug carriers. Such polymers can

18

include polyvinylpyrrolidine pyran copolymer, polyhydroxypropylmethacrylamide-phenol, polyhydroxyethyl-aspartamidephenol or polyethylene oxide-polylysine substituted with palmitoyl residues. Furthermore, the crystalline Efavirenz may be coupled to a class of biodegradable polymers useful in achieving controlled release of a drug, for example, polylactic acid, polyglycolic acid, copolymers of polylactic and polyglycolic acid, polyepsilon caprolactone, polyhydroxy butyric acid, polyorthoesters, polyacetals, polydihydropyrans, polycyanoacrylates and crosslinked or amphipathic block copolymers of hydrogels.

Gelatin capsules of crystalline Efavirenz contain Efavirenz and the liquid or solid compositions described herein. Gelatin capsules may also contain powdered carriers such as lactose, starch, cellulose derivatives, magnesium stearate, stearic acid and the like. Similar diluents can be used to make compressed tablets. Both tablets and capsules can be manufactured as sustained release products to provide for continuous release of medication over a period of hours. Tablets can be sugar coated or film coated to mask any unpleasant taste and to protect the tablet from the atmosphere or enteric coated for selective disintegration in the gastrointestinal track.

In general, water, a suitable oil, saline, aqueous dextrose (glucose), and related sugar solutions and glycols, such as propylene glycol or polyethylene glycols are suitable carriers for parenteral solutions. Solutions for parenteral solutions are prepared by dissolving the crystalline Efavirenz in the carrier and, if necessary, adding buffering substances. Anti-oxidizing agents such as sodium bisulfite, sodium sulfite, or ascorbic acid either alone or combined, are suitable stabilizing agents. Citric acid and its salts and sodium EDTA may also be employed. Parenteral solutions may also contain preservatives, such as benzalkonium chloride, methyl- or propyl-paraben and chlorobutanol.

Suitable pharmaceutical carriers are described in Remington's Pharmaceutical Sciences, Mack Publishing Co., a standard reference text in this field. Useful pharmaceutical dosage-forms for administration of the compounds of this invention can be illustrated as follows:

Capsules

A large number of unit capsules can be prepared by filling standard two-piece hard gelatin capsules each with 100 mg of powdered active ingredient, 150 mg of lactose, 50 mg of cellulose, and 6 mg magnesium stearic.

Soft Gelatin Capsules

A mixture of active ingredient in a digestible oil such as soybean oil, cottonseed oil or olive oil can be prepared and injected by means of a positive displacement pump into gelatin to form soft gelatin capsules containing 100 mg of the active ingredient. The capsules should then be washed and dried.

Tablets

A large number of tablets can be prepared by conventional procedures so that the dosage unit is 100 mg of active ingredient, 0.2 mg of colloidal silicon dioxide, 5 milligrams of magnesium stearate, 275 mg of microcrystalline cellulose, 11 mg of starch and 98.8 mg of lactose. Appropriate coatings may be applied to increase palatability or delay absorption.

Suspension

An aqueous suspension can be prepared for oral administration so that each 5 mL contain 25 mg of finely divided active ingredient, 200 mg of sodium carboxymethyl cellulose, 5 mg of sodium benzoate, 1.0 g of sorbitol solution, U.S.P., and 0.025 mg of vanillin.

US 6,673,372 B1

19

20

Injectable

A parenteral composition suitable for administration by injection can be prepared by stirring 1.5% by weight of active ingredient in 10% by volume propylene glycol and water. The solution is sterilized by commonly used techniques.

Nasal Spray

An aqueous solution is prepared such that each 1 milliliter contains 10 milligrams of active ingredient, 1.8 milligrams methylparaben, 0.2 milligram propylparaben and 10 milligrams methylcellulose. The solution is dispensed into 1 milliliter vials.

Lung Inhaler

A homogeneous mixture of the active ingredient in polysorbate 80 is prepared such that the final concentration of the active ingredient will be 10 milligrams per container and the final concentration of polysorbate 80 in the container will be 1% by weight. The mixture is dispensed into each can, the valves are crimped onto the can and the required amount of dichlorotetrafluoroethane is added under pressure.

Combination of components (a) and (b)

The Form 1, Form 2, Form 3, Form 4, Form 5 therapeutic agent component (a) of this invention can independently be in any dosage form, such as those described above, and can also be administered in various combinations, as described above. In the following description component (b) is to be understood to represent one or more agents as described previously. Thus, if components (a) and (b) are to be treated the same or independently, each agent of component (b) may also be treated the same or independently.

Components (a) and (b) of the present invention may be formulated together, in a single dosage unit (that is, combined together in one capsule, tablet, powder, or liquid, etc.) as a combination product. When component (a) and (b) are not formulated together in a single dosage unit, the component (a) may be administered at the same time as component (b) or in any order; for example component (a) of this invention may be administered first, followed by administration of component (b), or they may be administered in the reverse order. If component (b) contains more that one agent, e.g., one RT inhibitor and one protease inhibitor, these agents may be administered together or in any order. When not administered at the same time, preferably the administration of component (a) and (b) occurs less than about one hour apart. Preferably, the route of administration of component (a) and (b) is oral. The terms oral agent, oral inhibitor, oral compound, or the like, as used herein, denote compounds which may be orally administered. Although it is preferable that component (a) and component (b) both be administered by the same route (that is, for example, both orally) or dosage form, if desired, they may each be administered by different routes (that is, for example, one component of the combination product may be administered orally, and another component may be administered intravenously) or dosage forms.

As is appreciated by a medical practitioner skilled in the art, the dosage of the combination therapy of the invention may vary depending upon various factors such as the pharmacodynamic characteristics of the particular agent and its mode and route of administration, the age, health and weight of the recipient, the nature and extent of the symptoms, the kind of concurrent treatment, the frequency of treatment, and the effect desired, as described above.

The proper dosage of components (a) and (b) of the present invention will be readily ascertainable by a medical practitioner skilled in the art, based upon the present disclosure. By way of general guidance, typically a daily dosage may be about 100 milligrams to about 1.5 grams of each component. If component (b) represents more than one compound, then typically a daily dosage may be about 100 milligrams to about 1.5 grams of each agent of component (b). By way of general guidance, when the compounds of component (a) and component (b) are administered in combination, the dosage amount of each component may be reduced by about 70–80% relative to the usual dosage of the component when it is administered alone as a single agent for the treatment of HIV infection, in view of the synergistic effect of the combination.

The combination products of this invention may be formulated such that, although the active ingredients are combined in a single dosage unit, the physical contact between the active ingredients is minimized. In order to minimize contact, for example, where the product is orally administered, one active ingredient may be enteric coated. By enteric coating one of the active ingredients, it is possible not only to minimize the contact between the combined active ingredients, but also, it is possible to control the release of one of these components in the gastrointestinal tract such that one of these components is not released in the stomach but rather is released in the intestines. Another embodiment of this invention where oral administration is desired provides for a combination product wherein one of the active ingredients is coated with a sustained-release material which effects a sustained-release throughout the gastrointestinal tract and also serves to minimize physical contact between the combined active ingredients.

Furthermore, the sustained-released component can be additionally enteric coated such that the release of this component occurs only in the intestine. Still another approach would involve the formulation of a combination product in which the one component is coated with a sustained and/or enteric release polymer, and the other component is also coated with a polymer such as a low-viscosity grade of hydroxypropyl methylcellulose or other appropriate materials as known in the art, in order to further separate the active components. The polymer coating serves to form an additional barrier to interaction with the other component. In each formulation wherein contact is prevented between components (a) and (b) via a coating or some other material, contact may also be prevented between the individual agents of component (b).

Dosage forms of the combination products of the present invention wherein one active ingredient is enteric coated can be in the form of tablets such that the enteric coated component and the other active ingredient are blended together and then compressed into a tablet or such that the enteric coated component is compressed into one tablet layer and the other active ingredient is compressed into an additional layer.

Optionally, in order to further separate the two layers, one or more placebo layers may be present such that the placebo layer is between the layers of active ingredients. In addition, dosage forms of the present invention can be in the form of capsules wherein one active ingredient is compressed into a tablet or in the form of a plurality of microtablets, particles, granules or non-perils, which are then enteric coated. These enteric coated microtablets, particles, granules or non-perils are then placed into a capsule or compressed into a capsule along with a granulation of the other active ingredient.

These as well as other ways of minimizing contact between the components of combination products of the present invention, whether administered in a single dosage form or administered in separate forms but at the same time

US 6,673,372 B1

**21**

or concurrently by the same manner, will be readily apparent to those skilled in the art, based on the present disclosure.

Pharmaceutical kits useful for the treatment of HIV infection, which comprise a therapeutically effective amount of a pharmaceutical composition comprising a compound of component (a) and one or more compounds of component (b), in one or more sterile containers, are also within the ambit of the present invention. Sterilization of the container may be carried out using conventional sterilization methodology well known to those skilled in the art. Component (a) and component (b) may be in the same sterile container or in separate sterile containers. The sterile containers of materials may comprise separate containers, or one or more multi-part containers, as desired. Component (a) and component (b), may be separate, or physically combined into a single dosage form or unit as described above. Such kits may further include, if desired, one or more of various conventional pharmaceutical kit components, such as for example, one or more pharmaceutically acceptable carriers, additional vials for mixing the components, etc., as will be readily apparent to those skilled in the art. Instructions, either as inserts or as labels, indicating quantities of the components to be administered, guidelines for administration, and/or guidelines for mixing the components, may also be included in the kit.

Obviously, numerous modifications and variations of the present invention are possible in light of the above teachings. It is therefore to be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described herein.

Analytical Methods

x-Ray Powder Diffraction

x-Ray powder diffraction data of Efavirenz were obtained with a Philips Model 3720 automated powder diffractometer. Samples were run in a batch mode with a Model PW 1775 multi-position sample changer. The diffractometer was equipped with a variable slit (θ-compensating slit), a scintillation counter and a graphite monochromator. The radiation was CuKα (40 kV, 30 mA). Data were collected at room temperature from 2 to 60 degrees 2θ; the step size was 0.02 degrees; the count time was 0.5 sec. per step. Samples were prepared on glass specimen holders as a thin layer of powdered material without solvent.

Differential Scanning Calorimetry

The thermal properties of Efavirenz were characterized with differential scanning calorimetry using a TA Instruments DSC 910, with data analysis via a TA Instruments Thermal Analyzer 2100. Samples were placed in sealed aluminum pans for analysis with an empty aluminum pan serving as the reference. Heating rates of 5° C. per minute or 10° C. per minute were employed over a temperature range of 25° C. to 200° C. The instrument was calibrated with a indium standard.

EXAMPLES

The following examples teach the preparation of (S)-6-chloro-4-cyclopropylethynyl-4-trifluoromethyl-1,4-dihydro-2H-3,1-benzoxazin-2-one.

Example 1

Preparation of N-(4-chlorophenyl)-2,2-dimethyl propanamide

4-Chloroaniline (52.7 kg, 413 mol) was dissolved in a mixture of t-butyl methyl ether (180 kg), 30% aqueous sodium hydroxide (61.6 kg, 463 mol) and water (24.2 kg),

**22**

then cooled to 15° C. To the resulting slurry was charged trimethylacetyl chloride (52.2 kg, 448 mol) over 1 h, keeping the temperature below 40° C. After stirring 30 min at 30° C. the slurry was cooled to −10° C. and held for 2 hours. The product was collected by filtration, washed with a solution of 90/10 water/methanol (175 kg), then dried in vacuo to give 85 kg (97% yield) of the title compound as a crystalline solid: mp 152–153° C.; [1]H NMR (300 MHz, CDCl₃) δ 7.48 (d, J=9 Hz, 2H) 7.28 (d, J=9 Hz, 2H); [13]C NMR (75 MHz, CDCl₃) d 176.7, 136.6, 129.1, 128.9, 121.4, 39.6, 27.6.

Example 2

Preparation of 4-Chloro-2-trifluoroacetyl-aniline, Hydrochloride Hydrate

N-(4-Chlorophenyl)-2,2-dimethyl propanamide (36.7 kg, 173 mol) was charged to a solution of TMEDA (20.2 kg, 174 mol) in anhydrous t-butyl methyl ether (271.5 kg) and cooled to −20° C. To the cold slurry was added 2.7 N n-butyllithium in hexane (101.9 kg, 393 mol) while keeping the temperature below 5° C. After aging 2 hr at 0 to 5° C., the solution was cooled below −15° C. then rapidly reacted with ethyl trifluoroacetate (34.5 kg, 243 mol). After 30 min, the resulting solution was quenched into 3N HCl (196 L, 589 mol) keeping the temperature below 25° C. After removal of the aqueous phase, the organic solution was concentrated by distilling approximately 200 L of solvent. Acetic acid (352 kg) was added while distilling 325 kg solvent under 100 mm vacuum. After cooling the solution to 30° C., 12 N HCl (43.4 kg, 434 mol) was added and the mixture heated to 65 to 70° C. and held 4 hours. The resulting slurry was cooled to 5° C. and the product was collected by filtration, washed with ethyl acetate (50.5 kg) and dried in vacuo to give 42.1 kg (87%) of the title compound as a white crystalline solid: mp 159–162 dec; [1]H NMR (300 MHz, DMSO-d₆) d 7.65–7.5 (complex, 2H), 7.1 (d, J=8 Hz, 1H), 7.0 (brs, 3H); [19]F NMR (282 MHz, DMSO-d₆) δ −69.5.

Example 3

Preparation of N-((4'-Methoxy)benzyl)-4-chloro-2-trifluoroacetylaniline

To a slurry of 4-Chloro-2-trifluoroacetylaniline, hydrochloride hydrate (40.0 kg, 144 mol) in toluene (140 kg) and water (50 L) was added 30% NaOH (18 kg) to pH 7.0. After removing the aqueous phase, 4-methoxybenzyl alcohol (20 kg, 144 mol) and TsOH (1.0 kg, 5.3 mol) were added. The solution was heated to reflux and the water/toluene azeotrope (30 L) distilled. The solution was cooled to room temperature and washed with saturated brine (80 kg). The organic solution was concentrated in vacuo to a volume of 35–40 L, then diluted with THF (52 kg). The weight percent of the title compound in toluene/THF was calculated by HPLC to be 43%. The yield based on HPLC weight % analysis was 47.7 kg (96%). An analytical sample was obtained by removing the solvent in vacuo and recrystallizing from heptane: mp 82–84° C.; [1]H NMR (300 MHz, CDCl₃) δ 9.04 (s,1H), 7.74 (d, J=2 Hz, 1H), 7.35 (dd, J=2, 9 Hz), 7.24 (d, J=8 Hz, 2H), 6.91 (d, J=8 Hz, 2H), 6.75 (d, J=9 Hz, 1H), 4.43 (d, J=6 Hz, 2H), 3.79 (s, 3H); [13]C NMR (75 MHz, CDCl₃) δ 180.5, 159.2, 151.9, 137.4, 130.8, 128.9, 128.4, 119.9,117.0, 114.5, 114.4, 113.3, 55.3, 46.6.

Example 3a

Synthesis of (1R,2S)-Pyrrolidinyl norephedrine

To a mixture of n-butanol (227 kg), water (144 kg) and potassium carbonate (144 kg, 1043 mol), was added (1R,

**23**

2S)-norephedrine (68.6 kg, 454 mol). The mixture was heated to 90° C. and 1,4-dibromobutane (113.4 kg, 525 mol) was added over 2 hours. The reaction was refluxed 5 h then cooled to 40° C. Water (181 kg) was added and the phases separated at 30° C. To the organic phase was added 12 N HCl (54.3 kg, 543 mol). The solution was heated to reflux and 150 L of distillate removed at 200 to 300 mm. Toluene (39.5 kg) was added at 70° C. and the resulting slurry cooled to 0–5° C. for crystallization. The product was collected, washed twice with toluene (39 kg each) and dried under a nitrogen purge to give 83.6 kg of the title compound as its hydrochloride salt. The hydrochloride salt was charged to toluene (392 kg) and water (42 kg) and treated with 30% NaOH (approximately 55 kg, 414 mol) to a pH greater than 12. After removal of the lower aqueous phase, the organic solution was partially concentrated by distilling 140 L of solvent to give a 20 wt % solution of the title compound in toluene. The calculated yield was 50 kg (75%). An analytical sample was obtained by concentrating the toluene solution of the title compound in vacuo then recrystallizing from heptane: mp 46–48° C.

### Example 3b

#### Preparation of cyclopropylacetylene

A mixture of 5-chloro-1-pentyne (23.0 kg, 224 mol) and anhydrous THF (150 kg) is cooled to −20° C. n-Hexyllithium (2.3 eq.; 158 kg of 30 wt. %) in hexane is added into the mixture at such a rate as to not allow the temperature to go over 50° C. (approximately 2 hours). During the second half of the n-hexyllithium addition the temperature must remain above −5° C. to prevent an accumulation of the organolithium and a dangerously exothermic induction reaction. The reaction is aged at −5 to 0° C. for 2 hours, until GC analysis indicates at least 99% conversion. Toluene (35 to 40 kg) is then added and the reaction is concentrated under vacuum until the volume is reduced to ~⅓ of original volume. The mixture is heated (to ~40° C.) over the course of the concentration to maintain a good rate of distillation. The mixture is then cooled to −20° C. and a solution of ammonium chloride (11 to 12 kg) in 50 to 60 L water is added at such a rate as to not allow the temperature to go above 10° C. After separation of the aqueous layer (approximately 70 kg), the reaction mixture is circulated through a tower containing 15 kg of 3Å molecular sieves until the water content is <300 ppm or lower as determined by Karl Fisher analysis. The dried organic solution is then distilled through a column packed with steel wool at atmospheric pressure, collecting cyclopropylacetylene as a solution in THF/toluene/hexane. The calculated yield is 14.0 kg.

### Example 4

#### Preparation of (S)-5-Chloro-α-(cyclopropyl-ethynyl)-2-[(4-methoxyphenyl)methyl]-amino]α-(trifluoromethyl)benzenemethanol

To a toluene solution of (1R,2S)-pyrrolidinyl norephedrine (80 kg, containing 60.7 mol (1R,2S)-pyrrolidinyl norephedrine) was charged triphenylmethane (100 g). The solution was concentrated in vacuo to about half the original volume. Anhydrous THF (35 kg) was added and the solution chilled with the cooling jacket set at −50° C. When the temperature reached −20° C., n-hexyllithium (33 wt % in hexanes, 33.4 kg, 119.5 mol) was added while maintaining the temperature below 0° C. To the resulting red solution was charged a solution of cyclopropylacetylene (30 wt % in

**24**

THF/hexanes/toluene; containing about 4 kg, 65 mol of cyclopropylacetylene) while maintaining an internal temperature below −20° C. The resultant solution was aged at −45 to −50° C. for 1 hour. To the cold solution was charged a solution of N-((4'-Methoxy)benzyl)-4-chloro-2-trifluoroacetylaniline(43 wt % in THF/toluene; containing about 10 kg, 28.8 mol of N-((4'-Methoxy)benzyl)-4-chloro-2-trifluoroacetylaniline) while maintaining a reaction temperature below −40° C. After aging the mixture at −43+/−3° C. for 1 h, the reaction was quenched into 140 kg 1N HCl, pre-chilled to 0° C. The organic layer was separated and extracted twice with 25 kg portions of 1N HCl, twice with 40 kg water, then concentrated in vacuo to a volume of about 29 L. Toluene (47 kg) was added and the solution concentrated to a volume of 28 to 30 L. Heptane (23 kg) was charged and the mixture cooled and held at −5° C. for 4 hours. The product was filtered, washed twice with 10 kg portions of heptane and dried in vacuo to give 10 kg (85%) of the title compound as an off-white solid: mp 163–165° C.; [a]²⁵D +8.15° (c 1.006, MeOH); ¹H NMR (300 MHz, CDCl₃) δ 7.55 (brs, 1H), 7.23 (d, J=8 Hz, 2H), 7.13 (dd, J=3, 9 Hz, 1H), 6.86 (d, J=8 Hz, 2H), 6.59 (d, J=8 Hz, 1H), 4.95 (bs, 1H), 4.23 (s, 2H), 3.79 (s,3H), 2.39 (m, 1H), 1.34 (m, 1H), 0.84 (m, 2H), 0.76 (m,2H); ¹³C NMR (75 MHz, CDCl₃) δ 158.9, 145.5, 130.6, 130.3, 130.2, 128.6, 125.9, 122.0, 121.6, 119.5, 114.8, 114.1, 94.0, 75.2, 74.7, 70.6, 55.3, 48.0, 8.6, 8.5, −0.6; ¹⁹F NMR (282 MHz, CDCl₃) δ 80.19.

### Example 5

#### Preparation of (S)-6-Chloro-4-(cyclopropyl-ethynyl)-1,4-dihydro-4-(4'-methoxyphenyl)-3,1-benzoxazine

To a solution of heptane (295.5 kg) and ethyl acetate (32.5 kg) was added p-chloranil (57 kg, 232 mol) and (S)-5-Chloro-α-(cyclopropylethynyl)-2-[(4-methoxyphenyl)methyl]-amino]-α-(trifluoromethyl)benzenemethanol (89 kg, 217 mol). The mixture was refluxed with good agitation for 5.5 h then diluted with ethyl acetate (64.1 kg) and cooled to 30° C. Tetracholorophydroquinone was removed by filtration and washed with a mixture of heptane (104.7 kg) and ethyl acetate (31 kg). The filtrate was partially concentrated by distillation of 260 L solvent, then diluted with heptane (177 kg) and cooled to −10 to −15° C. The resulting slurry was filtered and the product washed with heptane (41 kg) and dried on the filter to less than 20 wt % heptane (by loss on drying). The yield calculated by HPLC, was 71 kg (80%). An analytical sample was obtained by trituration of the sample with 1N NaOH, followed by recrystallization from hexane/ethyl acetate: mp 130–131.7° C.; 1H NMR (300 MHz, DMSO-d₆) δ 7.46 (d, J=9 Hz, 2H), 7.28–7.21 (m, 3H), 7.0 (d, J=9 Hz, 2H), 6.85 (d, J=9 Hz, 1H), 5.52 (s, 1H), 3.78 (s, 3H), 1.52–1.47 (m, 1H), 0.90–0.84 (m, 2H), 0.72–0.68 (m, 1H); ¹³C NMR (75 MHz, DMSO-d₆) δ 160.3, 143.8, 129.6, 129.3, 128.9, 125.8, 123.1, 121.7, 118.1, 117.8, 113.8, 93.6, 80.9, 74.1, 70.3, 55.2, 8.5, 8.4, −1.07; ¹⁹F NMR (282 MHz, CDCl₃) δ 157.5.

### Example 6

#### (S)-5-Chloro-α-(cyclopropylethynyl)-2-amino-α-(trifluoromethyl)benzenemethanol

Crude (S)-5-Chloro-4-(cyclopropylethynyl)-1,4-dihydro-4-(trifluoromethyl)-2-(4'methoxyphenyl)-3,1-benzoxazine (71 kg calculated dry weight) was charged to a mixture of methanol (301 kg), 30% NaOH (121 kg) and water (61 L).

JTX001.0021
A100

US 6,673,372 B1

25

The mixture was heated to 60° C. to give a clear solution then cooled to 30° C. A solution of sodium borohydride (3.2 kg, 84.2 mol) in 0.2 N NaOH (29 L) was added to the methanolic solution over 20 min, keeping the temperature below 35° C. After 30 min, excess borohydride was quenched with acetone (5.8 kg) and the solution diluted with water (175 L) then neutralized to pH 8 to 9 with acetic acid. The resulting slurry was cooled to about 0° C., filtered and the product washed with water then dried in vacuo at 40° C. The crude product was reslurried with a mixture of toluene (133 kg) and heptanes (106 kg) initially at 25° C., then with cooling below −10° C. The product was filtered, washed with heptanes (41 kg) and dried in vacuo at 40° C. to give 44.5 kg (88%) as an off-white/pale yellow crystalline solid. An analytical sample was recrystallized from t-butyl methyl ether/heptane: mp 141–143° C.; $[\alpha]^{25}_D$ −28.3° (c0.106, MeOH); 1H NMR (300 MHz, CDCl₃) δ 7.54 (d, J=2 Hz, 1H), 7.13 (dd, i=9, 2 Hz, 1H), 6.61 (d, J=9 Hz, 1H), 4.61 (brs, 1H), 4.40 (brs, 1H), 1.44–135 (m, 1H), 0.94–0.78 (m, 2H); ¹³C NMR (75 MHz, DMSO-d₆) δ 146.7, 129.4, 129.0, 124.3, 118.4, 118.07, 118.05, 92.3, 72.6, 71.0, 8.2, 8.1, −1.1; ¹⁹F NMR (282 MHz CDCl₃) δ −80.5.

Example 7

Preparation of (S)-6-Chloro-4-(cyclopropyl-ethynyl)-1,4-dihydro-4-(trifluoromethyl)-2H-3,1-benzoxazine-2-one

(S)-5-Chloro-α-(cyclopropylethynyl)-2-amino-(trifluoromethyl)benzenemethanol (15.7 kg, 54.3 mol) was dissolved in a mixture of heptanes (32 kg) and THF (52 kg) below −10° C. Phosgene (~8.0 kg, 80 mol) was directly fed below the surface over about 1 h, keeping the temperature below 0° C. The resulting slurry was warmed to 20–25° C. and held 1 hour. Methanol (6.5 kg, 203 mol) was added and the solution stirred about 30 min. Heptanes (97 kg) was added and ~140 L of solvent was distilled under reduced pressure. Heptanes (97 kg) and THF (22 kg) were added and the solution washed with 5% aqueous sodium bicarbonate (15 L), followed by water (15 L). The solution was warmed to 50° C. and filtered into a clean reactor, followed by a 40 kg heptanes rinse. The solution was concentrated under reduced pressure, diluted with heptanes (22 kg) and cooled below −10° C. The product was filtered, washed with heptanes (37 kg) and dried in vacuo at 90–100° C. to give 16.0 kg (95%) as an off-white to slightly pinkish solid. HPLC: 99.8 area %: mp 139–141° C.; $[\alpha]^{25}_D$ −94.10 (c 0.300, MeOH); 1H NMR (400 MHz, DMSO-d₆) δ 11.05 (s, 1H), 7.54 (dd, J=2.5, 7 Hz, 1H), 7.43 (d, J=2.5 Hz, 1H), 6.99 (d, J=7 Hz, 1H), 51.58 (m, 1H), 0.92 (m, 2H), 0.77 (m, 2H); ¹³C NMR (100 MHz, DMSO-d₆) δ 146.23, 134.71, 132.04, 126.93, 126.57, 122.24, 116.83, 114.08, 95.63, 77.62, 65.85, 8.48, 8.44, −1.32; ¹⁹F NMR (282 MHz, DMSO-d₆) δ −81.1.

Examples 8–16 specifically teach the preparation of each of the forms of Efavirenz of the present invention, as well as methods to effectuate the interconversions of these forms (Scheme 5). The following examples are meant to be illustrative of the present invention, and not should not be taken as limiting the inventors scope.

26



Scheme 5

Example 8

Direct Crystallization of Form I

Efavirenz (800 g, 2.5 mol) was dissolved in THF (1.2 L) and heptane (6.8 L). The solution was clarified by filtration through a #1 Whatman paper. The THF was then removed by distillation at atmospheric pressure, as the volume was maintained constant by replacing with fresh heptane. When the level of the THF was <1%, the solution was cooled to 70° C. and seeded. The solution was further cooled and the crystallization started at 64° C. A sample indicated form I by XRD. The slurry was further cooled to 30° C. and filtered. The wet cake was dried at 65° C. in a vacuum oven with nitrogen purge until a loss on drying of 0.36% to yield 640 g of product (80%yield).

Example 9

Crystallization of Form 2, Conversion to Form 1

Efavirenz (450 g, 1.4 mol) was slurried in heptane (3.5 L) and heated to reflux until complete dissolution. The solution was allowed to cool to 73° C., at which point it was filtered through #1 Whatman paper and cooled to 6° C. The thin slurry was filtered and the wet cake was washed with 300 mL of heptane. The wet cake (389 g) was dried in a vacuum tray oven at 100° C. for 15 hours to yield 388 g (86% yield) of Form 1.

Example 10

Crystallization of Form 4, Conversion to Form 1

Efavirenz (32 g, 0.1 mol) was dissolved in 390 mL heptane and 20 mL of THF at 60° C. The solution was allowed to cool down and at 45° C. it was seeded with 50mg of DMP 266. After crystallization occurred, solvent was removed in vacuo and it was replaced with fresh heptane. The slurry was cooled to 0° C. and filtered. XRD indicated form IV. It was dried in a vacuum oven at 80° C. for 16 hours to yield 26 g of Form 1 (82% yield).

Example 11

Crystallization of Form 2, Conversion to Form 3, Conversion to Form 1

Efavirenz (105 g, 0.33 mol) was slurried in 1.2 L of heptane and heated to reflux until dissolution. The solution

US 6,673,372 B1

**27**

was allowed to cool to 75° C. and it was filtered through #1 Whatman paper and cooled. A thin slurry crystallized, and a sample was filtered. x-Ray powder diffraction indicated Form 2. The slurry was stirred at room temperature for 24 hours and the resulting thick slurry was diluted with 200 mL of heptane, filtered and dried under vacuum at room temperature to yield 82.5 g (79%). The solid was identified as Form 3 by X-ray powder diffraction. A 5 g sample was dried at 90° C. for 24 hours and the resulting solid was identified as form I by X-ray powder diffraction.

### Example 12

Conversion of Form 1 to Form 3

Efavirenz Form 1 (105 g, 0.33 mol) was slurried in 1.0 L of heptane at room temperature for seven days. A sample indicated no Form 1 present by XRD. The peaks obtained were the same as the one obtained starting from Form 2, although relative intensities were slightly different.

### Example 13

Conversion of Form 2 to Form 4

Efavirenz Form 2 (50 g, 0.16 mol) was slurried in 580 mL of heptanes. THF (7 mL, resulting in 1% THF in heptane) was added, heated to 40° C. and after 50 minutes a sample of the slurry was filtered and XRD (X-ray powder diffraction) still indicated Form 2. THF (28 mL, total 32 mL, resulting in 5% THF in heptane) was added in four portions. After the addition of the last portion, the mixture was cooled to 28° C., at which point a very thick slurry formed, confirmed to be Form 4 by XRD.

### Example 14

Conversion of Form 1 to Form 4

Efavirenz Form 1 (10 g, 0.03 mol) was slurried in 90 mL of heptane. The slurry was heated to 35° C. THF was added in 2 mL portions. After the addition of a total of 6 mL (resulting solution 6% THF), the slurry became very thick. XRD indicated Form 4.

### Example 15

Conversion of Form 2 to Form 1 by Heating a Slurry to 70° C.

Efavirenz Form 2 (3 g, 0.01 mol) was slurried in heptane (42 mL), heated to 70° C. and held for 2 hours. The slurry was cooled down to room temperature and a sample was filtered for XRD, indicating Form 1 only.

### Example 16

Conversion of Form 3 to Form 1 by Heating a Slurry to 70° C.

Efavirenz Form 3 (3 g, 0.01 mol) was slurried in heptane (42 mL) for 48 hours. XRD indicated Form 3. The slurry was then heated to 70° C., held for 2 hours, cooled to room temperature and a sample filtered for XRD, which indicated Form 1.

### Example 17

Direct Crystallization of Form 5

Efavirenz Form 1 (approximately 70 g) was slurried in 1 L of 1% v/v THF/heptane at room temperature. Undissolved

**28**

solids were removed by filtration and the mother liquor was seeded at room temperature with Form 5. Crystals formed slowly and were isolated by filtration, yielding 0.92 g of Form 5. The solid was identified as Form 5 by X-ray powder diffraction.

Alternatively, Efavirenz Form 1 (approximately 70 g) was slurried in 1.5 L of 1% v/v THF/heptane and warmed to 40° C. The solution was filtered warm (40° C.) to remove any undissolved solids and the mother liquor was seeded with Form 5 at 40° C. As the solution cooled to room temperature, Form 5 crystallized. The solid was isolated by filtration at room temperature (9.43 g).

Alternatively, Efavirenz Form 1 (approximately 70g) was slurried in 1 L of warm heptane and 10 mL of THF was added to adjust the solvent ratio to 1% v/v THF/heptane. The slurry was then heated to total dissolution at 85° C. As the solution cooled, it was seeded periodically with Form 5 until the seeds no longer dissolved (63° C.), then allowed to cool to 45° C. and filtered. The solid isolated was Form 1. The solution was then allowed to cool to room temperature overnight and Form 5 crystals were then collected by filtration (15.41g).

### Example 18

Conversion of Form 5 to Form 1

Form 5 was dried at 95° C. for 3 days in a vacuum oven with a nitrogen purge to give Form 1 which was identified by X-ray powder diffraction.

What is claimed is:

**1**. Form 2 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. **2**.

**2**. The compound of claim **1**, in substantially pure form.

**3**. The compound of claim **2**, wherein substantially pure is greater than 90 percent pure.

**4**. The compound of claim **1**, which is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 6.8±0.2, 9.2±0.2, 12.3±0.2, 16.2±0.2, 21.4±0.2, 22.7±0.2, 24.1±0.2, and 28.0±0.2.

**5**. The compound of claim **1** which is characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119° C.

**6**. The compound of claim **1** which is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. **6**.

**7**. The compound of claim **4**, which is further characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119° C.

**8**. A method for inhibiting viral replication which comprises providing the compound of claim **1**, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

**9**. A method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment a therapeutically effective amount of a compound of claim **1**.

**10**. The method of claim **9**, wherein the compound is administered at a dose of about 1 mg to about 1000 mg.

**11**. The compound of claim **1** prepared by the process of rapid crystallization from a saturated alkane solution of Efavirenz.

**12**. The process of claim **11**, wherein rapid crystallization comprises:

    1) dissolving Efavirenz in a suitable solvent at a suitable temperature to give a saturated solution;

US 6,673,372 B1

29

30

2) filtering the saturated solution; and

3) cooling the saturated solution rapidly to produce Form 2 crystalline Efavirenz.

**13.** The process of claim **12**, wherein the suitable solvent for rapid crystallization is heptane, the suitable temperature is about 70° C. to about 80° C., and cooling the saturated solution rapidly comprises contacting the saturated solution with a cold surface.

**14.** A process for preparing Form 4 of crystalline Efavirenz which is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. **8**, the process comprising:

  1) adding a suitable second solvent to a solution of Efavirenz in a first solvent to produce a final solution;

  2) distilling the final solution to a solvent composition from which Efavirenz crystallizes as Form 4 crystals; and

  3) isolating the crystals.

**15.** The process of claim **14**, wherein the suitable second solvent is heptane, the first solvent is tetrahydrofuran, the solvent composition is about 1 to about 10 percent tetrahydrofuran in heptane, and isolating comprises filtering.

**16.** Form 5 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 10.2±0.2, 11.4±0.2, 11.6±0.2, 12.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2.

**17.** The compound of claim **16** in substantially pure form.

**18.** The compound of claim **16**, which is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

**19.** A method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing the compound of claim **16**, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

**20.** A method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment a therapeutically effective amount of the compound of claim **16**.

**21.** The method of claim **20**, wherein the compound is administered at a dosage from about 1 to about 1000 mg per dose.

**22.** The compound of claim **16** prepared by recrystallization from a mixed solvent system.

**23.** A method of treating HIV infection which comprises administering, in combination, to a host in need thereof of:

  (a) a compound of claim **1** or **16**; and

  (b) at least one compound selected from the group consisting of HIV reverse transcriptase inhibitors and HIV protease inhibitors.

**24.** Form 2 of crystalline Efavirenz which is characterized by an differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. **6**.

**25.** The compound of claim **24** in substantially pure form.

**26.** The compound of claim **25**, wherein substantially pure is greater than 90 percent pure.

**27.** The compound of claim **24**, which is characterized by a differential scanning calorimetry thermogram having a peak at about 116° C. to about 119° C.

**28.** A method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing the compound of claim **24**, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

**29.** A method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment a therapeutically effective amount of a compound of claim **24**.

**30.** The method of claim **29**, wherein the compound is administered at a dose of about 1 mg to about 1000 mg.

**31.** The compound of claim **24** prepared by the process of rapid crystallization from a saturated alkane solution of Efavirenz.

**32.** The process of claim **31**, wherein rapid crystallization comprises:

  1) dissolving Efavirenz in a suitable solvent at a suitable temperature to give a saturated solution;

  2) filtering the saturated solution; and

  3) cooling the saturated solution rapidly to produce Form 2 crystalline Efavirenz.

**33.** The process of claim **32**, wherein the suitable solvent for rapid crystallization is heptane, the suitable temperature is about 70° C. to about 80° C., and cooling the saturated solution rapidly comprises contacting the saturated solution with a cold surface.

**34.** Form 5 of crystalline Efavirenz which is characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C.

**35.** The compound of claim **34** substantially pure form.

**36.** A method for inhibiting viral replication by a virally encoded reverse transcriptase which comprises providing the compound of claim **34**, in an amount sufficient to result in the HIV reverse transcriptase being contacted with an effective inhibitory amount of the active drug substance.

**37.** A method for the treatment of human immunodeficiency virus infection which comprises administering to a host in need of such treatment a therapeutically effective amount of the compound of claim **34**.

**38.** The method of claim **37**, wherein the compound is administered at a dosage from about 1 to about 1000 mg per dose.

**39.** The compound of claim **34** prepared by recrystallization from a mixed solvent system.

**40.** A method of treating HIV infection which comprises administering, in combination, to a host in need thereof a therapeutically effective amount

  (a) a compound of claim **24** or **34**; and

  (b) at least one compound selected from the group consisting of HIV reverse transcriptase inhibitors and HIV protease inhibitors.

**41.** Form 2 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 6.8±0.2, 9.2±0.2, 12.3±0.2, 16.2±0.2, 21.4±0.2, 22.7±0.2, 24.1±0.2, and 28.0±0.2.

**42.** A process for preparing Form 1 of crystalline Efavirenz, which is characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG. **1**, the process comprising:

  1) crystallizing Form 4 of crystalline Efavirenz from a solution of THF/heptane wherein the solution of THF/heptane is at about a 5% concentration of THF and is reduced to about a 1% concentration of THF; and

  2) heating Form 4 of crystalline Efavirenz to a temperature of about 80° C. to about 100° C.

**43.** A process for preparing Form 1 of crystalline Efavirenz, which is characterized by an x-ray powder diffraction pattern comprising four or more 2θ values selected from the group consisting of: 6.0±0.2, 6.3±0.2, 10.3±0.2, 10.8±0.2, 14.1±0.2, 16.8±0.2, 20.0±0.2, 20.5±0.2, 21.1±0.2, and 24.8±0; the process comprising:

US 6,673,372 B1

31

1) crystallizing Form 4 of crystalline Efavirenz from a solution of THF/heptane wherein the solution of THF/heptane is at about a 5% concentration of THF and is reduced to about a 1% concentration of THF; and

2) heating Form 4 of crystalline Efavirenz to a temperature of about 80° C. to about 100° C.

**44**. A process for preparing Form 1 of crystalline Efavirenz, which is characterized by a differential scanning calorimetry thermogram having a peak at about 138° C. to about 140° C., the process comprising:

1) crystallizing Form 4 of crystalline Efavirenz from a solution of THF/heptane wherein the solution of THF/heptane is at about a 5% concentration of THF and is reduced to about a 1% concentration of THF; and

32

2) heating Form 4 of crystalline Efavirenz to a temperature of about 80° C. to about 100° C.

**45**. A process for preparing Form 1 of crystalline Efavirenz, which is characterized by a differential scanning calorimetry thermogram substantially in accordance with that shown in FIG. **5**, the process comprising:

1) crystallizing Form 4 of crystalline Efavirenz from a solution of THF/heptane wherein the solution of THF/heptane is at about a 5% concentration of THF and is reduced to about a 1% concentration of THF; and

2) heating Form 4 of crystalline Efavirenz to a temperature of about 80° C. to about 100° C.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,673,372 B1                                    Page 1 of 1
DATED          : January 6, 2004
INVENTOR(S)    : Lilian A. Radesca et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [75], Inventors, should read as follows:
-- **Lilian A. Radesca**, Newark, DE;
**Michael B. Maurin**, Wilmington, DE;
**Shelley R. Rabel**, Landenberg, PA;
**James R. Moore**, Newark, DE --

Signed and Sealed this

Thirteenth Day of July, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 6,673,372 B1 | Page 1 of 1 |
| APPLICATION NO. | : 09/329421 | |
| DATED | : January 6, 2004 | |
| INVENTOR(S) | : Lilian A. Radesca et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, column 2 Item [57] (Abstract), delete "are-designated" and insert -- are designated --, therefor.

At column 28, line 37, in Claim 4, delete "four" and insert -- five --, therefor.

At column 29, line 24, in Claim 16, delete "four" and insert -- six --, therefor.

At column 29, line 26, in Claim 16, after "$11.6\pm0.2$," delete "$12.6\pm0.2$,".

At column 30, line 42, in Claim 40, after "amount" insert -- of: --.

At column 30, line 48, in Claim 41, delete "four" and insert -- five --, therefor.

Signed and Sealed this
Seventeenth Day of April, 2012

David J. Kappos
*Director of the United States Patent and Trademark Office*

**Certificate of Service**

I hereby certify that on the 3rd day of February, 2014, I electronically filed the **BRIEF FOR DEFENDANTS/ COUNTERCLAIMANTS-APPELLANTS MYLAN PHARMACEUTICALS INC. AND MATRIX LABORATORIES LTD. (NONCONFIDENTIAL VERSION)** using the Court's Case Management/Electronic Case Filing system, which will send a "Notice of Docket Activity" to the below-listed counsel.

Furthermore, on the aforementioned date, I served true and correct copies of the **BRIEF FOR DEFENDANTS/ COUNTERCLAIMANTS-APPELLANTS MYLAN PHARMACEUTICALS INC. AND MATRIX LABORATORIES LTD. (CONFIDENTIAL VERSION)** upon the below-listed counsel by delivering CD-ROMs containing a true and correct copy of the aforementioned document to an overnight courier (FedEx) for delivery the next business day, to wit: Tuesday, February 4, 2014 pursuant to Fed. R. App. P. 25(c)(1)(C) and paragraph ECF-9(B) of the Federal Circuit's May 17, 2012 Administrative Order Regarding Electronic Case Filing.

William F. Lee (William.Lee@wilmerhale.com)
Lauren B. Fletcher (Lauren. Fletcher@wilmerhale.com)
Andrew J. Danford (Andrew.Danford@wilmerhale.com)
Sarah R. Frazier (Sarah.Frazier@wilmerhale.com)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

Amy K. Wigmore (Amy.Wigmore@wilmerhale.com)
Thomas Saunders (Thomas.Saunders@wilmerhale.com)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Kurt W. Rohde (rohdek@mbhb.com)
Andrew W. Williams (williams@mbhb.com)
James C. Gumina (gumina@mbhb.com)
Paul H. Berghoff (berghoff@mbhb.com)
Sean M. Sullivan (sullivan@mbhb.com)
Sydney R. Kokjohn (kokjohn@mbhb.com)
John M. Schafer (schafer@mbhb.com)
McDonnell, Boehnen, Hulbert & Berghoff, LLP
300 South Wacker Drive
Chicago, IL 60606

*Counsel for Counterclaim Defendants-Appellees Merck & Co., Inc.,
Merck Sharp & Dohme Corp. and Plaintiffs/Counterclaim
Defendants-Appellees Bristol Myers Squibb Company, Bristol-Myers
Squibb Pharma Co.*

/s/David R. Marriott
David R. Marriott
*Attorney for Defendants/
Counterclaimants-Appellants*

## Certificate of Compliance

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).  The brief contains 13,880 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in Book Antiqua 14 point font.

February 3, 2014

/s/David R. Marriott
David R. Marriott
*Attorney for Defendants/*
*Counterclaimants-Appellants*