**2014-1141**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

BRISTOL-MYERS SQUIBB COMPANY AND BRISTOL-MYERS SQUIBB PHARMA CO.,

*Plaintiffs/Counterclaim Defendants-Appellees*,

MERCK & CO., INC. AND MERCK SHARP & DOHME CORP.,

*Counterclaim Defendants-Appellees*,

*v.*

MYLAN PHARMACEUTICALS INC. AND MATRIX LABORATORIES LTD.,

*Defendants/Counterclaimants-Appellants*.

Appeal from the United States District Court for the District of Delaware
in No. 09-CV-00651, Judge Leonard P. Stark.

## BRIEF FOR APPELLEES

AMY K. WIGMORE
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

PAUL H. BERGHOFF
JAMES C. GUMINA
MCDONNELL BOEHNEN HULBERT
  & BERGHOFF LLP
300 S. Wacker Drive, Suite 3200
Chicago, IL 60606
(312) 913-0001

March 20, 2014

WILLIAM F. LEE
LAUREN B. FLETCHER
ANDREW J. DANFORD
SARAH R. FRAZIER
MICHAELA P. SEWALL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Appellees Bristol-Myers
Squibb Company, Bristol-Myers Squibb
Pharma Co., Merck & Co., Inc., and
Merck Sharp & Dohme Corp.*

# CERTIFICATE OF INTEREST

Counsel for Appellees Bristol-Myers Squibb Co., Bristol-Myers Squibb Pharma Co., Merck & Co., Inc., and Merck Sharp & Dohme Corp. certify as follows:

1.    The full name of every party or amicus represented by us is:

Bristol-Myers Squibb Co., Bristol-Myers Squibb Pharma Co., Merck & Co., Inc., and Merck Sharp & Dohme Corp.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

Bristol-Myers Squibb Pharma Co. is an indirect, wholly-owned subsidiary of Bristol-Myers Squibb Co.

Merck Sharp & Dohme Corp. is a subsidiary of Merck & Co., Inc., which owns 10% or more of Merck Sharp & Dohme Corp.'s stock.

4.    The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP: Paul H. Berghoff, James C. Gumina, Sean M. Sullivan, S. Richard Carden, Andrew Williams, Kurt W. Rohde, Sydney R. Kokjohn, John M. Schafer

MORRIS, NICHOLS, ARSHT & TUNNELL LLP: Mary B. Graham, Derek James Fahnestock, Stephen J. Kraftschik

CONNOLLY BOVE LODGE & HUTZ LLP: Jeff B. Bove, Chad S.C. Stover, Steven A. Nash

WILMER CUTLER PICKERING HALE AND DORR LLP:  William F. Lee, Amy K. Wigmore, Lauren B. Fletcher, Thomas G. Saunders, Sarah R. Frazier, Andrew J. Danford, Michaela P. Sewall

Dated:  March 20, 2014

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................... i

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT OF RELATED CASES ............................................................ 1

STATEMENT OF ISSUES ............................................................................ 1

INTRODUCTION ........................................................................................ 2

STATEMENT OF CASE ............................................................................... 5

STATEMENT OF FACTS ............................................................................. 6

    A.    Crystalline Forms And Polymorphs ................................................ 6

        1.    Background ........................................................................... 6

        2.    Recrystallization techniques ................................................ 8

        3.    Analytical methods for characterizing crystalline forms ......... 10

            a.    *X-ray powder diffraction* ......................................... 10

            b.    *Differential scanning calorimetry* ............................. 12

    B.    Efavirenz, Sustiva®, And Mylan's ANDA Product ........................ 13

    C.    The Use Of Efavirenz To Treat HIV .............................................. 14

    D.    The Discovery Of Efavirenz Form 5 ............................................. 15

    E.    The '372 Patent ........................................................................... 19

    F.    Efavirenz Form 3 ........................................................................ 22

    G.    The District Court's Opinion ........................................................ 25

1.      Person of ordinary skill in the art..............................26

2.      Enablement.................................................26

3.      Written description.........................................27

4.      Indefiniteness .............................................28

5.      Inherent anticipation ......................................29

SUMMARY OF ARGUMENT ............................................29

ARGUMENT ..........................................................32

I.      STANDARD OF REVIEW ....................................32

II.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT CLAIM 18 IS
        ENABLED. .................................................33

        A.      The '372 Patent Enables An Ordinarily Skilled Artisan To
                Make Form 5 Without Seeding. ...........................33

                1.      The third paragraph of Example 17 illustrates the
                        recrystallization of Form 5 without seeding. ...........35

                2.      Other portions of the specification provide additional
                        details on how to obtain Form 5 without seeding..........39

                3.      Mr. Moore obtained Form 5 without seeding using the
                        methods disclosed in the '372 patent.....................40

        B.      Mr. Moore's Experimentation Without The Benefit Of The
                Patent's Disclosure Does Not Demonstrate A Lack Of
                Enablement. ...........................................42

        C.      Mylan's Speculation About Hypothetical Forms Of Efavirenz
                Cannot Meet Mylan's Burden Of Clear And Convincing Proof. .......43

III.    THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT
        MYLAN FAILED TO PROVE A LACK OF ADEQUATE WRITTEN
        DESCRIPTION SUPPORT FOR CLAIM 18. .........................46

A.   The '372 Patent Sufficiently Describes The Relevant Identifying Characteristics For Efavirenz Form 5. ...........................47

B.   The '372 Patent Need Not Provide Written Description For Mylan's Hypothetical Embodiments...................................50

C.   Mylan's Policy Arguments Do Not Undermine The District Court's Well-Reasoned Factual Findings In This Case. ....................52

IV.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT CLAIM 18 IS NOT INDEFINITE...................................................53

A.   Claim 18 Clearly Delineates The Scope Of The Invention. ...............54

B.   Mylan's Argument That Claim 18 Encompasses Other Polymorphs Of Efavirenz Is Irrelevant To Indefiniteness. ................55

V.   THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT FORM 3 DOES NOT INHERENTLY ANTICIPATE CLAIM 18. ........................................56

A.   Inherent Anticipation Is Inapplicable Because The Prior Art Expressly Discloses That Form 3 Does Not Meet The DSC And XRPD Limitations Of Claim 18..........................................57

B.   The District Court Correctly Found That Neither The DSC Limitation Nor The XRPD Limitation Is Met By Form 3. ................58

1.   Form 3 does not necessarily have a DSC peak between about 108 ºC to about 110 ºC....................................59

2.   Form 3 does not necessarily possess six or more of the requisite 2θ values................................................61

CONCLUSION ...................................................................63

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Alcon Research Ltd. v. Barr Laboratories, Inc.*,
   Nos. 2012-1340, -1341, ___ F.3d ___, 2014 WL 1013076
   (Fed. Cir. Mar. 18, 2014) .................................................................34, 44, 49

*Ancora Technologies, Inc. v. Apple, Inc.*,
   Nos. 2013-1378, -1414, ___ F.3d ___, 2014 WL 803104
   (Fed. Cir. Mar. 3, 2014) .................................................................54

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) (en banc) ...........................................46

*AstraZeneca LP v. Apotex, Inc.*,
   633 F.3d 1042 (Fed. Cir. 2010) .......................................................32

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984) .......................................................35

*Atlas Powder Co. v. Ireco, Inc.*,
   190 F.3d 1342 (Fed. Cir. 1999) .......................................................58

*Automotive Technologies International, Inc. v. BMW of North America, Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) .......................................................34

*Baxter International, Inc. v. McGaw, Inc.*,
   149 F.3d 1231 (Fed. Cir. 1998) .......................................................33

*Bio-Technology General Corp. v. Genentech, Inc.*,
   267 F.3d 1325 (Fed. Cir. 2001) .......................................................45

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ........................................................33

*Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013) .......................................................33, 42

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) .......................................................36, 46

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991) ...........................................................56, 60, 63

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
   323 F.3d 956 (Fed. Cir. 2002) ...................................................................47, 49

*Glaxo Inc. v. Novopharm Ltd.*,
   52 F.3d 1043 (Fed. Cir. 1993) ...........................................................................58

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
   No. 2013-1593, ___ F.3d ___, 2014 WL 685650
   (Fed. Cir. Feb. 24, 2014) ...........................................................................50, 53

*Halliburton Energy Services, Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ...........................................................54, 55, 56

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*,
   468 F.3d 1366 (Fed. Cir. 2006) ........................................................................33

*In re Metcalfe*,
   410 F.2d 1378 (C.C.P.A. 1969) .........................................................................45

*In re Moore*,
   439 F.2d 1232 (C.C.P.A. 1971) .........................................................................39

*In re Omeprazole Patent Litigation*,
   483 F.3d 1364 (Fed. Cir. 2007) ........................................................................57

*In re Strahilevitz*,
   668 F.2d 1229 (C.C.P.A. 1982) .........................................................................35

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ..........................................................................43

*Johns Hopkins University v. CellPro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998) ........................................................................42

*K-TEC, Inc. v. Vita-Mix Corp.*,
   696 F.3d 1364 (Fed. Cir. 2012) ........................................................................56

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006) ........................................................32

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005) ........................................................49

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004) ...................................................56, 57

*Microsoft Corp. v. i4i Limited Partnership*,
   131 S. Ct. 2238 (2011).....................................................................32

*Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*,
   Nos. 2012-1576, *et al.*, 2014 WL 463757 (Fed. Cir. Feb. 6, 2014) ..................47

*Pozen Inc. v. Par Pharmaceutical, Inc.*,
   696 F.3d 1151 (Fed. Cir. 2012) ........................................................32

*Schering Corp. v. Geneva Pharmaceuticals, Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003) ........................................................57

*Takeda Pharmaceutical Co. v. Zydus Pharmaceuticals USA, Inc.*,
   No. 2013-1406, ___ F.3d ___, 2014 WL 642714
   (Fed. Cir. Feb. 20, 2014)..................................................................50

*Technology Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008) ........................................................32

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
   723 F.3d 1363 (Fed. Cir. 2013) ........................................................54

*Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co.*,
   308 F.3d 1167 (Fed. Cir. 2002) ........................................................38

*Wellman, Inc. v. Eastman Chemical Co.*,
   642 F.3d 1355 (Fed. Cir. 2011) ........................................................53

*Wyeth & Cordis Corp. v. Abbott Laboratories*,
   720 F.3d 1380 (Fed. Cir. 2013) ........................................................46

# STATUTES

35 U.S.C.

§ 103 .................................................................................................43

§ 271 ...................................................................................................5

## STATEMENT OF RELATED CASES

No appeal in this case was previously before this Court or any other appellate court. Counsel for Appellees Bristol-Myers Squibb Company and Bristol-Myers Pharma Co. (collectively, "BMS"), as well as Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, "Merck"), are not aware of any other case pending in this Court or any other court that would directly affect or be directly affected by the Court's decision in this appeal.

## STATEMENT OF ISSUES

(1) *Enablement*. Whether the district court correctly concluded that Appellants Mylan Pharmaceuticals Inc. and Matrix Laboratories Ltd. (collectively, "Mylan") failed to prove by clear and convincing evidence that U.S. Patent No. 6,673,372 ("the '372 patent") lacks sufficient information to allow an ordinarily skilled artisan to make the crystalline form of efavirenz described in claim 18 without undue experimentation.

(2) *Written description*. Whether the district court did not clearly err in finding that Mylan failed to prove by clear and convincing evidence that the '372 patent lacks sufficient written description to demonstrate to an ordinarily skilled artisan that the inventors were in possession of the crystalline form of efavirenz described in claim 18.

(3) *Definiteness*. Whether the district court correctly concluded that Mylan failed to prove by clear and convincing evidence that the specific numerical limitations of claim 18 lack sufficient clarity to inform the public of the bounds of the claimed invention.

(4) *Inherent anticipation*. Whether the district court did not clearly err in finding that Mylan failed to prove by clear and convincing evidence that another crystalline form of efavirenz disclosed in a prior art patent necessarily and inevitably satisfies each limitation of claim 18 of the '372 patent.

## INTRODUCTION

Human Immunodeficiency Virus ("HIV") infection is a life-threatening disease that can destroy the body's immune system unless properly treated. Over the past two decades, scientists have discovered several antiviral drugs that, in combination, are highly effective at controlling HIV infection and preventing it from developing into Acquired Immunodeficiency Syndrome ("AIDS").

One such drug is the chemical compound efavirenz. Scientists at Merck discovered efavirenz in the early 1990s, and the United States Food and Drug Administration ("FDA") subsequently approved efavirenz for the treatment of HIV. Today, there is no known treatment that is better for managing HIV than an efavirenz-based regimen, and efavirenz's success is attributable to its unique

properties, including its potency, tolerability, and ability to be dosed once daily. BMS markets efavirenz in the United States under the brand name Sustiva®.

Seeking to exploit the success of efavirenz, Mylan filed an Abbreviated New Drug Application ("ANDA") to obtain FDA approval for a generic version of Sustiva®. BMS sued Mylan for infringement of the '372 patent under the Hatch-Waxman Act. In the district court, Mylan argued that claim 18 of the '372 patent, which covers a crystalline form of efavirenz, is not infringed and is invalid for lack of enablement, lack of written description, indefiniteness, and inherent anticipation. Following a five-day bench trial, the district court rejected Mylan's non-infringement defense and each of Mylan's invalidity arguments based on its detailed factual findings and credibility assessments.

On appeal, Mylan rehashes the same invalidity arguments and evidence that it presented to the district court, but Mylan's arguments are even less persuasive now in light of the district court's well-reasoned factual findings. For example, the district court found that the '372 patent discloses the recrystallization conditions necessary to make the claimed crystalline form of efavirenz without using the same crystalline form to seed the solution. The court also determined that the '372 patent discloses relevant identifying characteristics that are sufficient to distinguish the claimed invention from other crystalline forms of efavirenz. And the court found that a different crystalline form of efavirenz does not necessarily and

inevitably meet the specific limitations characterizing the crystalline form set forth in claim 18.  Mylan has not shown any clear error in these key factual findings (or others).  Instead, Mylan improperly seeks to have this Court substitute its own consideration of the record for the factual findings and credibility determinations made by the district court.

Mylan's invalidity arguments also rest on misinterpretations of the relevant legal standards.  Mylan's enablement and written description arguments seek to impose disclosure obligations that go far beyond what this Court's precedent requires.  Mylan's indefiniteness argument ignores that this Court has consistently recognized that specific numerical limitations—like those set forth in claim 18— are sufficiently definite to describe the scope of the claimed invention.  Mylan also adopts an unprecedented approach to inherency that would allow accused infringers to rewrite the prior art to include limitations that the allegedly anticipatory reference expressly shows are not present.

Lacking support for its arguments in the facts or the law, Mylan resorts to speculation about "thousands" of hypothetical crystalline forms of efavirenz that it says might satisfy the claim limitations and render claim 18 invalid for lack of enablement, lack of written description, or indefiniteness.  But it is undisputed that there are only five known crystalline forms of efavirenz, and the district court correctly found that only one satisfies the limitations of claim 18.  Mylan's

unfounded speculation about other hypothetical crystalline forms is not clear and convincing proof of invalidity. Finally, Mylan's related policy arguments about extending the scope of patent protection beyond the inventor's actual discovery have no application here.

The judgment should be affirmed.

## STATEMENT OF CASE

On April 9, 2009, Mylan filed an ANDA seeking FDA approval to market a generic version of BMS's HIV drug Sustiva®. A9(¶23). On August 28, 2009, BMS sued Mylan, alleging that Mylan's ANDA submission infringed the '372 patent under 35 U.S.C. § 271(e)(2) and that any commercial manufacture, use, offer for sale, or sale of Mylan's generic product would similarly infringe. A9(¶25); A112-113(¶¶24-30). Mylan counterclaimed for a declaratory judgment of invalidity and non-infringement of the '372 patent. A160-162(¶¶22-31). Mylan also sought a declaratory judgment of invalidity and non-infringement for U.S. Patent Nos. 6,639,071 ("the '071 patent") and 6,939,964 ("the '964 patent"), which are two of the Orange Book-listed patents for Sustiva®. A162-163(¶¶32-41).

Before trial, the parties stipulated to Mylan's non-infringement of the '071 and '964 patents.[1] A1781-1784. To further reduce the issues for trial, BMS agreed

---

[1]    Merck was a counterclaim-defendant only as to Mylan's counterclaims relating to the '071 and '964 patents, which are assigned to Merck.

to pursue an infringement claim only with respect to claim 18 of the '372 patent. A1801.

In January 2013, the district court held a five-day bench trial on infringement and validity of claim 18 of the '372 patent. A4. On September 30, 2013, the district court issued a 36-page opinion setting forth its detailed findings of fact and conclusions of law. A3-39. The court found that BMS had proved infringement by Mylan's ANDA product, and that Mylan had not provided clear and convincing proof of any of its invalidity theories. On November 5, 2013, the district court enjoined the approval of Mylan's ANDA until the expiration of the '372 patent and entered final judgment. A1-2.

Mylan appealed the judgment with respect to validity, but does not challenge the district court's infringement finding on appeal.

## STATEMENT OF FACTS

### A.    Crystalline Forms And Polymorphs

#### 1.    Background

Crystals are solids in which the atoms or molecules are arranged in a repeating pattern. A1956-1957(321:12-322:17). The basic building block of a crystal is the "unit cell," which contains atoms or molecules in a particular spatial arrangement. *Id.* The unit cell is repeated in three dimensions to make a larger crystalline structure. *Id.*

- 6 -

The same substance can organize into multiple crystalline forms that have different spatial arrangements of atoms or molecules in their unit cells. A1910-1911(140:24-142:3); A1956-1957(321:12-323:15). Distinct crystalline forms of the same material are known as "polymorphs." A6(¶10); A1910-1911(140:24-142:3); A1957(322:18-323:15). Although polymorphs are composed of the same material, their distinct crystalline structures typically give each polymorph unique properties. A6(¶10); A1911(142:21-143:21); A1957(322:18-323:15).

For example, a well-known polymorphic material is the element carbon. Diamond and graphite are each composed of carbon, but their crystal structures are different:



A10091; *see also* A1910(140:5-23). Whereas the atoms in a diamond are connected in a rigid three-dimensional shape that contributes to its extraordinary

hardness, the atoms in graphite are connected in two-dimensional layers that can slide over each other, making it a softer substance.  A1910(140:5-23).

### 2.    Recrystallization techniques

Recrystallization is a method for producing solid crystals of a material that is dissolved in a liquid solution.  A1928-1929(209:18-210:16).  Through recrystallization, scientists can isolate and purify a desired compound from a mixture of other materials.  *Id.*

Recrystallization occurs because there is a limit to the amount of material that a liquid can dissolve.  A1914-1915(157:2-158:11).  A solution is considered "saturated" when it cannot dissolve any more of a particular material.  *Id.*  If the concentration of dissolved material increases beyond the point of saturation, the solution is considered "supersaturated."  *Id.*  A supersaturated solution will release the dissolved material, allowing crystals to form.  A1915(158:12-159:22, 160:7-12).

A solution can reach the point of supersaturation in several ways.  For example, because materials are generally more soluble at higher temperatures, cooling a saturated solution may cause it to become supersaturated and result in crystal formation.  A1915(158:12-159:22).  Supersaturation may also be achieved by allowing the solvent to evaporate, which increases the concentration of the remaining solution.  A1915(158:12-160:6).

For polymorphic compounds, each polymorph typically has different solubility properties. A1915(158:12-159:22). A solution will recrystallize the polymorph that is the least soluble under a given set of conditions. *Id.* By adjusting the recrystallization conditions—such as the solvent, temperature, and concentration—it may be possible to control which polymorph is produced.

Another way to control the recrystallization process is by adding small amounts of solid crystals to the solution through a technique known as "seeding." A1915(160:13-161:6). If they are not dissolved, seed crystals can facilitate the formation of crystals by providing a surface on which the dissolved material can collect. A1915-1916(160:13-163:1); A1934-1935(233:15-234:24). Thus, seeding a solution can increase the speed of crystal formation. A1915-1916(160:13-163:1).

Although seeds of a particular polymorph may facilitate the formation of crystals of the same polymorph, the crystalline form of the seeds is not determinative of which polymorph will recrystallize. Rather, the solution will produce the least soluble polymorph under the particular recrystallization conditions, even if crystals of another polymorph are used to seed the solution. A1915(161:19-163:5). Moreover, once dissolved in a solution, seeds lose their crystalline structure entirely. A1934-1935(233:15-234:24). When that occurs, the seeds no longer provide a solid surface for facilitating crystal formation and cannot direct the recrystallization to produce a particular polymorph. *Id.*; *see also* A34.

### 3. Analytical methods for characterizing crystalline forms

#### a. X-ray powder diffraction

The most common technique for characterizing polymorphs is x-ray powder diffraction, or "XRPD." A1911-1912(145:23-146:10). XRPD provides information about a polymorph's crystal structure. This technique involves directing an x-ray beam at a sample that has been ground into powder. A1912(146:11-147:3, 147:18-148:1). The x-ray beam hits the sample at an angle ($\theta$) and then scatters off the sample. A1912(148:17-149:19). The angle $2\theta$ measures the position of the scattered radiation relative to the axis of the x-ray beam:



A10098; *see also* A1912(148:17-149:19).  A detector measures the amount of radiation that scatters off the sample, and the XRPD machine plots the intensity of the radiation detected at the various 2θ angles:



A10099; *see also* A1912-1913(146:11-147:3, 150:2-23).

The size and shape of the crystal's unit cell, as well as the arrangement of atoms in the unit cell, determine the position of the peaks in an XRPD pattern. A1912(147:4-17); A1957-1958(324:11-328:2).  As a result, distinct polymorphs of the same material typically have different sets of XRPD peaks.  A1913-1914(153:10-154:4).

When interpreting an XRPD pattern, not every increase in intensity is relevant to polymorph characterization.  Rather, the increase in intensity must be distinguishable from background noise to be considered a peak attributable to the

crystal structure. A1913(151:17-152:4). Moreover, the intensity of the peaks in an XRPD pattern can vary for samples of the same polymorph depending upon how the samples were prepared. A1958(326:23-328:2); A1989-1990(453:21-454:3). Impurities in a sample can cause additional peaks in the XRPD pattern that are not attributable to the polymorph's crystal structure. A1991(458:22-459:4, 459:15-19).

It is not necessary to include a complete pattern or peak listing to identify a particular polymorph. Rather, a listing of characteristic peaks is generally sufficient, and an ordinarily skilled artisan would understand that only characteristic peaks (as opposed to every single peak) are normally used in comparing multiple polymorphs. A2090(681:24-682:16).

### b. *Differential scanning calorimetry*

Differential scanning calorimetry, or "DSC," is another analytical technique for characterizing polymorphs. In DSC, a sample is placed in an oven that gradually increases its temperature. A1914(154:5-156:8). The DSC machine measures the amount of energy absorbed or released by the sample as the temperature increases. *Id.* The DSC machine reports its results as a "thermogram," which is a plot of the amount of energy absorbed or released by the sample as a function of temperature:



A10102; *see also* A1959(331:22-333:13). The peaks in a thermogram represent

phase changes for the material being studied—either from one polymorphic form

to another or, at the melting point, from a solid to a liquid. A1914(154:5-156:8);

A1959(331:22-333:13).

### B. Efavirenz, Sustiva®, And Mylan's ANDA Product

Efavirenz is a chemical compound that was discovered in the early 1990s by

scientists at Merck who were searching for new HIV drugs. A1896(83:19-85:5);

A1901(103:8-11). After its discovery, further work developing efavirenz was done

in the 1990s through a joint venture between Merck and DuPont known as

"DuPont Pharma." A1901(104:10-19). In 1998, the FDA approved efavirenz for

the treatment of HIV. A1901(105:16-21). Efavirenz is now sold in the United

States under the brand name Sustiva[®]. A8(¶¶18, 20). In 2001, BMS acquired

DuPont Pharma, along with the rights to market Sustiva[®] in the United States.[2]

Efavirenz has five polymorphs, which are designated Forms 1, 2, 3, 4, and 5.

A6(¶9). Sustiva[®] contains the efavirenz polymorph known as Form 1. A8(¶20).

The district court found that Mylan's ANDA product infringes claim 18 of the '372

patent, which covers efavirenz Form 5.[3] A19-23. Although Mylan's ANDA is

based on Form 5, rather than Form 1, Mylan's ANDA claims bioequivalence to

Sustiva[®], contains the same prescribing information as Sustiva[®], and relies on the

clinical studies involving Sustiva[®] as the basis for its FDA approval.

A2058(553:17-556:22); A7652.

## C.    The Use Of Efavirenz To Treat HIV

Patients with HIV require treatment with a combination of different drugs

that are effective against specific aspects of viral replication. A2052-2053(532:9-

536:24). Treating patients with a combination of drugs that work in different ways

helps avoid viral resistance. A2053(535:16-536:24).

---

[2]    Although Sustiva[®] was originally approved in 1998, the FDA approved
BMS's subsequent new drug application for a 600 mg tablet form of Sustiva[®] in
2002. A8(¶¶19-20). Mylan's ANDA seeks approval for a generic 600 mg
efavirenz tablet product.

[3]    As discussed below (p. 17), Form 5 was discovered after the clinical
development of Form 1 was already well underway, and DuPont Pharma therefore
did not put Form 5 into clinical development. Because Sustiva[®] does not contain
Form 5, the '372 patent is not one of the Orange Book-listed patents for Sustiva[®].

Efavirenz is a type of HIV drug known as a non-nucleoside reverse transcriptase inhibitor, or "NNRTI." A2055(542:22-543:15). Since 1998, the United States Department of Health and Human Services and the Centers for Disease Control and Prevention have issued a series of guidelines recommending treatment regimens for patients suffering from HIV infection. A2054-2055(540:19-542:2); A2682; A9565. Efavirenz was the only NNRTI recommended for the treatment of HIV when it was first approved in 1998, and it is one of only two drugs that have withstood the test of time and remained on the list of recommended HIV treatments since 1998. A2057-2058(552:12-553:8); A2710; A9627.

Efavirenz is a highly effective HIV drug because it is potent, well-tolerated, and can be dosed once a day. A1902(107:22-109:4). Under current treatment guidelines, efavirenz in combination with other drugs is one of the preferred regimens for treating HIV.[4] A2057(549:1-21). Indeed, there is no better treatment known for HIV than an efavirenz-based regimen. A2057-2058(552:12-553:8).

## D. The Discovery Of Efavirenz Form 5

James Moore was one of the DuPont Pharma scientists studying efavirenz in the 1990s. A1928(207:8-11). Mr. Moore sought to improve the manufacturing

---

[4] The drug Atripla® is a combination therapy that includes the recommended combination of efavirenz with two other drugs (tenofovir and emtricitabine) in a single tablet. A2057(551:16-552:11); A9627. Atripla® is the most prescribed drug for patients beginning treatment for HIV. A2057(550:15-551:15).

process for making efavirenz.  A1928(206:13-209:11).  In June 1998, Mr. Moore was asked to put aside his efavirenz research to work on an emergency assignment. A1930(216:17-217:18).  Mr. Moore left some glassware containing efavirenz and other reaction materials in his fume hood, which he did not clean up before he was called away.  *Id.*

When Mr. Moore returned a few weeks later, the materials he had left behind had formed "gorgeous crystals" in the shape of "very long needles." A1930-1931(217:19-219:14).  Mr. Moore had those crystals analyzed to determine what they were.  To his surprise, the crystals—which grew out of a "nasty brown liquid" full of impurities—were 100% pure efavirenz.  *Id.*; A1932(222:17-223:19); A3234.

Efavirenz is a chiral compound, meaning that it has two forms where the atoms are spatially arranged such that they are non-superimposable mirror images—like right and left hands.  A1928(208:1-209:11).  As is often true of chiral compounds, only one of the forms of efavirenz is biologically active.  *Id.*  Mr. Moore's crystals were 100% chirally pure—*i.e.*, they were composed entirely of the biologically active form.  A1931(219:15-18); A1932(222:17-223:19).  As Mr. Moore explained, obtaining such a high level of chiral purity was "pretty much unheard of for any chiral compound."  A1932(222:17-223:19).  Form 5's unique

crystal structure and high level of chiral purity allows the efavirenz molecules to pack together tightly and exclude impurities.  A1933(227:13-228:12).

At the time of Mr. Moore's discovery, there were four known polymorphs of efavirenz, and Form 1 was already far along in its clinical development. A1934(232:24-233:9).  Analysis of Mr. Moore's crystals revealed that they were a previously unknown fifth polymorph of efavirenz.  A1933(226:6-12); A3124; A3235.  Mr. Moore had his newly discovered Form 5 characterized by XRPD and DSC.  A1931(220:12-19); A1934(230:5-17); A3124.  Rather than delay approval of a life-saving drug by conducting additional clinical studies with Form 5, DuPont Pharma submitted the new drug application for efavirenz based on Form 1. A1934(232:24-233:9).

Although Form 5 was not placed into clinical development by DuPont Pharma, Mr. Moore decided to study Form 5 further to determine whether he could reproduce it consistently.  A1934(231:15-232:23).  Mr. Moore knew roughly what solvent system, concentration of efavirenz, and temperature had produced Form 5 from the material he had left in his fume hood.  A1934-1935(233:15-234:24).  He used that information as a starting point and then varied those parameters to determine the appropriate recrystallization conditions for Form 5.  A1935(235:9-237:16); A3125-3126.  After several attempts, Mr. Moore was able to produce Form 5.  A16(¶53); A1935(237:2-16).  Although not all of Mr. Moore's

experiments resulted in the formation of Form 5, even those experiments that did

not produce Form 5 were useful because knowing what *not* to do helped direct Mr.

Moore to the conditions for making Form 5 consistently.  A1937(242:6-244:23);

A3127-3129; A3150.

After narrowing down the appropriate conditions, Mr. Moore conducted a

series of seven experiments to recrystallize Form 5.[5]  A17(¶55); A1937(245:5-24);

A3144-3147.  Mr. Moore had learned from his prior experiments that Form 5 could

be obtained from a 1% solution of tetrahydrofuran ("THF") in heptane.  A1937-

1938(245:15-246:1).  Mr. Moore then adjusted the temperature and time of the

recrystallization to determine how best to obtain Form 5.  A3144-3147.

In six of the seven experiments, including an experiment in which Mr.

Moore did not seed at all (experiment 6), Mr. Moore obtained Form 5.  A17-

19(¶¶56-62); A1938-1940(246:7-256:8); A3144-3147.  The one experiment in

---

[5]     Mylan says (Br. 21) that Mr. Moore conducted twenty recrystallization
experiments.  But thirteen of those experiments—which the district court more
accurately described as only two experiments with multiple steps (A16(¶¶53-
54))—were Mr. Moore's effort to identify the appropriate recrystallization
conditions to make Form 5.  In the remaining experiments, Mr. Moore built on his
knowledge from these earlier experiments and obtained Form 5 six out of seven
times.  A17-19(¶¶56-62); A1938-1940(246:7-256:8); A3144-3147.

Mylan also complains (Br. 23 n.5) that the district court did not address a
single page from Mr. Moore's notebook (A3150), which describes the result of
allowing an efavirenz solution to sit for three months.  But Mylan never says how
that experiment is relevant, and its absence from the district court's discussion
simply reflects Mylan's failure to present any argument about it.

which Mr. Moore did not obtain Form 5 (experiment 4) revealed that recrystallization above 40 °C could result in the formation of other efavirenz polymorphs. A1939(250:13-251:16).

At the conclusion of the seven experiments, Mr. Moore believed that he had identified the recrystallization conditions that would make Form 5 reproducibly. A1940(256:14-257:7). That conclusion is reflected in Mr. Moore's contemporaneous notebook, which summarizes the results of those experiments as follows: "Excellent. Produced Form V Repeatedly." A3147; *see also* A19(¶62). Although Mr. Moore's work was spread over several months because of his other work obligations, it took Mr. Moore only about two weeks of actual working time to determine the appropriate recrystallization conditions for Form 5. A1941(258:8-16). Mr. Moore is one of the named inventors of the '372 patent (A80), and the '372 patent discloses Mr. Moore's experiments that demonstrate the appropriate recrystallization conditions for making Form 5. A1938(246:21-247:12, 249:1-6); A1939(253:7-13).

### E.    The '372 Patent

On June 10, 1999, Mr. Moore and other DuPont Pharma scientists filed a patent application relating to their work on efavirenz polymorphs. That application was assigned to BMS on October 1, 2001, and issued as the '372 patent on January 6, 2004. A6(¶¶7-8). The '372 patent expires on June 10, 2019. A6(¶7).

- 19 -

The '372 patent describes all five efavirenz polymorphs. A89(2:7-10). During prosecution of the '372 patent, the applicants disclosed U.S. Patent No. 5,965,729 ("the '729 patent"), which is a separate patent concerning efavirenz polymorphs filed by Merck. A2757; A3862. The '729 patent discloses three efavirenz polymorphs known as Forms I, II, and III, which correspond to Forms 1, 4, and 3 of the '372 patent, respectively. A3862. Merck and BMS agreed to arbitrate who had first invented those polymorphs, and the arbitrator awarded priority to Merck for those three polymorphs. A3863. The '372 patent therefore issued with claims to only Forms 2 and 5, along with claims to a specific process for obtaining Form 1. A102-104.

The '372 patent contains XRPD patterns and DSC thermograms for Forms 1, 2, 3, and 4. A81-88. The applicants inadvertently submitted an incorrect XRPD pattern and DSC thermogram for Form 5, which they withdrew during prosecution upon discovery of the error. A3866. The applicants did not submit a replacement XRPD pattern or DSC thermogram for Form 5 because "[t]he XRPD and DSC peak listings for Form 5 are correctly described within the specification and the Form 5 is properly characterized by these peaks." *Id.*; *see* A92(8:44-67) (listing characteristic XRPD and DSC peaks for Form 5).

The specification of the '372 patent describes how to make Form 5, including three methods disclosed in Example 17. A102(27:66-28:22). In the first

two methods, the recrystallization of Form 5 is induced by seeding.  A102(27:66-67-28:12).  In the third method, the recrystallization of Form 5 occurs after the seeds have been dissolved and all solids filtered from solution.  A102(28:13-22); *see also* A34-35.  Other portions of the specification provide additional details about how to obtain Form 5.  The specification states, for example, that "Form 5 has been determined to be the most thermodynamically stable crystalline form below 40° C."  A95(13:24-26).  It further explains that Form 5 "may be obtained by recrystallization from a dilute solution of THF/heptane."  A95(13:28-30).  That method is summarized graphically in Scheme 4:



A95(13:36-60).  Unlike the "heptane seeded" method for obtaining Form 1 (shown in middle right), the "slow crystallization" method of making Form 5 (shown in lower left corner) does not indicate any seeding.  *Id.*; A2099-2100(719:15-721:6).

The Patent Office has issued two certificates of correction for the '372 patent.[6]  A105-106.  As corrected, claim 16 reads as follows:

> Form 5 of crystalline Efavirenz which is characterized by an x-ray powder diffraction pattern comprising six or more 2θ values selected from the group consisting of 10.2±0.2, 11.4.±0.2, 11.6±0.2, 19.1±0.2, 20.6±0.2, 21.3±0.2, 22.8±0.2, 24.8±0.2, 27.4±0.2, 28.2±0.2, and 31.6±0.2.

A7(¶14); A103(29:23-28); A106.  Claim 18 depends from claim 16 and includes the additional limitation that the claimed invention is "characterized by a differential scanning calorimetry thermogram having a peak at about 108° C. to about 110° C."  A103(29:30-32).

## F.    Efavirenz Form 3

The efavirenz polymorph known as "Form 3" is described in several documents, which present conflicting information regarding the XRPD pattern and

---

[6]    The April 17, 2012 certificate of correction corrects claim 16 in two ways: (i) to reflect that it requires six—rather than four—of the listed XRPD peaks; and (ii) by deleting the 2θ value at 12.6±0.2.  A106.  The applicants made those amendments during prosecution (A3877), but the Patent Office erroneously printed the patent without making those changes.  *See* A103(29:24-26).

DSC thermogram associated with Form 3.[7] But it is undisputed that none of these documents discloses for Form 3 both an XRPD pattern containing six or more of the 2θ values and a DSC peak at about 108 °C to about 110 °C, as required by claim 18 of the '372 patent. In fact, two of the references undisputedly describe Form 3 as meeting *neither* limitation.

For example, Merck's '729 patent discloses Form 3, which it refers to as "Form III." A3862. The '729 patent lists the XRPD peaks for Form 3, but only five of those peaks correspond to the 2θ values required by claim 18 of the '372 patent. A13(¶42); A2766(5:15-40). Moreover, the '729 patent shows a DSC peak for Form 3 at 118 °C, not at about 108 °C to about 110 °C. A13(¶43); A2762; A2766(5:55-60).

Likewise, BMS has compiled an "Encyclopedia of Solid State Forms," which is BMS's internal reference standard for the properties of the efavirenz polymorphs. A13(¶44); A2094(700:7-14). The BMS Encyclopedia is a confidential BMS document that was not publicly available at the time that the application for the '372 patent was filed. A1992(464:18-465:1). The BMS Encyclopedia includes an XRPD pattern and a DSC thermogram for Form 3, which it refers to as "Form III" or "N-3." A7706; A7714. Only four XRPD peaks for

---

[7]     The record materials refer to this polymorph as both Form 3 and Form III. For consistency, this brief uses the Arabic numeral, which is how this polymorph is identified in the '372 patent. *E.g.*, A91-92(6:26-7:25).

Form 3 from the BMS Encyclopedia correspond to the 2θ values listed in claim 18 of the '372 patent. A28; A3514. And like the '729 patent, the DSC thermogram for Form 3 in the BMS Encyclopedia has a peak at 117 °C, not at about 108 °C to about 110 °C. A7714.

The '372 patent also discloses, but does not claim, efavirenz Form 3. The '372 patent indicates that Form 3 has a DSC peak at about 108 °C to about 110 °C. A87; A91(6:41-44). But only two of the XRPD peaks for Form 3 listed in the '372 patent correspond to the 2θ values required by claim 18. A91(6:32-36).

BMS scientist Lillian Radesca also obtained the XRPD pattern for a separate sample of efavirenz identified as "Form III."[8] A1134; A1931-1932(221:3-16, 221:23-222:2); A1991(461:20-24); A3244. Like the BMS Encyclopedia, Dr. Radesca's XRPD pattern is from BMS's internal files and was not publicly available prior to the filing of the application for the '372 patent. A1991(460:10-22). Dr. Mark Hollingsworth—an associate professor at Kansas State University and Mylan's expert in organic chemistry and the study of crystalline forms—testified that Dr. Radesca's sample has eight XRPD peaks that correspond to the 2θ

---

[8] Mylan's brief refers to Dr. Radesca's sample as the "Moore Sample," presumably because Mr. Moore overlaid the XRPD pattern for Dr. Radesca's sample with an XRPD pattern for Form 5 that he had prepared. *See* A1134; A1931(221:3-16); A3244. As Mr. Moore explained, however, the sample labeled "Form III" was prepared by Dr. Radesca, not Mr. Moore. A1931-1932(221:3-222:2). BMS therefore refers to this sample as "Dr. Radesca's sample," which is how the parties described it at trial.

values listed in claim 18. A1970(375:8-377:11). But, as Dr. Jerry Atwood—a professor at the University of Missouri and BMS's expert on supramolecular chemistry and polymorphs—explained, four of the supposed "peaks" that Dr. Hollingsworth identified are not sufficient increases in intensity above the background noise to be considered peaks attributable to the crystal structure of the sample. A2094(697:21-698:24). In any event, Mr. Moore and the experts for both sides agreed that Dr. Radesca's sample is not a reference standard for Form 3 and that its purity is unknown. A27; A1932(222:3-16) (Moore); A1992(462:4-463:15) (Hollingsworth); A2093-2094(694:24-697:9) (Atwood). Accordingly, it is possible that some of the peaks in Dr. Radesca's XRPD pattern are attributable to other polymorphs or impurities in the sample. A27-28; A2093(695:17-696:5). Moreover, there is no DSC information available for Dr. Radesca's sample. A1992(463:16-464:2).

### G.    The District Court's Opinion

Following a five-day bench trial during which the district court heard live testimony from six witnesses including Mr. Moore and experts for both parties, the district court concluded that Mylan had not carried its burden of proving any of its invalidity theories by clear and convincing evidence. A3-39.

### 1. Person of ordinary skill in the art

The district court found that a person of ordinary skill in the art for the '372 patent would have a Ph.D. in fields relevant to small molecule development, such as biochemistry, medicinal chemistry, organic chemistry, or the equivalent, or a bachelor's degree in the same fields with four to six years of practical experience. A10-11(¶¶31, 34). The court applied that understanding of the level of ordinary skill to its analysis of enablement, written description, and indefiniteness. A27-28; A34-35; A38-39.

### 2. Enablement

The district court found that the '372 patent provides detailed information concerning the recrystallization conditions that will produce Form 5, including "the solvent system ('1% v/v THF/heptane'); the temperature ('room temperature'); the time ('overnight'); and the amount of material ('approximately 70g' of efavirenz) to make a slurry." A35. The court concluded that, given that detailed disclosure, "any additional experimentation required to make Form 5 would be 'routine' and, therefore, not undue." *Id.*

The district court specifically rejected Mylan's argument that the '372 patent does not enable an ordinarily skilled artisan to make Form 5 without seeding. The court credited the testimony of BMS's expert Dr. Atwood that seeding is a process used to control the *rate* of recrystallization. A34. A person of ordinary skill would

thus understand that seeding is not a necessary condition for making Form 5, but merely a catalyst for the process. *Id.* The court further found that the recrystallization step in the third paragraph of Example 17 occurs "without any seed present in the solution" because "the seed is either dissolved or filtered out" prior to recrystallization to Form 5. A35.

The district court also determined that Mr. Moore's contemporaneous experiments confirm that an ordinarily skilled artisan could make Form 5 without undue experimentation. A35-36. In particular, the court found that "Mr. Moore was able to make Form 5 successfully" using "largely the same method (i.e., solvent system, temperature, and amount of material) as described in Example 17 of the '372 patent, but *without* seeding." A36 (emphasis in original). Mr. Moore testified that, based on his experimental work, he could "make Form 5 crystals at will … with or without seeding." *Id.*; *see also* A1940(257:3-7). The court found Mr. Moore's testimony "credible" and noted, by contrast, that Mylan's expert, Dr. Hollingsworth, "did not attempt to make Form 5 using the guidance of the '372 patent." *Id.*

### 3. Written description

The district court found that Mylan failed to carry its burden of proving by clear and convincing evidence that the '372 patent lacks sufficient written description support for claim 18. A38-39. As the court noted, the specification

discleses the eleven 2θ values and the DSC peak (about 108 °C to about 110 °C) required by claim 18.  A38.  The court found that those "relevant identifying characteristics of Form 5 are sufficient to distinguish Form 5 from the prior art." A39.  The court also determined that "any purported 'errors and inconsistencies' in the '372 patent, such as filing the original patent application with incorrect XRPD and DSC patterns for Form 5," do not "lead to the conclusion that the inventors did not possess the claimed invention."  *Id.*

### 4.    Indefiniteness

The district court concluded that claim 18 is not indefinite.  A30-31.  The court observed that "claim 18 of the '372 patent contains specific numeric requirements that define the physical characteristics of Form 5:  an x-ray powder diffraction pattern with six or more of the specified eleven 2θ values and DSC peak at about 108° C to about 110° C."  A31.  The court explained that these limitations are "sufficiently clear to 'inform the public of the bounds of the protected invention.'"  *Id.* (citation omitted).  Additionally, the court rejected Mylan's "hypothetical speculation" about other unknown polymorphs that might satisfy the limitations of claim 18 as insufficient to carry Mylan's burden by clear and convincing evidence.  *Id.*

### 5.     Inherent anticipation

Finally, the district court rejected Mylan's argument that claim 18 of the '372 patent is inherently anticipated by Form 3 from the '729 patent. A24-29. The court found that "Mylan ha[d] not offered any single x-ray powder diffraction pattern that, on its own, contains at least six of the 2θ values recited in claim 18," let alone "clear and convincing evidence that Form III in the '729 patent 'necessarily and inevitably' has six or more of the 2θ values required by claim 18 of the '372 patent." A29. The court also ruled that "Mylan may not pick and choose 2θ values from different samples in order to reach a conclusion of anticipation" because peaks that were not consistently present in each XRPD pattern could have been attributable to noise or impurities in the samples. A28-29.

With respect to the required DSC peak, the district court determined that Mylan had not shown that Form 3 has a DSC peak at about 108 °C to about 110 °C. A26. On the contrary, the court found that "Form III has a DSC peak at about 117° C." *Id.*

### SUMMARY OF ARGUMENT

The district court correctly rejected Mylan's invalidity challenges to claim 18 of the '372 patent.

*Enablement*. The '372 patent contains a detailed disclosure of the recrystallization conditions that would allow an ordinarily skilled artisan to make

Form 5 of efavirenz without undue experimentation. Mylan argues that the '372

patent does not disclose any example illustrating the recrystallization of Form 5

without seeding with Form 5 crystals, but that argument is both legally and

factually incorrect. Mylan's arguments do not address the relevant legal question,

which is whether an ordinarily skilled artisan could practice the claimed invention

without undue experimentation. And in any event, the district court found that the

recrystallization step in the third paragraph of Example 17 teaches how to make

Form 5 without any seed present. Coupled with the other disclosures in the '372

patent, that information is more than sufficient to allow an ordinarily skilled artisan

to practice the claimed invention without undue experimentation.

Mylan's speculation about other hypothetical efavirenz polymorphs does not

show a lack of enablement, which is assessed as of the filing date of the patent

application. As the district court found, there is only one known polymorph of

efavirenz that satisfies claim 18, and the '372 patent provides sufficient

information to allow an ordinarily skilled artisan to make it.

*Written description.* As the district court found, the '372 patent discloses all

of the relevant identifying characteristics necessary to distinguish Form 5 from

other efavirenz polymorphs and that demonstrates to an ordinarily skilled artisan

that the inventors were in possession of what they claimed. Although Mylan

argues that the inventors should have disclosed the full XRPD pattern and DSC

thermogram for Form 5, there is no requirement that the specification include every detail of the claimed invention.

The '372 patent describes the only known efavirenz polymorph that falls within the scope of claim 18, and Mylan's speculation that additional efavirenz polymorphs might conceivably exist that meet the claim limitations does not show a lack of adequate written description. Moreover, there is no dispute that the inventors were actually in possession of Form 5. Mylan's policy arguments about extending the scope of patent protection beyond the inventor's actual discovery therefore are not applicable here.

*Definiteness*. There can be no confusion as to what claim 18 covers. The claim contains specific numerical limitations that clearly set forth the metes and bounds of the claimed invention. The district court correctly found that claim 18 does not encompass efavirenz Form 3 or any efavirenz polymorph other than Form 5, and Mylan's speculation about other yet unknown polymorphs that might fall within the scope is not clear and convincing proof of indefiniteness. Indeed, even if Mylan had shown that other efavirenz polymorphs might fall within the scope of claim 18 (which it did not), that would not render the claims indefinite in light of the bright-line numerical limitations that clearly define the scope of the claim.

*Inherent anticipation*. The district court correctly found that efavirenz Form 3 does not inherently anticipate claim 18. It was Mylan's burden to show that

Form 3 necessarily and inevitably meets both the DSC and XRPD limitations of claim 18. But the prior art expressly discloses that Form 3 meets neither limitation, and Mylan has not shown clear error in the district court's factual finding that there is no sample of Form 3 that meets the claim limitations even once.

## ARGUMENT

### I.   STANDARD OF REVIEW

Because a patent is presumed valid, Mylan has the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

The district court's conclusions on enablement and indefiniteness are issues of law reviewed *de novo*, but the court's underlying factual findings are reviewed for clear error. *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008); *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 (Fed. Cir. 2006).

Determinations regarding the adequacy of written description and anticipation are purely factual inquiries that are reviewed for clear error. *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1166 (Fed. Cir. 2012); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010). "Under the clear error standard, the court's findings will not be overturned in the absence of a 'definite

and firm conviction' that a mistake has been made." *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1375 (Fed. Cir. 2006) (citation omitted).

Factual findings based on credibility determinations are entitled to particularly strong deference on appeal. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012); *Baxter Int'l, Inc. v. McGraw, Inc.*, 149 F.3d 1231, 1330 (Fed. Cir. 1998). "'Credibility determinations by the trial judge can virtually never be clear error.'" *Celsis*, 664 F.3d at 929 (citation omitted).

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT CLAIM 18 IS ENABLED.

An invention is sufficiently enabled "when at the time of filing the application one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). "[A]lthough experimentation must not be undue, a reasonable amount of routine experimentation … does not violate the enablement requirement." *Id.* The disclosure in the '372 patent is more than sufficient to satisfy that standard.

### A. The '372 Patent Enables An Ordinarily Skilled Artisan To Make Form 5 Without Seeding.

Contrary to Mylan's argument (Br. 41-43), the '372 patent discloses sufficient information to permit an ordinarily skilled artisan to obtain Form 5 without seeding. As the district court found, the patent's specification discloses

the recrystallization conditions necessary to make Form 5.  *See* A35 ("When

considered as a whole, the '372 patent provides one of ordinary skill in the art with

information about the solvent system ('1% v/v THF/heptane'); the temperature

('room temperature'); the time ('overnight'); and the amount of material

('approximately 70g' of efavirenz) to make a slurry.").  The court further found

that, in light of those teachings, and in view of the high level of ordinary skill in

the art, "any additional experimentation required to make Form 5 would be

'routine' and, therefore, not undue."  A35.  Mylan does not dispute that those

conditions are disclosed in the '372 patent, let alone attempt to demonstrate that

any experimentation by an ordinarily skilled artisan to obtain Form 5 in light of

that disclosure would be undue.[9]

Mylan's failure to address the adequacy of the recrystallization conditions

disclosed in the '372 patent is fatal to its enablement argument.  *See Alcon*

*Research Ltd. v. Barr Labs., Inc.*, Nos. 2012-1340, -1341, ___ F.3d ___, 2014 WL

---

[9]     Mylan quotes *Automotive Technologies International, Inc. v. BMW of North
America, Inc.*, 501 F.3d 1274, 1284 (Fed. Cir. 2007), to suggest that the lengthier
disclosure in the '372 patent for the other polymorphs shows inadequate disclosure
for Form 5.  Br. 43.  But this case is not comparable to *Automotive Technologies*,
where the specification merely provided "an overview" of the non-enabled
embodiment "without providing any details of how [it] operates."  501 F.3d at
1282.  Here, as the district court found, the specification discloses the necessary
details to permit an ordinarily skilled artisan to make Form 5.  A35.  That the
patent says more about the other polymorphs does not diminish the detailed
disclosure for Form 5.

1013076, at *6 (Fed. Cir. Mar. 18, 2014) (rejecting lack of enablement argument because it did not address the "determinative question" of whether "any experimentation is necessary to practice" the claimed invention). It is well established that inventors need only disclose sufficient information to permit an ordinarily skilled artisan to practice the invention without undue experimentation; specific examples illustrating how to make the invention (though contained in the '372 patent (*see infra* pp. 35-39)) are unnecessary. *See, e.g.*, *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1576-1577 (Fed. Cir. 1984); *In re Strahilevitz*, 668 F.2d 1229, 1232 (C.C.P.A. 1982) ("[E]xamples are not required to satisfy section 112, first paragraph."). Mylan's rigid focus on whether there is a specific example showing the recrystallization of Form 5 without seeding sidesteps the relevant inquiry and attempts to impose a higher burden for enablement than the law requires.

In addition to resting on a faulty legal premise, Mylan's specific criticisms of the patent's disclosure are incorrect.

### 1. The third paragraph of Example 17 illustrates the recrystallization of Form 5 without seeding.

Mylan suggests that Example 17 does not illustrate recrystallization of Form 5 without seeding (Br. 41-42), but the district court found precisely the opposite. Specifically, based on "credible testimony" from Mr. Moore and BMS's expert Dr. Atwood, the court determined that "the crystallization step in Example 17 occurs

without any seed present in the solution." A34-35; *see also* A2104(737:24-738:4) (Atwood) ("Q. Is there any seeding that you see in the portion of the third part of example 17 starting with the dilute solution and carrying forward? A. No, this is without seeding.").

That factual finding is well-supported. The '372 patent itself explains that any seeds used in the third paragraph of Example 17 are either dissolved or filtered out before cooling the solution to room temperature to allow Form 5 crystals to form. A102(28:16-19). Once dissolved, any seeds used in prior steps lose their crystalline form and are unable to direct the recrystallization toward a particular polymorph. A34; A1934-1935(233:15-234:24). Any undissolved seeds would be removed by filtration. A34; A1939(253:17-254:15) (Moore) ("I filtered out the residual solids so there is no seed in it.").

Mylan argues that "[t]he specification does not indicate … whether the filtration step removes any of the Form 5 seeds and, if so, how completely." Br. 30. But that argument ignores the knowledge of an ordinarily skilled artisan, who, as Dr. Atwood explained, would understand that filtration removes the seeds. A2101-2102(728:19-729:8) ("One then filters out the solids."); A2104(737:24-738:4) ("[T]his is without seeding."). The specification need not spell out such routine details to satisfy the enablement requirement. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) ("[A] patent disclosure need

not enable information within the knowledge of an ordinarily skilled artisan. Thus, a patentee preferably omits from the disclosure any routine technology that is well known at the time of application.").

Mylan is also incorrect that "[n]othing suggests that the step of saturating the solution with Form 5 seed was arbitrary or inconsequential." Br. 41. The fact that those seeds are dissolved or filtered out is exactly why seeding with Form 5 is inconsequential. Indeed, BMS's expert explained that one of ordinary skill would understand that the earlier seeding step could be accomplished with crystals of another efavirenz polymorph because the solids are removed from solution by filtration prior to the recrystallization to Form 5.[10] A2116(786:10-787:6). Moreover, Mylan's suggestion that it is somehow BMS's burden to show that seeding with Form 5 is "arbitrary or inconsequential" misapprehends the applicable burden of proof. It is Mylan's burden as the party challenging validity to show by clear and convincing evidence that the seeding step has any effect on an

---

[10]    Contrary to Mylan's suggestion (Br. 15, 45-46), the recrystallization conditions, not the crystalline form of the seeds, determines which polymorph will form. A1915-1916(161:19-163:5) (Atwood) ("[W]hen we put the seed crystal in, we'll get crystallization of the less soluble [polymorph]. And this is generally true whether we put in the seed crystal of the more soluble or less soluble polymorph."). The record here shows that seeding with Form 5 can result in the formation of *other* efavirenz polymorphs depending upon the recrystallization conditions. *E.g.*, A102(28:16-19) (seeding with Form 5 produced Form 1); A1938(249:7-24) (seeding with Form 5 produced a mixture of Form 2 and Form 5). There is therefore no basis for Mylan's assertion (Br. 45-46) that the district court misunderstood the role of seeding in the recrystallization process.

ordinarily skilled artisan's ability to practice the claimed invention, not BMS's burden to show that it does not. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1186 (Fed. Cir. 2002).

Mylan speculates that the recrystallization step in the third paragraph of Example 17 may have been aided by "unintentional" seeding because Mr. Moore previously produced Form 5 crystals that could have been inadvertently introduced into the solution. Br. 46. But if the recrystallization of Form 5 was attributable to unintentional seeding, Mylan's expert could have tested that hypothesis by attempting to make Form 5 in an environment where Form 5 had never been present. Mylan's expert, however, did no such testing. A36; A1995(474:14-16).

Mylan's speculation about unintentional seeding is not only the type of "general and vague" attack that this Court has held is insufficient to show a lack of enablement, *Union Carbide*, 308 F.3d at 1186, but is also flatly contradicted by the district court's finding that the recrystallization step in the third paragraph of Example 17 "occurs without any seed present in the solution." A35. The district court thus did not, as Mylan contends (Br. 46), ignore evidence of unintentional seeding. The court simply found that evidence unpersuasive in light of the record evidence showing that the recrystallization to Form 5 in the third paragraph of Example 17 occurs without any seed present. A34-35.

Mylan's speculation (Br. 46) about microscopic seeds that may have remained after filtration is similarly unsupported.  Mylan cites a publication (A2743-2744) that discusses the effect of seed size on crystal formation, not whether residual seeds remain after filtration.  The cited testimony from Mylan's expert (which is unrelated to A2743-2744) discusses seeds that are *dissolved* in the solution.  A1981(420:18-421:23) (Hollingsworth) ("The seeding occurred on the previous page before he filtered out the solids that didn't dissolve.").  Those dissolved seeds have no ability to direct the recrystallization toward a particular polymorph because, as the district court found based on Mr. Moore's "credible testimony," "the crystal form is gone" once dissolved into solution.  A34; A1934-1935(233:15-234:24).

### 2. Other portions of the specification provide additional details on how to obtain Form 5 without seeding.

Mylan's focus on Example 17 ignores that enablement depends upon the specification's teachings as a whole when viewed from the perspective of an ordinarily skilled artisan.  *See, e.g.*, *In re Moore*, 439 F.2d 1232, 1235 (C.C.P.A. 1971) (evaluating enablement requires consideration of "whether the specification disclosure as a whole is such as to enable one skilled in the art to make and use the claimed invention").  It is therefore misleading for Mylan to suggest that in the '372 patent "only one example, Example 17, describes the preparation of Form 5."

Br. 29.  There are other portions of the specification that teach how to make Form

5 without seeding.

For example, column 13 of the '372 patent states that Form 5 "may be

obtained by recrystallization from a dilute solution of THF/heptane."  A95(13:28-

30).  Mylan attempts to downplay that statement as simply summarizing Example

17.  Br. 42.  But if that were true, it would only confirm that Example 17 teaches

the recrystallization of Form 5 without seeding:  not only does the description of

how to make Form 5 in column 13 never mention seeding, but the graphical

representation of it in Scheme 4 does not mention any seeding to make Form 5

either.  A95(13:28-60).  When the inventors intended to indicate the use of

seeding, they did so explicitly, including in the description of how to obtain Form

1 on the middle right side of Scheme 4.  A95(13:36-60).  The lack of any reference

to seeding to make Form 5 in that portion of the specification confirms the district

court's finding that an ordinarily skilled artisan reading the '372 patent would

understand how to make Form 5 without seeding.

### 3. Mr. Moore obtained Form 5 without seeding using the methods disclosed in the '372 patent.

The only evidence of anyone actually using the recrystallization conditions

disclosed in the '372 patent shows that it resulted in the formation of Form 5

crystals without seeding.  Specifically, the district court found—again, based on

Mr. Moore's "credible" testimony—that he "was able to make Form 5

successfully" using "largely the same method (i.e., solvent system, temperature, time, and amount of material) as described in [the third paragraph of] Example 17 of the '372 patent, but *without* seeding." A36; *see also* A1939(251:17-253:16). Although Mylan attempts to downplay Mr. Moore's success by pointing to the "advantage of [his] expertise and experience" (Br. 45), the ordinarily skilled artisan would also be highly skilled. *See* A10-11(¶¶31, 34). The district court expressly found that it would not require undue experimentation for an ordinarily skilled artisan to apply the teachings of the '372 patent to obtain Form 5 without seeding, just as Mr. Moore did. A35. Indeed, Mylan can hardly criticize Mr. Moore's success when, as the district court pointed out, Mylan's own expert did not even attempt to make Form 5. A36; A1994-1995(473:23-474:16). Moreover, the fact that it took Mr. Moore only two weeks of actual work to arrive at the appropriate recrystallization conditions for making Form 5 further suggests that any additional experimentation by an ordinarily skilled artisan—with the benefit of the patent's disclosure—would not be undue. A1941(258:8-16).[11]

---

[11]  Mylan's suggestion that Mr. Moore's experiments were "private" and "undisclosed" (Br. 42-43) is incorrect. Mr. Moore explained that his experiments are reflected in the specification of the '372 patent. A1939(253:7-11) ("Q. And is this experiment, number five, reported as part of example 17 in your patent, JTX-1? A. Yes, it was. It was paragraph three."). And the district court found that one of those experiments used largely the same methods as disclosed in the third paragraph of Example 17 to obtain Form 5 without seeding. A36.

## B. Mr. Moore's Experimentation Without The Benefit Of The Patent's Disclosure Does Not Demonstrate A Lack Of Enablement.

Mylan is also incorrect (Br. 43-46) that Mr. Moore's experimentation with respect to Form 5 suggests that claim 18 is not enabled. Enablement depends upon whether the teachings of the *patent's specification*, in the context of what was known to a person of ordinary skill in the art, are sufficient to enable him to practice the invention. *Cephalon*, 707 F.3d at 1336. Mylan's suggestion (Br. 44) that Mr. Moore obtained Form 5 without seeding in only one out of eight experiments is misleading. The seven supposedly failed experiments that Mylan points to were performed without the benefit of the patent's disclosure and are irrelevant to the question of enablement. A1935(235:5-237:16); A3125-3126; *see Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998) ("A party who wishes to prove that the claims of a patent are not enabled by means of a failed attempt to make the disclosed invention must show that the patent's disclosure was followed."). In fact, it was that very experimentation that allowed Mr. Moore to discover the appropriate conditions to recrystallize Form 5 that are disclosed in the '372 patent. A1937(243:21-244:18) (Moore) ("[I]t was my job to continue working on it, to figure out what the conditions were…. So I was on a process, and I hadn't gotten to the end yet."). The inventor's own process of discovery without the benefit of the patent's specification does not suggest, let

alone prove, a lack of enablement. *See In re Wands*, 858 F.2d 731, 740 (Fed. Cir. 1988) (rejecting the inventors' failed experiments as evidence of a lack of enablement because they merely reflected that the inventors were learning a new technique); *cf.* 35 U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was made.").

Of course, once Mr. Moore determined the appropriate conditions for making Form 5, he was able to make it consistently both with and without seeding. A17-19(¶¶55-62); A36; A1940(256:14-257:7). That is reflected in Mr. Moore's contemporaneous notebook after Mr. Moore obtained Form 5 in six out of seven experiments: "Excellent. Produced Form V Repeatedly." A3147; *see also* A36. Contrary to Mylan's suggestion (Br. 43), the inventors upheld their end of the "patent bargain" and disclosed the appropriate recrystallization conditions for Form 5 that Mr. Moore discovered. A35. As the district court observed, Mr. Moore's success using the same recrystallization conditions disclosed in the '372 patent confirms that claim 18 is enabled. A36.

### C. Mylan's Speculation About Hypothetical Forms Of Efavirenz Cannot Meet Mylan's Burden Of Clear And Convincing Proof.

There is no support for Mylan's assertion that there are "'thousands of' other potential forms within the scope of claim 18." Br. 38. Tellingly, the only record material that Mylan cites beyond its own attorney argument (A2193(936:11-18); A2329-2930) is testimony from BMS's expert Dr. Atwood. *E.g.*, A10366 (citing

- 43 -

A2115(784:4-20)).  But Dr. Atwood never said there were "thousands" of polymorphs that could potentially meet the claim; all he said was that, as a matter of mathematics, there are many ways to pick six values out of a list of eleven:

> Q.  Just eyeballing it, would it surprise you that there is 1,024 possible combine [sic] combinations that meet the [XRPD] limitations of claim 16?

> A.  You're taking me back to college algebra.  A combination of eleven things taking six at a time, it's been a long time since I had that.

> Q.  Would you agree that there is a lot of them?

> A.  There would be a lot of different combinations, yes.

A2115(784:9-20).  That calculation ignores the additional requirements of claim 18 that the polymorph must (i) be composed of efavirenz and (ii) have a DSC peak at about 108 °C to about 110 °C.  A103(29:30-32).  Mylan's assertion (Br. 58) that there are "'a lot of' other polymorphs … that are encompassed by the claim" is incorrect because it does not take into account all of the claim limitations.

Mylan also created several hypothetical XRPD patterns corresponding to the 2θ values required by claim 18.  *See* Br. 48-49 (Figs. 5-6).  But those hypothetical XRPD patterns do not correspond to any *actual* efavirenz polymorph; they are entirely made up.  A2123(813:7-11) (Atwood) ("[T]his is a hypothetical pattern that you can draw it any way you want.").  Such speculation is no basis for establishing a lack of enablement.  *See, e.g.*, *Alcon*, 2014 WL 1013076, at *6 (finding "unsubstantiated conclusory" testimony insufficient to prove lack of

enablement); *Bio Tech. Gen. Corp. v. Genentech, Inc.*, 267 F.3d 1325, 1333 (Fed. Cir. 2001) (rejecting lack of enablement argument "based on a hypothetical non-enabled codon sequence"); *cf. In re Metcalfe*, 410 F.2d 1378, 1382-1383 (C.C.P.A. 1969) (rejecting argument that the claimed invention might not be enabled in the future as "too speculative to justify a holding that the disclosure is insufficient under [§] 112"). Moreover, Mylan's hypothetical XRPD patterns illustrate only a single claim limitation. Dr. Atwood therefore did not "admit[]" that "the '372 patent does not enable the many other polymorphs potentially within the scope of claim 18" when discussing those hypothetical patterns. Br. 50. On the contrary, Dr. Atwood was clear that Mylan's hypothetical XRPD patterns do not suggest that any polymorph other than Form 5—real or imaginary—meets all of the claim limitations. A2123(813:12-20; 815:18-816:2) ("Well, I agree that you've drawn these up so that there are six peaks that match. I'm not testifying that each of these is actually Form 5. I don't see, for example, the DSC.").

It is undisputed that there are only five known polymorphs of efavirenz. A6(¶9); A2124(817:4-13) (Atwood) ("But remember, there are only five forms of efavirenz. And none of those are hypothetical."). The district court expressly found that only one, Form 5, meets all the limitations of claim 18. A35 n.13 ("[T]he evidence established that only one existing form of material satisfies the requirements of claim 18: Form 5 of crystalline efavirenz."). Claim 18 is

therefore unlike the broad genus or other open-ended claims encompassing thousands of potential species that this Court has found not enabled. *See, e.g.*, *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1385 (Fed. Cir. 2013) (holding that a broad genus claim was not enabled where it encompassed tens of thousands compounds that would require undue experimentation to screen). Indeed, despite Mylan's assertions about the supposed breadth of claim 18 (Br. 47), Mylan has not identified any actual efavirenz polymorph that meets all of the claim limitations and yet is not taught by the '372 patent.

In addition to lacking factual support, Mylan's arguments about hypothetical polymorphs fail as a matter of law. Any potential later-discovered polymorphs that might meet the claim limitations are irrelevant to the question of enablement, which is determined as of the filing date. *See Chiron*, 363 F.3d at 1254 ("The law does not expect an applicant to disclose knowledge invented or developed after the filing date. Such disclosure would be impossible.").

## III. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT MYLAN FAILED TO PROVE A LACK OF ADEQUATE WRITTEN DESCRIPTION SUPPORT FOR CLAIM 18.

To satisfy the written description requirement, "the disclosure of the application relied upon [must] reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en

banc).  For chemical inventions, the written description requirement is satisfied where the specification discloses "relevant identifying characteristics" that distinguish a claimed compound from other materials.  *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002); *see also Pfizer Inc. v. Teva Pharm. USA, Inc.*, Nos. 2012-1576, *et al.*, 2014 WL 463757, at *5 (Fed. Cir. Feb. 6, 2014) (nonprecedential).  Such characteristics include disclosure of "complete or partial structure" or "other physical and/or chemical properties."  *Enzo*, 323 F.3d at 964.

### A. The '372 Patent Sufficiently Describes The Relevant Identifying Characteristics For Efavirenz Form 5.

As the district court found, the "relevant identifying characteristics" of efavirenz Form 5 are sufficiently described in the '372 patent.  A38.  Claim 18 discloses that Form 5 is composed of crystalline efavirenz and "contains specific numeric requirements that define the physical characteristics of Form 5:  an x-ray powder diffraction pattern with six or more of the specified eleven $2\theta$ values and DSC peak at about 108° C to 110° C."  A31.  That is exactly what is described in the patent's specification, which undisputedly provides the full chemical name and structure for efavirenz, along with the identifying XRPD and DSC peaks that provide literal support for claim 18.  *E.g.*, A89(1:32-49) (providing the chemical name and structure for efavirenz); A92(8:40-67) (listing characteristic XRPD peaks for Form 5); A95(13:23-24) ("Form 5 has a melting point of about 108° C. to about 110° C., observed by differential scanning calorimetry.").

That disclosure is more than sufficient to demonstrate to a person of ordinary skill in the art that the inventors were in possession of Form 5. Indeed, it is customary in the field of chemistry to identify a particular polymorph by listing only characteristic peaks—not all peaks that might appear in the XRPD pattern. A2090(681:23-682:16) (Atwood) ("Q. … [I]s it important to a person of skill in the art to list every single peak, all of the peaks? A. No, it's not important to one of skill in the art. And that's not the way the listings are normally done."). A person of skill would thus neither expect nor rely upon a full listing, but would instead "focus on characteristic peaks, peaks that allowed one to make a differentiation in the case." A2090(681:24-682:7, 683:3-13) (Atwood).

Mylan does not dispute that the '372 patent discloses these characteristics. Instead, Mylan argues that the inventors were required to disclose a full XRPD pattern and DSC thermogram for Form 5. Br. 53-57. But Mylan never explains why that additional information is necessary to convey that the inventors were in possession of Form 5, let alone attempt to show clear error in the district court's finding that the characteristic XRPD and DSC peaks identified in the '372 patent are the relevant identifying characteristics for Form 5. Mylan's argument that "[a] person of ordinary skill would have expected an inventor who actually possessed Form 5 to have been able to provide" the full XRPD pattern and DSC thermogram (Br. 54) ignores the applicable legal standard, which requires only disclosure of the

relevant identifying characteristics. *See Enzo*, 323 F.3d at 964. An inventor is not required to disclose every possible characteristic of the claimed invention to provide adequate written description. *See Alcon*, 2014 WL 1013076, at *9 (explaining that "all that the written description requirement demands" is a disclosure that "demonstrate[s] that the inventors possessed the claimed invention"); *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (holding that "it is unnecessary to spell out every detail of the invention in the specification" because patent disclosures are written for persons of ordinary skill in the art).

Mylan suggests (Br. 56-57) that claim 18 is "inherently ambiguous" because it contains a listing of XRPD peaks that are "possessed by the four other forms disclosed in the patent-in-suit." But that argument ignores what claim 18 actually requires: a crystalline form of efavirenz with six or more of the eleven listed $2\theta$ values *and* a DSC peak at about 108 °C to about 110 °C. A103(29:30-32). None of the efavirenz polymorphs other than Form 5 meets *both* of those requirements.

Mylan is also incorrect that the prosecution history of the '372 patent suggests a lack of written description. Br. 55. The applicants withdrew an incorrect XRPD pattern and DSC thermogram for Form 5, but they recognized that the correct identifying XRPD and DSC characteristics of Form 5 were already disclosed in the specification. A3866. The Patent Office apparently agreed,

allowing the claims to Form 5 to issue immediately after the applicants withdrew the erroneous XRPD pattern and DSC thermogram. A3868. As the district court found, the removal of incorrect information during prosecution "would not lead one of ordinary skill in the art to ignore the explicit disclosure of the '372 patent specification." A39. Again, Mylan does not suggest that finding is clearly erroneous.

### B. The '372 Patent Need Not Provide Written Description For Mylan's Hypothetical Embodiments.

Mylan also argues that the '372 patent is invalid for failure to describe the "whole class" of "a lot of" other efavirenz polymorphs that could potentially fall within the scope of claim 18. Br. 58. Mylan, however, fails to identify any such polymorph, and its speculation is no basis for finding a lack of written description. *See Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, No. 2013-1406, ___ F.3d ___, 2014 WL 642714, at *7 (Fed. Cir. Feb. 20, 2014) (finding no clear and convincing proof of invalidity for lack of written description where the "evidence established only a hypothetical possibility" that the inventors were not in possession of the full scope of the claimed invention).

Indeed, this is not a case where the claim encompasses a wide range of possibilities or uses functional language to cover "yet-unidentified ways of achieving a desired result." *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, No. 2013-1593, ___ F.3d ___, 2014 WL 685650, at *7 (Fed. Cir. Feb. 24, 2014).

- 50 -

There are only five known polymorphs of efavirenz. A6(¶9). And as Mylan stipulated before trial, all five are disclosed in the '372 patent. A1321(¶32) ("The '372 patent discloses different crystalline forms that the inventors of the patent refer to as Forms 1, 2, 3, 4, and 5."). The district court explicitly found that Form 5 is the only known efavirenz polymorph that satisfies the specific requirements of claim 18 (A35 n.13) and repeatedly rejected Mylan's speculative arguments about other possible polymorphs due to the lack of supporting evidence:

- "Mylan has not offered evidence of any other compound that satisfies the other requirements of claim 18 (e.g., $2\theta$ values) and would render the endothermic/exothermic distinction pertinent. Mylan's hypothetical speculation does not constitute clear and convincing evidence of indefiniteness." A31.

- "The Court also does not agree that there are 'thousands of distinct characterizations of material that would be considered Form 5.' At trial the evidence established that only one existing form of material satisfies the requirements of claim 18: Form 5 of crystalline efavirenz." A35 n.13 (citation omitted).

- "There is no evidence in the record that a crystal form of efavirenz exists which satisfies the requirements of claim 18, but has an *exothermic* peak at about 108°C to about 110°C. Mylan cites no authority for the suggestion that a patent may be found invalid for lack of enablement based on the patent's failure to enable one of skill in the art to make a compound that does not exist." A37.

Mylan's continued speculation on appeal is no basis for disturbing the district court's well-reasoned factual finding that claim 18 is supported by adequate written description.

## C.    Mylan's Policy Arguments Do Not Undermine The District Court's Well-Reasoned Factual Findings In This Case.

Unable to demonstrate any error—let alone clear error—in the district court's factual findings, Mylan offers three policy arguments to suggest that the inventors should have disclosed the full XRPD pattern and DSC thermogram for Form 5. None of those arguments is correct or has any application to this case.

*First*, Mylan argues that the disclosure of the '372 patent allowed BMS to "sidestep prior art that otherwise would not be distinguishable." Br. 59. But Mylan never offers *any* evidence that BMS did anything of the sort. Mylan's suggestion (Br. 60) that BMS could have identified other XRPD peaks that Form 5 supposedly shares in common with Form 3 does not indicate a lack of novelty or obviousness because it says nothing about the relevant differences between Form 3 and Form 5.

*Second*, Mylan's argument that BMS's disclosure "invites exactly the type of overreaching the written description requirement was designed to guard against" is inconsistent with the facts of this case. Br. 59 (internal quotation marks omitted). There is no dispute that Mr. Moore *actually* possessed Form 5. A1933(226:6-14); A3124 ("This sample of long needles of [efavirenz] is a previously undiscovered crystal form."); A3235 ("The structure is the fifth polymorph which has been found for this compound."). Claim 18 covers exactly what Mr. Moore discovered, and the district court correctly found that there are no

other known efavirenz polymorphs that fall within the scope of claim 18.

A35 n.13. There is no violation of the written description requirement where, as here, there is no evidence that the claims go beyond what the inventor actually discovered. *See GlaxoSmithKline*, 2014 WL 685650, at *6 (finding adequate written description where "the claim is no broader in scope than the written description").

*Third*, Mylan's speculative arguments about "patent evergreening" (Br. 60) are incorrect and, in any event, inapplicable here. The disclosure of relevant identifying characteristics for Form 5 in the '372 patent eliminates any possibility of patent evergreening. It would not be possible to obtain claims in the future that cover other peaks in the XRPD pattern for Form 5 because those claims would be anticipated by the '372 patent. To the extent that a new polymorphic form might later be discovered that has additional XRPD peaks that are distinct from Form 5, that is a separate invention—not evergreening.

## IV. THE DISTRICT COURT CORRECTLY CONCLUDED THAT CLAIM 18 IS NOT INDEFINITE.

To prove indefiniteness, "an accused infringer must demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011). Because the metes and

bounds of the claimed invention are readily apparent, claim 18 is not invalid for indefiniteness.[12]

### A. Claim 18 Clearly Delineates The Scope Of The Invention.

There is no dispute about what claim 18 requires. As the district court found, claim 18 "contains *specific numeric requirements* that define the physical characteristics of Form 5: an x-ray powder diffraction pattern with six or more of the specified eleven $2\theta$ values and DSC peak at about 108° C to 110° C." A31 (emphasis added). Such "exact values" and "numbers that set the boundaries of [the claimed] range" make the scope of the claim "readily ascertainable." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013); *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1252 (Fed. Cir. 2008) (holding that a claim would not be invalid for indefiniteness where it requires a "specific numeric range" for a "physical property" of the invention). The indefiniteness analysis here begins and ends with those bright-line boundaries in the claim itself.

---

[12] Mylan asks to submit supplemental briefing following the Supreme Court's decision in *Biosig Instruments, Inc. v. Nautilus, Inc.* Br. 62 n.10. But there is no need for additional briefing because the disposition of Mylan's argument does not depend upon the "insolubly ambiguous" standard under review. *See Ancora Techs., Inc. v. Apple, Inc.*, Nos. 2013-1378, -1414, ___ F.3d ___, 2014 WL 803104, at *5 (Fed. Cir. Mar. 3, 2014) (rejecting indefiniteness challenge because there was "no reasonable uncertainty about the boundaries of the claims at issue" regardless of the standard announced in *Biosig*). Claim 18 contains specific numerical limitations that are readily ascertainable to an ordinarily skilled artisan under any standard.

Lacking any argument that the claim language itself is unclear, Mylan attempts to create ambiguity by twisting the district court's construction of "characterized by" to suggest that there is some confusion as to the scope of claim 18. Br. 64. Although the district court construed "characterized by" to refer to "the physical characteristics recited in the subject claims, which may or may not distinguish it from other forms of efavirenz" (A1219), it further construed "Form 5," the subject of claim 18, as "[a] polymorphic crystal form of [efavirenz] that can be distinguished from other forms" (A1222). Individually, the claimed 2θ values and DSC peak that characterize Form 5 need not distinguish it from other forms of efavirenz. Taken together, however, those characteristics are what differentiate Form 5 from other efavirenz polymorphs. Mylan's arguments about the district court's claim construction cannot create ambiguity where there simply is none.

## B. Mylan's Argument That Claim 18 Encompasses Other Polymorphs Of Efavirenz Is Irrelevant To Indefiniteness.

Contrary to Mylan's argument (Br. 64-66), claim 18 does not encompass Form 3 of efavirenz. As explained below (pp. 59-63), and as the district court correctly found (A24-29), Mylan failed to establish that Form 3 meets either the XRPD or DSC limitations of claim 18. But even if claim 18 encompassed Form 3, that would not render the claim indefinite. Rather, as this Court has explained, where the scope of the claim is clear, the "focus would properly be on other validity challenges (e.g. anticipation)." *Halliburton*, 514 F.3d at 1252.

Accordingly, Mylan's arguments regarding Form 3 have no bearing on the indefiniteness analysis.

Mylan's speculation about the existence of hypothetical efavirenz polymorphs (Br. 67-68) is similarly irrelevant to indefiniteness. The boundaries of claim 18 are clearly defined regardless of what may fall within them.[13]

## V. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT FORM 3 DOES NOT INHERENTLY ANTICIPATE CLAIM 18.

"To prove that a claim is invalid for anticipation, 'the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention.'" *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1377 (Fed. Cir. 2012) (citation omitted). If the prior art reference does not expressly disclose all the claim limitations, it may anticipate if the missing characteristics are inherent within it. *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). "[W]hen the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence." *Metabolite Labs. v. Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1367 (Fed. Cir. 2004) (quoting *Continental Can*,

---

[13] Mylan's policy argument (Br. 69-70) that BMS could claim additional or disclaimed polymorphs within the scope of claim 18 is incorrect. An assertion of infringement by a later-developed efavirenz polymorph would be addressed by other invalidity challenges. *See Halliburton*, 514 F.3d at 1252. Mylan's suggestion (Br. 70) that BMS could assert infringement of claim 18 by Form 3 is factually incorrect because Form 3 does not meet both the XRPD and DSC limitations of claim 18. *See infra* pp. 59-63.

948 F.2d at 1268). Any such extrinsic evidence "must make clear that the missing descriptive matter is *necessarily* present in the thing described in the reference." *Id*. (emphasis added).

### A. Inherent Anticipation Is Inapplicable Because The Prior Art Expressly Discloses That Form 3 Does Not Meet The DSC And XRPD Limitations Of Claim 18.

The '729 patent—the only prior art disclosure of efavirenz Form 3—is not "silent" about either the DSC or XRPD limitations of claim 18. Instead, the '729 patent expressly discloses a DSC peak for Form 3 at 118 °C (*i.e.*, outside the claimed range) and only five of the requisite 2θ values. A13(¶¶42-43); A2762; A2766(5:15-60). Mylan's recourse to the doctrine of inherent anticipation therefore is improper: there is no "gap" to fill, but instead an explicit prior art disclosure concerning the characteristics of Form 3 that Mylan wishes to rewrite. *See Metabolite Labs.*, 370 F.3d at 1367.

This case is accordingly unlike those that Mylan cites (Br. 76) where different sources measured different characteristics so that one showed an intrinsic property that the other did not assess. *See In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1373 (Fed. Cir. 2007) (affirming inherent anticipation finding where the anticipatory reference was silent as to a particular limitation); *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1378 (Fed. Cir. 2003) (affirming inherent anticipation finding where "the prior art supplie[d] no express description of any

part of the claimed subject matter"); *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1348 (Fed. Cir. 1999) (affirming inherent anticipation finding where a single limitation was not expressly addressed in the prior art). In contrast, the '729 patent measured the DSC and XRPD properties of Form 3 and disclosed values that undisputedly do not meet either limitation. A13(¶¶42-43); A2762; A2766(5:15-60).

Moreover, to prove inherency, Mylan must show that the prior art *necessarily* meets the claim limitations. *See, e.g.*, *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-1048 (Fed. Cir. 1993) (requiring allegedly anticipatory prior art to meet claimed limitations consistently in order to anticipate). No matter what is shown by the other documents (which, in fact, repeatedly confirm that Form 3 does not meet the claim limitations (*see infra* pp. 59-63)), they are insufficient to demonstrate that Form 3 necessarily possesses the claim limitations when the '729 patent itself says that it does not.

### B. The District Court Correctly Found That Neither The DSC Limitation Nor The XRPD Limitation Is Met By Form 3.

It is Mylan's burden to show by clear and convincing evidence that Form 3 necessarily meets *both* the DSC and XRPD limitations of claim 18, but Mylan did not present sufficient proof that either limitation is satisfied. The district court did not clearly err in finding that neither the claimed DSC peak nor the requisite six of the eleven listed $2\theta$ values is inherent to Form 3.

### 1.    Form 3 does not necessarily have a DSC peak between about 108 ºC to about 110 ºC.

The district court's finding that "Mylan has failed to establish by clear and convincing evidence that Form III in the '729 patent has a DSC peak between 108° and 110° C, as required by claim 18 of the '372 patent" (A26) is well-supported. *First*, the '729 patent expressly states that Form 3 has a DSC peak at 118 °C (A2766(5:55-60)), which is obviously different from the range claimed in the '372 patent, as the experts for both parties agreed.  *See* A1993-1994(469:17-470:7) (Hollingsworth); A2091(686:11-687:8) (Atwood).  *Second*, the 118 °C peak of the '729 patent is consistent with the data reported in the BMS Encyclopedia, which shows a peak at 117 °C.  A7714; *see also* A26; A1993(468:10-19) (Hollingsworth); A2092(690:20-691:19) (Atwood).  As the district court found: "Taken together, this evidence supports a finding that Form III has a DSC peak at about 117° C."  A26.

Mylan has not even attempted to show clear error in that finding.  Instead, Mylan's only argument is that BMS is somehow estopped from denying that Form 3 meets the DSC limitation of claim 18 based on the disclosure of the '372 patent, which identifies a DSC peak for Form 3 that matches the claimed range.  Br. 77 (citing A91(6:41-44); A94(12:46-48)).  But BMS's representation during prosecution that Form 3 of the '372 patent corresponds with Form III of the '729 patent (A3862) is not a statement that Form 3 *necessarily* has the DSC peak

disclosed in the '372 patent, which is the relevant question for inherency. *Continental Can*, 948 F.2d at 1268. Indeed, BMS could not have said that Form 3 always has the requisite DSC peak to satisfy claim 18 because the '729 patent itself confirms that it does not. A2762; A2766(5:55-60); *see also* A13(¶44); A25; A1993-1994(469:17-470:7) (Hollingsworth); A2091(686:11-687:8) (Atwood).

Mylan is also incorrect that "the district court disregarded the evidence that Form 3 … has a DSC peak falling within the claimed temperature range." Br. 61. The district court undeniably considered the disclosure in the '372 patent (A25) but found it, and Mylan's theory about that disclosure, insufficient to carry Mylan's burden in light of the other record evidence, which repeatedly shows that Form 3 does not have a DSC peak at about 108 °C to about 110 °C. A26.

Mylan's own expert conceded, in light of all the record evidence, that the DSC peak disclosed in the '372 patent could just be a "mistake." A1994(471:6-472:1). A potential mistake is hardly clear and convincing proof of inherency, let alone evidence of clear error in the district court's factual findings. Mylan's expert was fully able to confirm the actual DSC peak for Form 3 through his own testing, but did not bother to do so despite the apparent conflict in the disclosures of the '372 patent on the one hand and the '729 patent and the BMS Encyclopedia on the other. A26; A1994(473:11-22) (Hollingsworth) ("[C]ertainly it's easy to put the sample in the DSC and run it."). The district court correctly found that Mylan had

not carried its burden to show by clear and convincing evidence that Form 3 necessarily has a DSC peak at about 108 °C to about 110 °C.

### 2. Form 3 does not necessarily possess six or more of the requisite 2θ values.

Without the required DSC peak, Form 3 cannot anticipate claim 18 regardless of its XRPD pattern, and the Court need not consider Mylan's arguments with respect to the XRPD limitation. Nevertheless, Mylan also failed to show that Form 3 inherently possesses six or more of the 2θ values required by claim 18.

It is undisputed that the '729 patent characterizes Form 3 as having only five of the claimed 2θ values, even though the entire XRPD pattern is disclosed. A13(¶42); A2761; A2766(5:15-50); A2093(694:8-16). Similarly, the BMS Encyclopedia—which is BMS's reference standard for the properties of the efavirenz polymorphs—undisputedly characterizes Form 3 as having only four of the claimed 2θ values (again, even though the entire XRPD pattern was measured and disclosed). A2095(703:18-704:4); A2112(769:24-770:6); A3514. As the district court found, "Mylan has not offered any single x-ray powder diffraction pattern that, on its own, contains at least six of the 2θ values recited in claim 18." A29. If Mylan cannot identify a single sample of Form 3 that meets the XRPD limitation of claim 18 even once, it can hardly say that limitation is inherent to Form 3.

Mylan's argument with respect to the XRPD limitation rests largely on testimony from its expert that *one* of the multiple characterizations of Form 3—Dr. Radesca's sample—has eight XRPD peaks that correspond to the eleven listed 2θ values in claim 18. A1970(375:8-377:11) (Hollingsworth). But Mr. Moore and the experts for both parties agreed that the purity of Dr. Radesca's sample is unknown. A1932(222:3-8) (Moore); A1992(462:4-463:15) (Hollingsworth); A2093-2094(694:24-697:9) (Atwood). Mylan therefore cannot rely on Dr. Radesca's sample to establish which of the eight peaks it identified are necessarily attributable to Form 3 because, as the district court found, it is possible that some are attributable to other polymorphs or impurities in the sample. A27-28; *see also* A2093(695:17-696:5).

Mylan nevertheless argues that its failure of proof on this point is irrelevant because Dr. Radesca's sample merely "confirms the presence" of six peaks that appear in other samples. Br. 75. But a sample that undisputedly is of unknown purity cannot confirm anything. And Mylan ignores the testimony from BMS's expert that the supposedly confirmatory "peaks" in Dr. Radesca's sample are not sufficient increases above the background noise to be attributable to the crystal structure. A2094(697:21-698:24) (Atwood). Indeed, Mylan's own expert agreed that such "noise makes it difficult to know what's a peak and what's not." A1991(458:16-21) (Hollingsworth).

Putting aside those evidentiary deficiencies, Mylan's argument fails as a legal matter because Mylan's burden is to show that the limitation is "*necessarily present in the thing described in the reference.*" *Continental Can*, 948 F.2d at 1268 (emphasis added). Showing that a particular peak is *sometimes* present is insufficient. If anything, the fact that the samples of Form 3 in the record do not consistently have peaks at the same $2\theta$ values that Mylan identified in Dr. Radesca's sample confirms those XRPD peaks are *not* inherent to Form 3.

Even if Mylan had shown that Dr. Radesca's sample meets the XRPD limitation (which the district court correctly found that Mylan had not), there is no DSC information available for it. A1992(463:16-464:2) (Hollingsworth). The absence of any DSC information for Dr. Radesca's sample—coupled with the district court's factual finding that Form 3 has a DSC peak at 117 °C, not at about 108 °C to about 110 °C (A26)—prevents Mylan from meeting its burden of proving that all of the claim limitations are necessarily present in Form 3.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

/s/ William F. Lee

AMY K. WIGMORE
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

PAUL H. BERGHOFF
JAMES C. GUMINA
MCDONNELL BOEHNEN HULBERT
   & BERGHOFF LLP
300 S. Wacker Drive, Suite 3200
Chicago, IL 60606
(312) 913-0001

March 20, 2014

WILLIAM F. LEE
LAUREN B. FLETCHER
ANDREW J. DANFORD
SARAH R. FRAZIER
MICHAELA P. SEWALL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Appellees Bristol-Myers Squibb Company, Bristol-Myers Squibb Pharma Co., Merck & Co., Inc., and Merck Sharp & Dohme Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Appellees with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 20th day of March, 2014, and served a copy on counsel of record by the CM/ECF system.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

March 20, 2014

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), the brief contains 13,994 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

March 20, 2014